IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and )
BOSTON SCIENTIFIC SCIMED, INC., )
)
)
Plaintiffs, )
)
v. )          Civil Action No. 07-765-SLR
)
JOHNSON & JOHNSON, INC. and )          **JURY TRIAL DEMANDED**
CORDIS CORPORATION, )
)
Defendants. )
)
)

### AFFIDAVIT OF NON-RESIDENCE OF
### JOHNSON & JOHNSON, INC. PURSUANT TO 10 DEL. C. § 3104

**STATE OF DELAWARE**          )
                                                     ) ss.
**COUNTY OF NEW CASTLE**          )

**BE IT REMEMBERED** that on this 10th day of December, 2007, the deponent Karen E.

Keller, personally appeared before me, a Notary Public for the State and County aforesaid, and

deposed and stated as follows:

1.       I am an attorney with the law firm of Young Conaway Stargatt & Taylor, LLP,

attorneys for the plaintiff in the above captioned matter.

2.       The defendant, Johnson & Johnson, Inc. is a non-resident of the State of

Delaware, and on November 27, 2007 and all other times pertinent, was a non-resident of the

State of Delaware. The last known available address of Johnson & Johnson, Inc. is One Johnson

& Johnson Plaza, New Brunswick, New Jersey 08933.

3.       On December 2, 2007, I caused to be mailed by registered mail an envelope to

Johnson & Johnson, Inc. at the address above. The envelope contained copies of a Notice in the

054604.1003

form attached hereto as Exhibit 1, and copies of the Summons and Complaint, attached hereto as

Exhibit 2, to the last-known address listed in paragraph 2 of this Affidavit.  Attached hereto as

Exhibit 3 is the receipt of registered mail which was obtained at the Post Office upon mailing of

the envelope.

      4.     On December 7, 2007, I received from the United States Post Office the return

receipt showing delivery and acceptance by Johnson & Johnson, Inc. of the envelope.  Pursuant

to Local Rule 4.1(b), said return receipt is attached hereto as Exhibit 4.

Karen E. Keller (#4489)

**SWORN TO AND SUBSCRIBED** before me, a Notary Public in and for the

State and County aforesaid, on the day and year first above written.

Notary Public

My Commission Expires: __2|16|2009__

054604.1003

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| | ) |
| v. | ) Civil Action No. 07-765 |
| | ) |
| JOHNSON & JOHNSON, INC. and CORDIS CORPORATION, | ) **JURY TRIAL DEMANDED** ) ) |
| | ) |
| Defendants. | ) ) |
| | ) |

**NOTICE**

TO:    JOHNSON & JOHNSON, INC.
       One Johnson & Johnson Plaza
       New Brunswick, NJ 08933

PLEASE TAKE NOTICE that there has been served upon the Secretary of State of the

State of Delaware the original of a Summons and Complaint, copies of which are attached

hereto, in which you are named as a defendant in an action brought by Boston Scientific

Corporation and Boston Scientific Scimed, Inc. Said Summons and Complaint were served upon

the Secretary of State of the State of Delaware on November 27, 2007, and service of process

was filed with the United States District Court for the District of Delaware on November 28,

2007. Under the provisions of 10 Del. C. § 3104, service of the original Summons and

Complaint upon the Secretary of State as aforesaid is as effectual to all intents and purposes as if

it had been made upon you personally within the State of Delaware.

Failure on your part to obey the command of the within writ could result in a default judgment being taken against you.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
jingersoll@ycst.com
kkeller@ycst.com
(302) 571-6554

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. Delucia
Paul M. Richter
Michael K. Levy
Jerry Canada
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated:  November 28, 2007

# EXHIBIT 2
# PART 1

AO 440 (Rev. 10/93) Summons in a Civil Action

# United States District Court

<table>
<tr><td>**DISTRICT OF**</td><td>DELAWARE</td></tr>
</table>

BOSTON SCIENTIFIC CORPORATION
and BOSTON SCIENTIFIC SCIMED, INC.,

           Plaintiffs,

      v.

JOHNSON & JOHNSON, INC. and CORDIS
CORPORATION,
          Defendants.

**SUMMONS IN A CIVIL CASE**

CASE NUMBER:

0 7 - 7 6 5

TO:

JOHNSON & JOHNSON, INC.
c/o Secretary of State
Division of Corporations
John G. Townsend Bldg.
401 Federal Street, Suite 4
Dover, DE 19901

**YOU ARE HEREBY SUMMONED** and required to serve upon PLAINTIFF'S ATTORNEY (name and address)

Josy W. Ingersoll, Esquire
Karen E. Keller, Esquire
Young Conaway Stargatt & Taylor, LLP
1000 West Street, 17th Floor
P. O. Box 391
Wilmington, DE  19899-0391

an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint.  You must also file your answer with the Clerk of this Court within a reasonable period of time after service.

PETER T. DALLEO

NOV 2 7 2007

CLERK

DATE

_(signature)_

(BY) DEPUTY CLERK

DB01:2484265.1

054604.1003

AO 440 (Rev 10/93) Summons in a Civil Action

| RETURN OF SERVICE |||
|---|---|---|
| Service of the Summons and Complaint was made by me[1] || DATE _November 27 2007_ |
| NAME OF SERVER (*PRINT*) _Bryan Steilke_ || TITLE _Process Server_ |

*Check one box below to indicate appropriate method of service*

☑ Served personally upon the defendant.   Place where served: _Secutary of State_
_401 federal street, Dever DE 1904. Service Accepted by Rebecca_
_Daniels @ 2:05 pm._

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.   Name of person with whom the summons and complaint were left: _____

_____

☐ Returned unexecuted: _____

_____

_____

☐ Other (specify): _____

_____

_____

| STATEMENT OF SERVICE FEES |||
|---|---|---|
| TRAVEL | SERVICES | TOTAL |

| DECLARATION OF SERVER |
|---|
| I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.<br><br>Executed on _Nov 27 2007_          _____<br>      Date                                                    Signature of Server<br><br><br><br>          _15 East North Street Dever DE 19901_<br>          Address of Server |

[1] As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOSTON SCIENTIFIC CORPORATION and )
BOSTON SCIENTIFIC SCIMED, INC.,      )
                                     )
                                     )      **0 7 - 7 6 5**
          Plaintiffs,                )
                                     )      Civil Action No. _____
                                     )
     v.                              )      **JURY TRIAL DEMANDED**
                                     )
JOHNSON & JOHNSON, INC. and          )
CORDIS CORPORATION,                  )
                                     )
          Defendants.                )
                                     )

**COMPLAINT FOR DECLARATORY JUDGMENT
OF PATENT INVALIDITY AND NONINFRINGEMENT**

          Plaintiffs Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively

"BSC"), through their attorneys, bring this complaint against Defendants Johnson & Johnson,

Inc. and Cordis Corporation (collectively "J&J") and requests a jury trial on all issues so triable.

BSC alleges as follows, upon knowledge with respect to itself and its own acts, and upon

information and belief as to the circumstances and facts of others:

## NATURE OF THE ACTION

          1.     This is an action for a declaratory judgment that United States Patent No.

7,300,662 entitled "Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular

Disease" (the "Falotico '662 patent") is invalid and not infringed by BSC.  The Falotico '662

patent is attached as Exhibit A.

## THE PARTIES

2.     Plaintiff Boston Scientific Corporation is a corporation organized under the laws of the State of Delaware, having its principal place of business at One Boston Scientific Place, Natick, Massachusetts 01760.

3.     Plaintiff Boston Scientific Scimed, Inc. is a corporation organized under the laws of the State of Minnesota, having its principle place of business at One Scimed Place, Maple Grove, Minnesota 55311.

4.     Upon information and belief, Defendant Johnson & Johnson, Inc. is a corporation organized under the laws of the State of New Jersey and has a principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

5.     Upon information and belief, Defendant Cordis Corporation ("Cordis") is a corporation organized under the laws of the State of Florida and has a principal place of business in Miami Lakes, Florida.  Cordis is a subsidiary of Johnson & Johnson, Inc.

## JURISDICTION AND VENUE

6.     This action arises under the Patent Laws of the United States (35 U.S.C. § 1, *et seq.*).

7.     This Court has jurisdiction over the subject matter of all causes of action herein pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201 and 2202.

8.     On information and belief, J&J has systematic and continuous contacts in this judicial district.

9.     On information and belief, J&J regularly avails itself of the benefits of this judicial district, including the jurisdiction of the courts.

2

10.    On information and belief, J&J regularly transacts business within this judicial district.

11.    On information and belief, J&J regularly sells products in this judicial district. J&J derives substantial revenues from sales in this district.

12.    This Court has personal jurisdiction, general and specific, over J&J.

13.    Venue in this judicial district is proper pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b).

## BACKGROUND

14.    BSC is a world renowned leader in the development of intravascular stents used to treat coronary artery disease.

15.    J&J and, in particular, Cordis, directly compete with BSC in the field of intravascular stents used to treat coronary artery disease.

16.    J&J has a well-known history of suing competitors, including BSC, in the field of intravascular stents for patent infringement. Within the past several years, J&J and/or Cordis have sued BSC in this Court, alleging patent infringement in cases involving intravascular stents used to treat coronary artery disease. BSC has also brought suits for patent infringement against J&J within this judicial district.

17.    Pursuant to an agreement between BSC and Abbott Laboratories ("Abbott"), BSC is presently selling the PROMUS™ Everolimus-Eluting Coronary Stent System ("PROMUS") in Europe and other countries outside the United States. The PROMUS stent is a private-labeled XIENCE™ V Everolimus Eluting Coronary Stent System ("XIENCE V") which is manufactured for BSC by Abbott in the United States. The PROMUS stent is an intravascular stent used to

treat coronary artery disease. It advantageously releases a drug designed to diminish reblocking (restenosis) of the patient's blood vessel into which the stent has been inserted.

18.     The PROMUS stent received CE Mark approval in October 2006, which allows BSC to distribute PROMUS in 27 countries of the European Economic Area. Since that time, BSC has been taking title to the PROMUS stent from Abbott in the United States and then exporting those stents to the European market. BSC intends to begin selling its PROMUS stent in the United States in 2008.

19.     In 2006, BSC purchased Guidant Corporation ("Guidant"). As part of the agreement governing the Guidant acquisition, Guidant separately sold the rights to its everolimus-eluting stent product to Abbott. BSC separately entered into an agreement with Abbott that permits BSC to sell (under the designation "PROMUS") the everolimus-eluting stents manufactured by Abbott (which Abbott sells on its own as its "XIENCE V" stent).

20.     Abbott currently manufactures and sells its own everolimus-eluting stent, the XIENCE V stent, which is the same product as BSC's PROMUS stent, and BSC has made a substantial investment in the PROMUS stent.

21.     On May 15, 2007, Cordis filed a Complaint against Abbott in the United States District Court for the District of New Jersey (Civil Action No. 07-2265), alleging infringement of U.S. Patent No. 7,217,286 (the "Falotico '286 patent" or alternatively, the "'7286 patent"). On May 29, 2007, Cordis filed a Complaint against Abbott in the United States District Court for the District of New Jersey (Civil Action No. 07-2477), alleging infringement of U.S. Patent No. 7,223,286 (the "Wright '286 patent" or alternatively, the "'3286 patent"). On June 12, 2007, Cordis filed a Complaint against Abbott in the United States District Court for the District of New Jersey (Civil Action No. 07-2728), alleging infringement of U.S. Patent No. 7,229,473 (the

4

"Wright '473 patent"). Collectively, these three Cordis patents are referred to as "the Asserted Cordis Patents."

22.     During the prosecution of each of the Asserted Cordis Patents, Cordis separately petitioned the United States Patent and Trademark Office for expedited consideration in view of perceived patent infringement in connection with the XIENCE V stent. Upon issuance of these three patents, Cordis promptly asserted the new patents against Abbott. Exactly the same circumstances exist with regard to the Falotico '662 patent: Cordis likewise petitioned for expedited Patent Office review of the application that led to the Falotico '662 patent based, again, on perceived infringement by the XIENCE V stent. The petition of August 7, 2006 is attached as Exhibit B.

23.     Cordis' recent pattern of promptly asserting its new patents, and in particular those patents issuing from an expedited Patent Office evaluation demanded by Cordis because of alleged infringement, has created a present substantial controversy between J&J and BSC concerning the PROMUS stent. J&J, through Cordis, has asserted rights under related patents against the same product as the PROMUS stent, and the alleged infringement of the Asserted Cordis Patents has created an apprehension that Cordis will sue BSC for alleged infringement of the Falotico '662 patent.

## RELATED CASES PENDING IN THE DISTRICT OF DELAWARE

24.     There are now five cases pending in the District of Delaware that are related to the instant case, as set forth in the below paragraphs.

25.     On September 29, 2006, Abbott filed a declaratory judgment action against J&J, alleging that other Cordis-owned patents – U.S. Patent Nos. 6,585,764 (the "'764 patent"), 6,776,796 (the "'796 patent"), and 6,808,536 (the "'536 patent") – are invalid and not infringed

5

by Abbott's manufacture and/or use of the XIENCE V stent in the Unites States. (*See* Ex. C, the complaint in Civil Action No. 06-613-SLR).[1] Although on August 8, 2007, Cordis granted Abbott a covenant not to sue on those patents, that action remains active in view of pending motions to amend the complaint, as explained below.

26.    On May 15, 2007, Abbott filed a declaratory judgment action against Cordis in the United States District Court for the District of Delaware relating to U.S. Patent No. 7,217,286 (the "Falotico '286 patent"). (*See* Ex. D, the complaint in Civil Action No. 07-259-SLR). Abbott alleges in its May 15 complaint that the Falotico '286 patent is invalid and not infringed by Abbott's manufacture and/or use of the XIENCE V stent in the Unites States. (*Id.* at p. 17). Abbott's declaratory judgment action against the Falotico '286 patent, which is currently pending in this judicial district, is the first filed action concerning the Falotico '286 patent. Also on May 15, 2007, Abbott filed a motion for leave to file a supplemental complaint or in the alternative to consolidate related cases in Civil Action No. 06-613-SLR pending before the United States District Court for the District of Delaware. (*See* Ex. E, Abbott's motion for leave to file a supplemental complaint or consolidate related cases). Abbott's motion requests leave to file a supplemental complaint to add a claim for declaratory judgment of invalidity and noninfringement of the Falotico '286 patent. (*Id.* at p. 2).

27.    On May 25, 2007, BSC filed a declaratory judgment action against Cordis in the United States District Court for the District of Delaware relating to the Falotico '286 patent. (*See* Ex. F, the complaint in Civil Action No. 07-333-SLR). BSC asserts in that May 25

---

[1] The exhibits originally filed with Exhibits C-L herein have not been attached. Exhibits C-K correspond to Exhibits C-K filed with the compliant in Civil Action No. 07-409-SLR and Exhibit L is the complaint in Civil Action No. 07-409-SLR. Should the Court require a copy of these exhibits, Plaintiffs are available to do so.

054604.1003

complaint that the Falotico '286 patent is invalid and not infringed by BSC's above-recited

activities regarding the PROMUS stent. (*Id.* at p. 6).

28. On May 29, 2007, Abbott filed a supplemental motion for leave to file a

supplemental complaint or in the alternative to consolidate related cases in Civil Action No. 06-

613-SLR pending before the United States District Court for the District of Delaware. (*See* Ex.

G, Abbott's motion for leave to file a supplemental complaint or to consolidate related cases).

Also on May 29, 2007, Abbott filed a motion for leave to file a supplemental complaint in Civil

Action No. 07-259-SLR pending before the United States District Court for the District of

Delaware. (*See* Ex. H, Abbott's supplemental motion for leave to file a supplemental

complaint). Abbott's motions request leave to file supplemental complaints to add claims for

declaratory judgment of invalidity and noninfringement of U.S. Patent No. 7,223,286 (the

"Wright '286 patent"). (Ex. G at p. 1; Ex. H at p. 1).

29. On June 1, 2007, BSC filed a declaratory judgment action against J&J in the

United States District Court for the District of Delaware relating to the Wright '286 patent. (*See*

Ex. I, the complaint in Civil Action No. 07-348-SLR). BSC asserts in its June 1 complaint that

the Wright '286 patent is invalid and not infringed by BSC's above-recited activities regarding

the PROMUS stent. (*Id.* at p. 7).

30. On June 12, 2007, Abbott filed a second supplemental motion for leave to file a

supplemental complaint or in the alternative to consolidate related cases in Civil Action No. 06-

613-SLR pending before the United States District Court for the District of Delaware. (*See* Ex.

J, Abbott's second supplemental motion for leave to file a supplemental complaint or to

consolidate related cases). Also on June 12, 2007, Abbott filed a supplemental motion for leave

to file a supplemental complaint in Civil Action No. 07-259-SLR pending before the United

7

054604.1003

States District Court for the District of Delaware.  (*See* Ex. K, Abbott's supplemental motion for

leave to file a supplemental complaint).  Abbott's motions request leave to file supplemental

complaints to add claims of invalidity and noninfringement of U.S. Patent No. 7,229,473

(identified as the "Wright '473 patent").  (Ex. J at p. 1; Ex. K at p. 1).

31.    On June 22, 2007, BSC filed a declaratory judgment action against J&J in the

United States District Court for the District of Delaware relating to the Wright '473 patent.  (*See*

Ex. L, the complaint in Civil Action No. 07-409-SLR).  BSC asserts in its June 22 complaint that

the Wright '473 patent is invalid and not infringed by BSC's above-recited activities regarding

the PROMUS stent.  (*Id.* at p. 8).

32.    The instant action by BSC against J&J is related to Abbott's September 29, 2006

action because at least the Falotico '796 patent is part of the same patent family as the Falotico

'662 patent, the prior art to both patents is related, and the products at issue in the September 29,

2006 action (Abbott's XIENCE V) and this action (BSC's PROMUS) are related.  Also, as

discussed above, Abbott has also recently filed motions to amend its complaint in the September

29, 2006 action to include the Falotico '286 patent, the Wright '286 patent, and the Wright '473

patent or, in the alternative, consolidate its September 29, 2006, May 15, May 29, and June 12

actions.

33.    The instant action by BSC against J&J is related to Abbott's May 15 complaint

and supplemental complaint and BSC's May 25 complaint on the Falotico '286 patent, Abbott's

May 29 supplemental complaints and BSC's June 1 complaint on the Wright '286 patent, and

BSC's June 22 complaint on the Wright '473 patent, because the patents involved all have claims

purporting to cover similar subject matter, the prior art to the those patents is related, and the

products of the declaratory judgment plaintiffs, XIENCE V (Abbott) and PROMUS (BSC), are

related. Essentially identical Scheduling Orders have been entered in Abbott's declaratory judgment case (Civil Action No. 06-613-SLR, D.I. 85) and BSC's declaratory judgment cases (Civil Action No. 07-333-SLR, D.I. 19; Civil Action No. 07-348-SLR, D.I. 17; Civil Action No. 07-409-SLR, D.I. 18).

## COUNT I

## INVALIDITY AND NONINFRINGEMENT OF U.S. PATENT NO. 7,300,662

34.    BSC repeats and realleges each and every allegation contained in paragraphs 1-33 of this Complaint as though fully set forth herein.

35.    Each of the claims in the Falotico '662 patent is invalid for failure to comply with one or more of the requirements of Title 35, United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103 and 112.

36.    The PROMUS stent does not infringe any valid claim of the Falotico '662 patent.

## PRAYER FOR RELIEF

WHEREFORE, BSC prays that this Court enter judgment as follows, ordering that:

(a)    Each and every claim of U.S. Patent No. 7,300,662 is invalid;

(b)    Plaintiffs are not liable for directly, contributorily or inducing infringement of any claim of U.S. Patent No. 7,300,662;

(c)    Defendants and their officers, agents, employees, representatives, counsel and all persons in active concert or participation with any of them, directly or indirectly, be enjoined from threatening or charging infringement of, or instituting any action for infringement of U.S. Patent No. 7,300,662 against Plaintiffs, its suppliers, customers, distributors or users of its products;

9

054604.1003

(d)    Defendants pay to Plaintiffs the costs and reasonable attorney's fees incurred by

Plaintiffs in this action; and

(e)    Plaintiffs be granted such other and further relief as this Court deems just and

proper.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

YOUNG CONAWAY STARGATT &
TAYLOR, LLP

Josy W. Ingersoll (#1088)
Karen E. Keller (#4489)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE  19801
jingersoll@ycst.com
kkeller@ycst.com
(302) 571-6554

*Attorneys for Plaintiffs*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*

*Of Counsel:*

Richard L. Delucia
Paul M. Richter
Michael K. Levy
Jerry Canada
KENYON & KENYON LLP
One Broadway
New York, NY 10004
(212) 425-7200

Dated: November 27, 2007

10

DB01:2484292.1                                                                                    054604.1003

# EXHIBIT A



US007300662B2

(12) **United States Patent**

Falotico et al.

(10) Patent No.: **US 7,300,662 B2**

(45) Date of Patent: *Nov. 27, 2007

(54) **DRUG/DRUG DELIVERY SYSTEMS FOR THE PREVENTION AND TREATMENT OF VASCULAR DISEASE**

(75) Inventors: **Robert Falotico**, Belle Mead, NJ (US); **Gregory A. Kopia**, Hillsborough, NJ (US); **Gerard H. Llanos**, Stewartsville, NJ (US)

(73) Assignee: **Cordis Corporation**, Miami Lakes, FL (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 503 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **10/829,074**

(22) Filed: **Apr. 21, 2004**

(65) **Prior Publication Data**

US 2004/0260268 A1    Dec. 23, 2004

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/850,293, filed on May 7, 2001, now abandoned, which is a continuation-in-part of application No. 09/575,480, filed on May 19, 2000.

(60) Provisional application No. 60/263,979, filed on Jan. 25, 2001, provisional application No. 60/263,806, filed on Jan. 24, 2001, provisional application No. 60/262,614, filed on Jan. 18, 2001, provisional application No. 60/262,461, filed on Jan. 18, 2001, provisional application No. 60/204,417, filed on May 12, 2000.

(51) Int. Cl.
*A61F 2/00*  (2006.01)
*A61F 2/06*  (2006.01)

(52) U.S. Cl. ...................... 424/424; 623/1.42; 623/1.45

(58) Field of Classification Search ........ 424/422–426; 623/1.42–1.48
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 861,659 A | 7/1907 | Johnston ..................... 464/147 |
| 3,051,677 A | 8/1962 | Rexford ...................... 522/156 |
| 3,279,996 A | 10/1966 | Long et al. .................. 424/424 |
| 3,526,005 A | 9/1970 | Bokros ..................... 623/11.11 |
| 3,599,641 A | 8/1971 | Sheridan ..................... 604/256 |

(Continued)

FOREIGN PATENT DOCUMENTS

DE          3205942 A1    9/1983

(Continued)

OTHER PUBLICATIONS

Boston Scientific, "Measuring DES Efficacy," www.taxus-stent.com/usa/efficacy.html, pp. 1-3, copyright 2006.*

(Continued)

*Primary Examiner*—Sharon E. Kennedy
(74) *Attorney, Agent, or Firm*—Woodcock Washburn LLP

(57) **ABSTRACT**

A drug and drug delivery system may be utilized in the treatment of vascular disease. A local delivery system is coated with rapamycin or other suitable drug, agent or compound and delivered intraluminally for the treatment and prevention of neointimal hyperplasia following percutaneous transluminal coronary angiography. The local delivery of the drugs or agents provides for increased effectiveness and lower systemic toxicity.

**25 Claims, 2 Drawing Sheets**

## US 7,300,662 B2
Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,657,744 A | 4/1972 | Ersek | |
| 3,744,596 A | 7/1973 | Sander | 188/203 |
| 3,779,805 A | 12/1973 | Alsberg | 427/105 |
| 3,929,992 A | 12/1975 | Sehgal et al. | 424/122 |
| 3,932,627 A | 1/1976 | Margraf | |
| 3,948,254 A | 4/1976 | Zaffaroni | 128/833 |
| 3,952,334 A | 4/1976 | Bokros et al. | 623/11.11 |
| 3,968,800 A | 7/1976 | Vilasi | 606/198 |
| 4,069,307 A | 1/1978 | Higuchi et al. | 424/432 |
| 4,076,285 A | 2/1978 | Martinez | 285/332 |
| 4,292,965 A | 10/1981 | Nash et al. | |
| 4,299,226 A | 11/1981 | Banka | 604/509 |
| 4,300,244 A | 11/1981 | Bokros | 623/1.13 |
| 4,312,920 A | 1/1982 | Pierce et al. | 428/425.5 |
| 4,321,711 A | 3/1982 | Mano | 623/1.43 |
| 4,323,071 A | 4/1982 | Simpson et al. | 606/194 |
| 4,390,599 A | 6/1983 | Broyles | 428/597 |
| 4,413,359 A | 11/1983 | Akiyama et al. | 623/23.72 |
| 4,423,183 A | 12/1983 | Close | 524/546 |
| 4,441,216 A | 4/1984 | Ionescu et al. | |
| 4,503,569 A | 3/1985 | Dotter | |
| 4,512,338 A | 4/1985 | Balko et al. | 606/108 |
| 4,550,447 A | 11/1985 | Seiler, Jr. et al. | 623/1.32 |
| 4,553,545 A | 11/1985 | Maass et al. | |
| 4,560,374 A | 12/1985 | Hammerslag | 604/509 |
| 4,562,596 A | 1/1986 | Kronberg | 623/1.32 |
| 4,565,740 A | 1/1986 | Golander et al. | 428/409 |
| 4,580,568 A | 4/1986 | Gianturco | |
| 4,613,665 A | 9/1986 | Larm | |
| 4,642,111 A | 2/1987 | Sakamoto et al. | 424/492 |
| 4,655,771 A | 4/1987 | Wallsten | |
| 4,656,083 A | 4/1987 | Hoffman et al. | 442/123 |
| 4,676,241 A | 6/1987 | Webb et al. | 128/207.14 |
| 4,678,466 A | 7/1987 | Rosenwald | 424/427 |
| 4,687,482 A | 8/1987 | Hanson | 623/1.49 |
| 4,689,046 A | 8/1987 | Bokros | 623/2.31 |
| 4,731,054 A | 3/1988 | Billeter et al. | 604/93.01 |
| 4,733,665 A | 3/1988 | Palmaz | |
| 4,739,762 A | 4/1988 | Palmaz | |
| 4,740,207 A | 4/1988 | Kreamer | 623/1.15 |
| 4,749,585 A | 6/1988 | Greco et al. | 428/422 |
| 4,753,652 A | 6/1988 | Langer et al. | 623/1.42 |
| 4,760,849 A | 8/1988 | Kropf | 606/191 |
| 4,768,507 A | 9/1988 | Fischell et al. | 623/1.11 |
| 4,776,337 A | 10/1988 | Palmaz | |
| 4,786,500 A | 11/1988 | Wong | 424/422 |
| 4,787,899 A | 11/1988 | Lazarus | 623/1.11 |
| 4,800,882 A | 1/1989 | Gianturco | |
| 4,810,784 A | 3/1989 | Larm | 536/20 |
| 4,856,516 A | 8/1989 | Hillstead | |
| 4,871,357 A | 10/1989 | Hsu et al. | 604/266 |
| 4,872,867 A | 10/1989 | Joh | |
| 4,876,109 A | 10/1989 | Mayer et al. | 604/269 |
| 4,886,062 A | 12/1989 | Wiktor | |
| 4,907,336 A | 3/1990 | Gianturco | |
| 4,916,193 A | 4/1990 | Tang et al. | |
| 4,954,126 A | 9/1990 | Wallsten | |
| 4,969,458 A | 11/1990 | Wiktor | |
| 4,990,131 A | 2/1991 | Dardik | |
| 4,990,155 A | 2/1991 | Wilkoff | |
| 4,994,071 A | 2/1991 | MacGregor | |
| 4,994,298 A | 2/1991 | Yasuda | 427/490 |
| 4,998,923 A | 3/1991 | Samson et al. | 606/194 |
| 5,015,253 A | 5/1991 | MacGregor | |
| 5,019,090 A | 5/1991 | Pinchuk | 623/1.15 |
| 5,019,096 A | 5/1991 | Fox, Jr. et al. | 600/36 |
| 5,029,877 A | 7/1991 | Fedeli et al. | 277/354 |
| 5,034,265 A | 7/1991 | Hoffman et al. | 442/126 |
| 5,035,706 A | 7/1991 | Gianturco | |
| 5,041,100 A | 8/1991 | Rowland et al. | |
| 5,041,126 A | 8/1991 | Gianturco | |
| 5,047,020 A | 9/1991 | Hsu | 604/266 |
| 5,049,132 A | 9/1991 | Shaffer et al. | |
| 5,049,403 A | 9/1991 | Larm et al. | 427/2.1 |
| 5,053,048 A | 10/1991 | Pinchuk | |
| 5,059,166 A | 10/1991 | Fischell et al. | 600/3 |
| 5,061,275 A | 10/1991 | Wallsten et al. | |
| 5,061,750 A | 10/1991 | Feijen et al. | |
| 5,064,435 A | 11/1991 | Porter | |
| 5,092,877 A | 3/1992 | Pinchuk | |
| 5,102,417 A | 4/1992 | Palmaz | |
| 5,104,404 A | 4/1992 | Wolff | |
| 5,116,365 A | 5/1992 | Hillstead | |
| 5,122,154 A | 6/1992 | Rhodes | |
| 5,131,908 A | 7/1992 | Dardik et al. | |
| 5,133,732 A | 7/1992 | Wiktor | |
| 5,134,192 A | 7/1992 | Feijen et al. | |
| 5,135,536 A | 8/1992 | Hillstead | |
| 5,163,952 A | 11/1992 | Froix | |
| 5,163,958 A | 11/1992 | Pinchuk | |
| 5,171,217 A | 12/1992 | March et al. | 604/507 |
| 5,171,262 A | 12/1992 | MacGregor | |
| 5,176,660 A | 1/1993 | Truckai | |
| 5,176,972 A | 1/1993 | Bloom et al. | 430/14 |
| 5,178,618 A | 1/1993 | Kandarpa | |
| 5,180,366 A | 1/1993 | Woods | |
| 5,182,317 A | 1/1993 | Winters et al. | |
| 5,185,408 A | 2/1993 | Tang et al. | |
| 5,192,307 A | 3/1993 | Wall | |
| 5,195,984 A | 3/1993 | Schatz | |
| 5,202,332 A | 4/1993 | Hughes et al. | 514/291 |
| 5,213,576 A | 5/1993 | Abiuso et al. | |
| 5,213,898 A | 5/1993 | Larm et al. | 428/422 |
| 5,217,483 A | 6/1993 | Tower | |
| 5,222,971 A | 6/1993 | Willard et al. | |
| 5,226,913 A | 7/1993 | Pinchuk | |
| 5,234,456 A | 8/1993 | Silvestrini | |
| 5,246,445 A | 9/1993 | Yachia et al. | |
| 5,258,020 A | 11/1993 | Froix | |
| 5,258,021 A | 11/1993 | Duran | |
| 5,262,451 A | 11/1993 | Winters et al. | |
| 5,266,073 A | 11/1993 | Wall | |
| 5,272,012 A | 12/1993 | Opolski | 428/423.1 |
| 4,733,665 A | 1/1994 | Palmaz | 606/108 |
| 5,275,622 A | 1/1994 | Lazarus et al. | |
| 5,282,823 A | 2/1994 | Schwartz et al. | |
| 5,282,824 A | 2/1994 | Gianturco | |
| 5,283,257 A | 2/1994 | Gregory et al. | |
| 5,288,711 A | 2/1994 | Mitchell et al. | |
| 5,290,305 A | 3/1994 | Inoue | |
| 5,292,331 A | 3/1994 | Boneau | |
| 5,292,802 A | 3/1994 | Rhee et al. | |
| 5,304,121 A | 4/1994 | Sahatjian | |
| 5,304,200 A | 4/1994 | Spaulding | |
| 5,306,250 A | 4/1994 | March et al. | |
| 5,308,862 A | 5/1994 | Ohlstein | |
| 5,308,889 A | 5/1994 | Rhee et al. | |
| 5,314,444 A | 5/1994 | Gianturco | |
| 5,314,472 A | 5/1994 | Fontaine | |
| 5,328,471 A | 7/1994 | Slepian | |
| 5,334,301 A | 8/1994 | Heinke et al. | |
| 5,336,518 A | 8/1994 | Pallassana et al. | |
| 5,338,770 A | 8/1994 | Winters et al. | |
| 5,342,348 A | 8/1994 | Kaplan | |
| 5,342,387 A | 8/1994 | Summers | |
| 5,342,621 A | 8/1994 | Eury | |
| 5,354,257 A | 10/1994 | Roubin et al. | |
| 5,354,308 A | 10/1994 | Simon et al. | |
| 5,356,433 A | 10/1994 | Rowland et al. | |
| 5,366,504 A | 11/1994 | Andersen et al. | |
| 5,368,566 A | 11/1994 | Crocker | |
| 5,370,683 A | 12/1994 | Fontaine | |
| 5,370,691 A | 12/1994 | Samson | |
| 5,375,612 A | 12/1994 | Cottenceau et al. | |

US 7,300,662 B2

Page 3

| | | | |
|---|---|---|---|
| 5,376,112 A | 12/1994 | Duran | |
| 5,378,475 A | 1/1995 | Smith et al. ................ 424/473 | |
| 5,380,299 A | 1/1995 | Fearnot et al. | |
| 5,382,261 A | 1/1995 | Palmaz | |
| 5,383,853 A | 1/1995 | Jung et al. ............ 604/103.04 | |
| 5,383,928 A | 1/1995 | Scott et al. | |
| 5,387,235 A | 2/1995 | Chuter | |
| 5,389,106 A | 2/1995 | Tower | |
| 5,391,730 A | 2/1995 | Skotnicki et al. ........... 540/456 | |
| 5,393,772 A | 2/1995 | Yue et al. | |
| 5,395,390 A | 3/1995 | Simon et al. | |
| 5,397,355 A | 3/1995 | Marin et al. | |
| 5,399,352 A | 3/1995 | Hanson ...................... 424/423 | |
| 5,403,341 A | 4/1995 | Solar | |
| 5,405,377 A | 4/1995 | Cragg | |
| 5,409,696 A | 4/1995 | Narayanan et al. | |
| 5,411,549 A | 5/1995 | Peters | |
| 5,415,619 A | 5/1995 | Lee et al. | |
| 5,417,969 A | 5/1995 | Hsu et al. ................ 424/78.27 | |
| 5,419,760 A | 5/1995 | Narciso, Jr. | |
| D359,802 S | 6/1995 | Fontaine | |
| 5,421,955 A | 6/1995 | Lau | |
| 5,423,885 A | 6/1995 | Williams | |
| 5,429,618 A | 7/1995 | Keogh | |
| 5,429,634 A | 7/1995 | Narciso | |
| 5,439,446 A | 8/1995 | Barry | |
| 5,441,515 A | 8/1995 | Khosravi et al. | |
| 5,441,516 A | 8/1995 | Wang et al. | |
| 5,441,947 A | 8/1995 | Dodge et al. | |
| 5,443,458 A | 8/1995 | Eury | |
| 5,443,477 A | 8/1995 | Marin et al. | |
| 5,443,496 A | 8/1995 | Schwartz et al. | |
| 5,443,498 A | 8/1995 | Fontaine | |
| 5,443,500 A | 8/1995 | Sigwart | |
| 5,447,724 A | 9/1995 | Heimus et al. | |
| 5,449,372 A | 9/1995 | Schmaltz et al. | |
| 5,449,373 A | 9/1995 | Pinchasik et al. | |
| 5,449,382 A | 9/1995 | Dayton | |
| 5,464,450 A | 11/1995 | Buscemi et al. | |
| 5,464,540 A | 11/1995 | Friesen et al. .............. 210/640 | |
| 5,464,650 A | 11/1995 | Berg et al. | |
| 5,474,563 A | 12/1995 | Myler et al. ................ 606/108 | |
| 5,486,357 A | 1/1996 | Narayanan | |
| 5,496,365 A | 3/1996 | Sgro | |
| 5,500,013 A | 3/1996 | Buscemi et al. | |
| 5,504,091 A | 4/1996 | Molnar-Kimber et al. .. 514/291 | |
| 5,510,077 A | 4/1996 | Dinh et al. | |
| 5,512,055 A | 4/1996 | Domb et al. ................ 604/265 | |
| 5,516,781 A | 5/1996 | Morris et al. | |
| 5,519,042 A | 5/1996 | Morris et al. ............... 514/378 | |
| 5,523,092 A | 6/1996 | Hanson et al. | |
| 5,527,354 A | 6/1996 | Fontaine et al. | |
| 5,545,208 A | 8/1996 | Wolff et al. | |
| 5,551,954 A | 9/1996 | Buscemi et al. | |
| 5,554,182 A | 9/1996 | Dinh et al. | |
| 5,554,954 A | 9/1996 | Takahashi | |
| 5,556,413 A | 9/1996 | Lam | |
| 5,559,122 A | 9/1996 | Nelson et al. ............... 514/291 | |
| 5,562,922 A | 10/1996 | Lambert | |
| 5,563,146 A | 10/1996 | Morris et al. | |
| 5,569,197 A | 10/1996 | Helmus et al. | |
| 5,569,295 A | 10/1996 | Lam | |
| 5,569,462 A | 10/1996 | Martinson et al. .......... 424/423 | |
| 5,569,463 A | 10/1996 | Helmus et al. .............. 424/426 | |
| 5,571,089 A | 11/1996 | Crocker ................. 604/103.01 | |
| 5,571,166 A | 11/1996 | Dinh et al. | |
| 5,574,059 A | 11/1996 | Regunathan et al. | |
| 5,575,818 A | 11/1996 | Pinchuk ...................... 623/1.15 | |
| 5,578,075 A | 11/1996 | Dayton | |
| 5,580,873 A | 12/1996 | Bianco et al. | |
| 5,580,874 A | 12/1996 | Bianco et al. | |
| 5,591,140 A | 1/1997 | Narayanan et al. | |
| 5,591,197 A | 1/1997 | Orth et al. | |
| 5,591,224 A | 1/1997 | Schwartz et al. | |
| 5,591,227 A | 1/1997 | Dinh et al. | |
| 5,599,352 A | 2/1997 | Dinh et al. | |
| 5,603,722 A | 2/1997 | Phan et al. | |
| 5,604,283 A | 2/1997 | Wada et al. ................ 524/236 | |
| 5,605,696 A | 2/1997 | Eury et al. | |
| 5,607,463 A | 3/1997 | Schwartz et al. | |
| 5,607,475 A | 3/1997 | Cahalan et al. | |
| 5,609,629 A | 3/1997 | Fearnot et al. | |
| 5,616,608 A | 4/1997 | Kinsella et al. ............. 514/449 | |
| 5,620,984 A | 4/1997 | Bianco et al. | |
| 5,621,102 A | 4/1997 | Bianco et al. | |
| 5,622,975 A | 4/1997 | Singh et al. | |
| 5,624,411 A | 4/1997 | Tuch | |
| 5,628,785 A | 5/1997 | Schwartz et al. | |
| 5,629,077 A | 5/1997 | Turnlund et al. | |
| 5,629,315 A | 5/1997 | Bianco et al. | |
| 5,632,763 A | 5/1997 | Glastra | |
| 5,632,771 A | 5/1997 | Boatman et al. ........... 623/1.15 | |
| 5,632,776 A | 5/1997 | Kurumatani et al. ....... 424/423 | |
| 5,632,840 A | 5/1997 | Campbell | |
| 5,635,201 A | 6/1997 | Fabo ........................... 424/443 | |
| 5,637,113 A | 6/1997 | Tartaglia et al. | |
| 5,643,312 A | 7/1997 | Fischell et al. | |
| 5,643,939 A | 7/1997 | Ohlstein | |
| 5,646,160 A | 7/1997 | Morris et al. | |
| 5,648,357 A | 7/1997 | Bianco et al. | |
| 5,649,952 A | 7/1997 | Lam | |
| 5,649,977 A | 7/1997 | Campbell | |
| 5,651,174 A | 7/1997 | Schwartz et al. | |
| 5,652,243 A | 7/1997 | Bianco et al. | |
| 5,653,747 A | 8/1997 | Dereume ................... 623/1.54 | |
| 5,653,992 A | 8/1997 | Bezwada et al. | |
| 5,662,609 A | 9/1997 | Slepian | |
| 5,665,591 A | 9/1997 | Sonenshein et al. ........ 435/375 | |
| 5,665,728 A | 9/1997 | Morris et al. | |
| 5,667,764 A | 9/1997 | Kopia et al. ............... 424/1.45 | |
| 5,669,924 A | 9/1997 | Shaknovich | |
| 5,670,506 A | 9/1997 | Leigh et al. | |
| 5,672,638 A | 9/1997 | Verhoeven et al. ......... 523/112 | |
| 5,674,242 A | 10/1997 | Phan et al. ................. 606/198 | |
| 5,679,400 A | 10/1997 | Tuch | |
| 5,679,659 A | 10/1997 | Verhoeven et al. | |
| 5,684,061 A | 11/1997 | Ohnishi et al. ............. 523/114 | |
| 5,691,311 A | 11/1997 | Maraganore et al. ........ 514/12 | |
| 5,693,085 A | 12/1997 | Buirge et al. | |
| 5,697,967 A | 12/1997 | Dinh et al. | |
| 5,697,971 A | 12/1997 | Fischell et al. | |
| 5,700,286 A | 12/1997 | Tartaglia et al. | |
| 5,707,385 A | 1/1998 | Williams | |
| 5,709,874 A | 1/1998 | Hanson et al. | |
| 5,713,949 A | 2/1998 | Jayaraman ................. 623/1.12 | |
| 5,716,981 A | 2/1998 | Hunter et al. .............. 514/449 | |
| 5,725,549 A | 3/1998 | Lam | |
| 5,725,567 A | 3/1998 | Wolff et al. | |
| 5,728,150 A | 3/1998 | McDonald et al. | |
| 5,728,420 A | 3/1998 | Keogh | |
| 5,731,326 A | 3/1998 | Hart et al. | |
| 5,733,327 A | 3/1998 | Igaki et al. | |
| 5,733,920 A | 3/1998 | Mansuri et al. | |
| 5,733,925 A | 3/1998 | Kunz et al. | |
| 5,735,897 A | 4/1998 | Buirge | |
| 5,739,138 A | 4/1998 | Bianco et al. | |
| 5,755,734 A | 5/1998 | Richter et al. | |
| 5,755,772 A | 5/1998 | Evans et al. ................ 128/898 | |
| 5,759,205 A | 6/1998 | Valentini ................... 433/173 | |
| 5,769,883 A | 6/1998 | Buscemi et al. | |
| 5,776,184 A | 7/1998 | Tuch | |
| 5,780,462 A | 7/1998 | Lee et al. ................... 514/183 | |
| 5,780,476 A | 7/1998 | Underiner et al. | |
| 5,782,908 A | 7/1998 | Cahalan et al. | |
| 5,788,979 A | 8/1998 | Alt | |
| 5,792,106 A | 8/1998 | Mische ................. 604/103.01 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5,792,772 A | 8/1998 | Bianco et al. | | 6,179,817 B1 | 1/2001 | Zhong | 604/265 |
| 5,798,372 A | 8/1998 | Davies et al. | | 6,187,757 B1 | 2/2001 | Clackson et al. | 514/31 |
| 5,799,384 A | 9/1998 | Schwartz et al. | | 6,193,746 B1 | 2/2001 | Strecker | 623/1.13 |
| 5,800,507 A | 9/1998 | Schwartz | | 6,214,901 B1 | 4/2001 | Chudzik et al. | |
| 5,800,508 A | 9/1998 | Goicoechea et al. | | 6,225,346 B1 | 5/2001 | Tang et al. | 514/523 |
| 5,807,861 A | 9/1998 | Klein et al. | | 6,240,616 B1 | 6/2001 | Yan | |
| 5,811,447 A | 9/1998 | Kunz et al. | | 6,245,537 B1 | 6/2001 | Williams et al. | 435/135 |
| 5,820,917 A | 10/1998 | Tuch | | 6,251,920 B1 | 6/2001 | Grainger et al. | 514/319 |
| 5,820,918 A | 10/1998 | Ronan et al. | | 6,254,632 B1 | 7/2001 | Wu et al. | |
| 5,824,048 A | 10/1998 | Tuch | | 6,254,634 B1 | 7/2001 | Anderson et al. | 623/1.42 |
| 5,824,049 A | 10/1998 | Ragheb et al. | | 6,258,121 B1 | 7/2001 | Yang et al. | |
| 5,827,587 A | 10/1998 | Fukushi | 428/36.6 | 6,268,390 B1 | 7/2001 | Kunz | |
| 5,833,651 A | 11/1998 | Donovan et al. | | 6,273,913 B1 | 8/2001 | Wright et al. | |
| 5,837,008 A | 11/1998 | Berg et al. | | 6,284,305 B1 | 9/2001 | Ding et al. | 427/2.28 |
| 5,837,313 A | 11/1998 | Ding et al. | | 6,287,320 B1 | 9/2001 | Slepian | |
| 5,843,120 A | 12/1998 | Israel et al. | 623/1.15 | 6,287,628 B1 | 9/2001 | Hossainy et al. | |
| 5,843,166 A | 12/1998 | Lentz et al. | 623/1.13 | 6,299,604 B1 | 10/2001 | Ragheb et al. | |
| 5,843,172 A | 12/1998 | Yan | | 6,306,144 B1 | 10/2001 | Sydney et al. | 606/108 |
| 5,849,034 A | 12/1998 | Schwartz | | 6,306,166 B1 | 10/2001 | Barry et al. | |
| 5,851,217 A | 12/1998 | Wolff et al. | | 6,306,176 B1 | 10/2001 | Whitbourne | |
| 5,851,231 A | 12/1998 | Wolff et al. | | 6,306,421 B1 | 10/2001 | Kunz et al. | |
| 5,858,990 A | 1/1999 | Walsh | | 6,309,380 B1 | 10/2001 | Larson et al. | |
| 5,861,027 A | 1/1999 | Trapp | | 6,309,660 B1 | 10/2001 | Hsu et al. | |
| 5,865,814 A | 2/1999 | Tuch | | 6,313,264 B1 | 11/2001 | Caggiano et al. | |
| 5,871,535 A | 2/1999 | Wolff et al. | | 6,316,018 B1 | 11/2001 | Ding et al. | 424/423 |
| 5,873,904 A | 2/1999 | Ragheb et al. | | 6,335,029 B1 | 1/2002 | Kamath et al. | 424/423 |
| 5,876,433 A | 3/1999 | Lunn | | 6,358,556 B1 | 3/2002 | Ding et al. | 427/2.24 |
| 5,877,224 A | 3/1999 | Brocchini et al. | 514/772.2 | 6,369,039 B1 | 4/2002 | Palasis et al. | 424/93.2 |
| 5,879,697 A | 3/1999 | Ding et al. | | 6,379,382 B1 | 4/2002 | Yang | 623/1.42 |
| 5,882,335 A | 3/1999 | Leone et al. | | 6,387,121 B1 | 5/2002 | Alt | 623/1.15 |
| 5,891,108 A | 4/1999 | Leone et al. | | 6,403,635 B1 | 6/2002 | Kinsella et al. | 514/449 |
| 5,893,840 A | 4/1999 | Hull et al. | 604/103.02 | 6,407,067 B1 | 6/2002 | Schafer | 514/19 |
| 5,897,911 A | 4/1999 | Loeffler | 427/2.25 | 6,517,858 B1 | 2/2003 | Le Moel et al. | 424/424 |
| 5,900,246 A | 5/1999 | Lambert | | 6,517,889 B1 | 2/2003 | Jayaraman | 427/2.24 |
| 5,902,266 A | 5/1999 | Leone et al. | | 6,545,097 B2 | 4/2003 | Pinchuk et al. | 525/240 |
| 5,912,253 A | 6/1999 | Cottens et al. | 514/291 | 6,585,764 B2 | 7/2003 | Wright et al. | 623/1.42 |
| 5,916,910 A | 6/1999 | Lai | 514/423 | 6,620,194 B2 | 9/2003 | Ding et al. | 623/1.43 |
| 5,922,393 A | 7/1999 | Jayaraman | 427/2.3 | 6,746,773 B2 | 6/2004 | Llanos et al. | 428/421 |
| 5,922,730 A | 7/1999 | Hu et al. | 514/291 | 6,776,796 B2 | 8/2004 | Falotico et al. | 623/1.46 |
| 5,932,243 A | 8/1999 | Fricker et al. | 424/450 | 6,808,536 B2 | 10/2004 | Wright et al. | 623/1.42 |
| 5,932,299 A | 8/1999 | Katoot | 427/508 | 2001/0007083 A1 | 7/2001 | Roorda | |
| 5,932,580 A | 8/1999 | Levitzki et al. | 181/152 | 2001/0029351 A1 | 10/2001 | Falotico et al. | 604/103.02 |
| 5,951,586 A | 9/1999 | Berg et al. | | 2001/0029660 A1 | 10/2001 | Johnson | |
| 5,957,971 A | 9/1999 | Schwartz | | 2001/0032014 A1 | 10/2001 | Yang et al. | |
| 5,968,091 A | 10/1999 | Pinchuk et al. | 623/1.16 | 2001/0034363 A1 | 10/2001 | Li et al. | |
| 5,972,027 A | 10/1999 | Johnson | | 2001/0037145 A1 | 11/2001 | Guruwaiya et al. | |
| 5,976,534 A | 11/1999 | Hart et al. | | 2002/0010418 A1 | 1/2002 | Lary et al. | 604/101.04 |
| 5,977,163 A | 11/1999 | Li et al. | | 2002/0032477 A1 | 3/2002 | Helmus et al. | 623/1.2 |
| 5,980,553 A | 11/1999 | Gray et al. | | 2002/0041899 A1 | 4/2002 | Chudzik et al. | 424/487 |
| 5,980,566 A | 11/1999 | Alt et al. | | 2002/0061326 A1 | 5/2002 | Li et al. | 424/424 |
| 5,980,972 A | 11/1999 | Ding | | 2002/0068969 A1 | 6/2002 | Shanley et al. | 623/1.16 |
| 5,981,568 A | 11/1999 | Kunz et al. | | 2002/0071902 A1 | 6/2002 | Ding et al. | 427/2.24 |
| 5,985,307 A | 11/1999 | Hanson et al. | | 2002/0082680 A1 | 6/2002 | Shanley et al. | 623/1.16 |
| 5,997,468 A | 12/1999 | Wolff et al. | | 2002/0082685 A1 | 6/2002 | Sirhan et al. | 623/1.42 |
| 6,004,346 A | 12/1999 | Wolff et al. | | 2002/0091433 A1 | 7/2002 | Ding et al. | 623/1.2 |
| 6,015,432 A | 1/2000 | Rakos et al. | 623/1.13 | 2002/0095114 A1 | 7/2002 | Palasis | 604/96.01 |
| 6,015,815 A | 1/2000 | Mollison | 514/291 | 2002/0099438 A1 | 7/2002 | Furst | 623/1.16 |
| 6,039,721 A | 3/2000 | Johnson et al. | | 2002/0103526 A1 | 8/2002 | Steinke | 623/1.11 |
| 6,059,813 A | 5/2000 | Vrba et al. | | 2002/0119178 A1 | 8/2002 | Levesque et al. | 424/423 |
| 6,071,305 A | 6/2000 | Brown et al. | | 2002/0123505 A1 | 9/2002 | Mollison et al. | 514/291 |
| 6,074,659 A | 6/2000 | Kunz et al. | | 2002/0127327 A1 | 9/2002 | Schwartz et al. | 427/2.15 |
| 6,080,190 A | 6/2000 | Schwartz | | 2002/0133232 A1 | 9/2002 | Das | 623/1.16 |
| 6,096,070 A | 8/2000 | Ragheb et al. | | 2002/0133224 A1 | 9/2002 | Bajgar et al. | 623/1.39 |
| 6,120,536 A | 9/2000 | Dinge et al. | | 2002/0165608 A1 | 11/2002 | Llanos | 604/500 |
| 6,120,847 A | 9/2000 | Yang et al. | 427/335 | 2002/0193475 A1 | 12/2002 | Hossainy et al. | 524/113 |
| 6,136,798 A | 10/2000 | Cody et al. | | 2003/0065377 A1 | 4/2003 | Davila et al. | 604/265 |
| 6,140,127 A | 10/2000 | Sprague | | 2003/0216699 A1 | 11/2003 | Falotico | |
| 6,146,358 A | 11/2000 | Rowe | | 2004/0049265 A1 | 3/2004 | Ding et al. | 623/1.42 |
| 6,153,252 A | 11/2000 | Hossainy et al. | | 2004/0243097 A1 | 12/2004 | Falotico et al. | 604/500 |
| 6,159,488 A | 12/2000 | Nagier et al. | 424/423 | 2004/0260268 A1 | 12/2004 | Falotico et al. | 604/500 |
| 6,171,232 B1 | 1/2001 | Papandreou et al. | | 2005/0002986 A1 | 1/2005 | Falotico et al. | 424/426 |
| 6,171,609 B1 | 1/2001 | Kunz | | 2005/0004663 A1 | 1/2005 | Llanos et al. | 623/1.46 |
| 6,177,272 B1 | 1/2001 | Nabel et al. | | 2005/0033261 A1 | 2/2005 | Falotico et al. | 604/500 |

| | | | | |
|---|---|---|---|---|
| 2005/0106210 A1 | 5/2005 | Ding et al. | ............... | 424/423 |
| 2005/0187611 A1 | 8/2005 | Ding et al. | ............... | 623/1.15 |
| 2005/0208200 A1 | 9/2005 | Ding et al. | ............... | 427/2.25 |
| 2006/0088654 A1 | 4/2006 | Ding et al. | ............... | 427/2.21 |
| 2006/0089705 A1 | 4/2006 | Ding et al. | ............... | 623/1.15 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 19723723 A1 | 12/1998 |
| EP | 0 145 166 A2 | 6/1985 |
| EP | 0 177 330 A2 | 4/1986 |
| EP | 0 183 372 A1 | 6/1986 |
| EP | 0 221 570 A2 | 5/1987 |
| EP | 0 421 729 A2 | 4/1991 |
| EP | 0 540 290 A2 | 10/1992 |
| EP | 0 568 310 A1 | 11/1993 |
| EP | 0 604 022 A1 | 6/1994 |
| EP | 0 621 015 A1 | 10/1994 |
| EP | 0 623 354 A1 | 11/1994 |
| EP | 0 734 698 A2 | 3/1996 |
| EP | 0 712 615 A1 | 5/1996 |
| EP | 0 716 836 A1 | 6/1996 |
| EP | 0 800 801 A1 | 8/1996 |
| EP | 0 734 721 A1 | 10/1996 |
| EP | 0 747 069 A2 | 12/1996 |
| EP | 0 761 251 A1 | 3/1997 |
| EP | 0 830 853 A1 | 7/1997 |
| EP | 0 540 290 B1 | 1/1998 |
| EP | 0 815 803 A1 | 7/1998 |
| EP | 0 850 651 A2 | 7/1998 |
| EP | 0 938 878 A3 | 9/1999 |
| EP | 0950386 B1 | 10/1999 |
| EP | 0 968 688 A1 | 1/2000 |
| EP | 0 633 032 B1 | 2/2001 |
| EP | 1 192 957 A2 | 4/2002 |
| EP | 1 588 726 A1 | 10/2005 |
| EP | 1 588 727 A1 | 10/2005 |
| FR | 0 566 807 A1 | 4/1992 |
| GB | 1 205 743 | 9/1970 |
| GB | 2 135 585 A | 9/1984 |
| GB | 0 662 307 A2 | 12/1994 |
| SU | 660689 | 5/1979 |
| SU | 1457921 | 2/1989 |
| WO | 89/03232 A1 | 4/1989 |
| WO | WO 91/12779 A1 | 9/1991 |
| WO | WO 92/15286 A1 | 9/1992 |
| WO | WO 94/01056 A1 | 1/1994 |
| WO | WO 94/21308 A1 | 9/1994 |
| WO | WO 94/21309 A1 | 9/1994 |
| WO | WO 94/24961 A1 | 11/1994 |
| WO | WO 96/00272 A1 | 1/1996 |
| WO | WO 96/26689 A1 | 9/1996 |
| WO | WO 96/32907 A1 | 10/1996 |
| WO | WO 96/34580 A1 | 11/1996 |
| WO | 96/41807 A1 | 12/1996 |
| WO | WO 97/25000 A1 | 7/1997 |
| WO | WO 97/33534 A1 | 9/1997 |
| WO | 97/33575 A1 | 10/1997 |
| WO | 98/08465 A1 | 3/1998 |
| WO | 98/13344 A1 | 4/1998 |
| WO | WO 98/19628 A1 | 5/1998 |
| WO | 98/23244 A1 | 6/1998 |
| WO | WO 98/23228 A1 | 6/1998 |
| WO | WO 98/34669 A1 | 8/1998 |
| WO | WO 98/36784 A1 | 8/1998 |
| WO | WO 98/47447 A1 | 10/1998 |
| WO | WO 98/56312 A1 | 12/1998 |
| WO | 00/21584 A1 | 4/2000 |
| WO | 00/27455 A1 | 5/2000 |
| WO | WO 00/27445 A1 | 5/2000 |
| WO | 00/32255 A1 | 6/2000 |
| WO | 00/38754 A1 | 7/2000 |
| WO | 01/87342 A2 | 11/2001 |
| WO | 01/87372 A1 | 11/2001 |
| WO | 01/87373 A1 | 11/2001 |
| WO | WO 01/87376 A1 | 11/2001 |
| WO | 02/26139 A1 | 4/2002 |
| WO | 02/26271 A1 | 4/2002 |
| WO | 02/26280 A1 | 4/2002 |
| WO | 02/26281 A1 | 4/2002 |
| WO | 03/015664 A1 | 2/2003 |
| WO | 03/057218 A1 | 7/2003 |

### OTHER PUBLICATIONS

U.S. Appl. No. 07/819,314, filed Jan. 9, 1992, Morris.
U.S. Appl. No. 08/424,884, filed Apr. 19, 1995, Helmus et al.
U.S. Appl. No. 08/526,273, filed Sep. 11, 1995, Ding.
U.S. Appl. No. 08/730,542, filed Oct. 11, 1996, Helmus.
U.S. Appl. No. 09/575,480, filed May 19, 2000, Kopia.
U.S. Appl. No. 10/431,059, filed May 7, 2003, Falotico.
Abraham, R. T., "Mammalian target of rapamycin: Immunosupressive drugs offer new insight into cell growth regulation," *Progress in Inflammation Research*, 2000, Switzerland.
Alvarado, R. et al., "Evaluation of Polymer-coated Balloon-expandable Stents in Bile Ducts," *Radiology*, 1989, 170, 975-978.
Badimon, J. J. et al., "Inhibitory Effects of Rapamycin on Intimal Hyperplasia After PTCA," *JACC*, Mar. 1998.
Bailey et al., "Polymer Coating of Palmaz-Schatz Stent Attenuates Vascular Spasm after Stent Placement," *Circulation*, 82:III-541 (1990).
Berk, B. C. et al., "Pharmacologic Roles of Heparin and Glucocorticoids to Prevent Restenosis After Coronary Angioplasty," *JACC*, May 1991, 17(6), 111B-117B.
Bertram, P. G. et al., "The 14-3-3 proteins positively regulate rapamycin-sensitive signaling," *Current Biology*, 1998, 8, 1259-1267.
Biomaterials Science (B.D. Ratner, Ed.), Academic Press, New York, NY, pp. 228-238, 1996.
Campbell, G. R. et al., "Phenotypic Modulation of Smooth Muscle Cells in Primary Culture, Vascular Smooth Muscle Cells in Culture," *CRC Press*, 1987, 39-55.
Chang, M. W. et al., "Adenovirus-mediated Over-expression of the Cyclin/Cyclin-dependent Kinase inhibitor, p21 inhibits Vascular Smooth Muscle Cell Proliferation and Neointima Formation in the Rat Carotid Artery Model of Balloon Angioplasty," *J. Clin. Invest.*, 1995, 96, 2260-2268.
Chung, J. et al., "Rapamycin-FKBP specifically blocks growth-dependent activation of and signaling by the 70 kd S6 protein kinases," *Cell*, Jun. 26, 1992, 69(7), 1227-1236.
Clowes, A. W. et al., "Kinetics of cellular proliferation after arterial injury. IV. Heparin inhibits rat smooth muscle mitogenesis and migration," *Circ. Res.*, 1986, 58(6), 839-845.
Clowes, A. W. et al., Kinetics of Cellular Proliferation after Arterial Injury, *Laboratory Investigation*, 1985, 52(6), 611-616.
Clowes, A. W. et al., "Significance of quiescent smooth muscle migration in the injured rat carotid artery," *Circ Res.* 1985, 56(1), 139-145.
Clowes, A. W., "Suppression by heparin of smooth muscle cell proliferation in injured arteries," *Nature*, 1977, 265(5595), 625-626.
Colburn, M. D. et al., "Dose responsive suppression of myointimal hyperplasia by dexamethasone," *J. Vasc. Surg.*, 1992, 15, 510-518.
Currier, J. W. et al., "Colchicine Inhibits Restenosis After Iliac Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1989, 80(4), 11-66 (Abstract No. 0263).
Encyclopedia of Polymer Science and Engineering, vol. 7, Fluocoarbon Elastomers, pp. 257-267, Mar. 1989.
Farb, A. et al., "Vascular smooth muscle cell cytotoxicity and sustained inhibition of neointimal formation by fibroblast growth factor 2-saporin fusion protein," *Circ. Res.*, 1997, 80, 542-550.
Ferns, G. A. A. et al., "Inhibition of Neointimal Smooth Muscle Accumulation After Angioplasty by an Antibody to PDGF," *Science*, 1991, 253, 1129-1132.

Fischman, D. L. et al., "A Randomized Comparison of Coronary-Stent Placement and Balloon Angioplasty in the Treatment of Coronary Artery Disease," *N. Eng. J. Med.*, Aug. 25, 1994, 331(8), 496-501.

Franklin, S. M. et al., "Pharmacologic prevention of restenosis after coronary angioplasty: review of the randomized clinical trials," *Coronary Artery Disease* Mar. 1993, 4(3), 232-242.

Fukuyama, J. et al., "Tranilast suppresses the vascular intimal hyperplasia after balloon injury in rabbits fed on a high-cholesterol diet," *Eur. J. Pharmacol.*, 1996, 318, 327-332.

Gregory, C. R. et al., "Rapamycin Inhibits Arterial Intimal Thickening Caused by Both Alloimmune and Mechanical Injury," *Transplantation*, Jun. 1993, 55(6), 1409-1418.

Gregory, C. R. et al., "Treatment with Rapamycin and Mycophenolic Acid Reduces Arterial Intimal Thickening Produced by Mechanical Injury and Allows Endothelial Replacement," *Transplantation*, Mar. 15, 1995, 59(5), 655-661.

Guyton, J. R. et al., "Inhibition of rat arterial smooth muscle cell proliferation by heparin. In vivo studies with anticoagulant and nonanticoagulant heparin," *Circ. Res.*, 1980, 46, 625-634.

Hansson, G. K. et al., "Interferon-γ Inhibits Arterial Stenosis After Injury," *Circ.*, 1991, 84, 1266-1272.

Hashemolhosseini, S. et al., "Rapamycin Inhibition of the G1 to S Transition Is Mediated by Effects on Cyclin D1 mRNA and Protein Stability," *J. Biol Chem*, Jun. 5, 1998, 273, 14424-14429.

Jonasson, J. et al., "Cyclosporin A inhibits smooth muscle proliferation in the vascular response to injury," *Proc. Natl., Acad. Sci.*, 1988, 85, 2303-2306.

Kuhnt, M. et al., "Microbial Conversion of Rapamycin," *Enzyme and Microbial Technology*, 1997, 21, 405-412.

Lange, R. A. MD et al., "Restenosis After Coronary Balloon Angioplasty," *Annu. Rev. Med.*, 1991, 42, 127-132.

Liu, M. W. et al., "Trapidil in Preventing Restenosis After Balloon Angioplasty in the Atherosclerotic Rabbit," *Circ.*, 1990, 81, 1089-1093.

Liu, M. W., MD et al., "Restenosis After Coronary Angioplasty Potential Biologic Determinants and Role of Intimal Hyperplasia," *Circulation*, 1989, 79, 1374-1387.

Lundergan, C. F. et al., "Peptide inhibition of Myointimal Proliferation by Angiopeptin, a Somatostatin Analogue," *JACC*, May 1991, 17(6), 132B-136B.

Majesky, M. W. et al., "Heparin regulates smooth muscle S phase entry in the injured rat carotid artery," *Circ. Res.*, 1987, 61, 296-300.

Marx, S. O. et al., "Rapamycin-FKBP Inhibits Cell Cycle Regulators of Proliferation in Vascular Smooth Muscle Cells," *Circ. Res.*, 1995, 76, 412-417.

Nemecek, G. M. et al., "Terbinafine Inhibits the Mitogenic Response to Platelet-Derived Growth Factor in Vitro and Neointimal Proliferation in Vivo," *J. Pharmacol. Exp. Thera.*, 1989, 248, 1167-1174.

Okada, T. et al., "Localized Release of Perivascular Heparin Inhibits Intimal Proliferation after Endothelial Injury without Systemic Anticoagulation," *Neurosurgery*, 1989, 25, 892-898.

Poon, M. et al., "Rapamycin Inhibits Vascular Smooth Muscle Cell Migration," *J. Clin Invest.*, Nov. 1996, 98(10), 2277-2283.

Popma, J. J. et al., "Clinical trials of restenosis after coronary angioplasty," *Circulation*, Sep. 1991, 84(3), 1426-1436.

Powell, J. S. et al., "Inhibitors of Angiotensin-Converting Enzyme Prevent Myointimal Proliferation After Vascular Injury," *Science*, 1989, 245, 186-188.

Rensing, B. J. et al., Coronary restenosis elimination with a sirolimus eluting stent, *European Heart Journal*, 2001, 22, 2125-2130.

Rodeck, C. et al., "Methods for the Transcervical Collection of Fetal Cells During the First Trimester of Pregnancy," *Prenatal Diagnosis*, 1995, 15, 933-942.

Serruys, P. W. et al., "A comparison of balloon-expandable-stent implantation with balloon angioplasty in patients with coronary artery disease," *N Engl J Med*, Aug. 25, 1994; 331(8), 489-495.

Serruys, P. W. et al., "Evaluation of ketanserin in the prevention of restenosis after percutaneous transluminal coronary angioplasty. A multicenter randomized double-blind placebo-controlled trial," *Circulation*. Oct. 1993; 88(4 Pt 1), 1588-1601.

Serruys, P. W. et al., "Heparin-coated Palmaz-Schatz stents in human coronary arteries. Early outcome of the Benestent-II Pilot Study," *Circulation*, Feb. 1, 1996; 93(3), 412-422.

Siekierka, J. J., "Probing T-Cell Signal Transduction Pathways with the Immunosupressive Drugs, FK-506 and Rapamycin," *Immunologic Research*, 1994, 13, 110-116.

Sigwart, et al., "Intravascular Stents to Prevent Occlusion and Restenosis After Transluminal Angioplasty," *N. Engl. J. Med.*, Mar. 19, 1987, 316, 701-706.

Simons, M. et al., "Antisense c-*myb* oligonucleotides inhibit intimal arterial smooth muscle cell accumulation in vivo," *Nature*, 1992, 359, 67-70.

Snow, A. D. et al., "Heparin modulates the composition of the extracellular matrix domain surrounding arterial smooth muscle cells," *Am. J. Pathol.*, 1990, 137, 313-330.

Sollott, S. J. et al., "Taxol Inhibits Neointimal Smooth Muscle Cell Accumulation after Angioplasty in the Rat," *J. Clin. Invest.*, 1995, 95, 1869-1876.

van Der Giessen, et al., "Self-expandable Mesh Stents: an Experimental Study Comparing Polymer Coated and Uncoated Wallstent Stents in the Coronary Circulation of Pigs," *Circulation* 1990, 82(suppl. III):III-542.

van Der Giessen, W. J. et al., "Coronary stenting with polymer-coated and uncoated self-expanding endoprostheses in pigs," Coron. Art. Disease 1992; 3, 631-640.

Vasey, C. G. et a., "Clinical Cardiology: Stress Echo and Coronary Flow", , *Circulation*, Oct. 1989, 80(4) Supplement II, II-66.

Verweire, E. et al., "Evaluation of Fluorinated Polymers As Coronary Stent Coating," *Journal of Materials Science: Materials in medicine*, Apr. 2000.

Weinberger, J. et al., "Intracoronary irradiation: dose response for the prevention of restenosis in swine," *Int. J. Rad. Onc. Biol. Phys.*, 1996, 36, 767-775.

Preliminary Amendment in U.S. Appl. No. 07/258,189, May 22, 1989.

Trial Transcript from Nov. 6, 2000 at 185-90 and 235-36 (Attorney's opening remarks regarding '984 patent).

Trial Transcript from Nov. 7, 2000 at 274-301, 307-315, 320-28 and 332 (Cordis expert testimony regarding the Palmaz-Schatz stent); 370-379, 480-496 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 8, 2000 at 547-63, 657-63, 674-722, 782-85 (Cordis expert testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art).

Trial Transcript from Nov. 9, 2000 at 819-23, 921 (Cordis expert testimony regarding the '984 patent); 926-941 . (R. Croce testimony re Palmaz-Schatz stent); 1033-1053. (R. Schatz testimony).

Trial Transcript from Nov. 13, 2000 at 1086-1134. (R. Schatz testimony); 1275-1305 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 14, 2000 at 1390-1404, 1448-1454, 1486-1500 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Nov. 15, 2000 at 1686-87, 1724-42, 1828-34, 1850-54, 1887-92 (AVE expert testimony regarding the '984 patent).

Trial Transcript from Nov. 16, 2000 at 2077-198 (AVE expert testimony regarding the alleged obviousness of the '984 patent).

Trial Transcript from Nov. 17, 2000 at 2331-34 (jury instructions as to the meaning of the limitations of the claims of the '984 patent).

Trial Transcript from Nov. 20, 2000 at 2441-48, 2499-2500, 2546-50, 2552-56 (Attorney's closing arguments regarding the '984 patent).

Trial Transcript from Nov. 21, 2000 at 2592-94 (reading of jury verdict).

Trial Transcript from Dec. 18, 2000 at 2750-95 (Cordis expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Trial Transcript from Dec. 20, 2000 at 3421-88 (AVE expert testimony regarding the Palmaz-Schatz stent during the damages phase).

Jury verdict, dated Nov. 21, 2000.

District Court decisions on post-trial motions (194 F. Supp. 2d 323).

Court of Appeal for the Federal Circuit decision (339 F.3d 1352).

Trial Transcript from Mar. 4, 2005 at 133-135, 171-173 and 192-96 (Attorney's opening remarks regarding '984 validity).

Trial Transcript from Mar. 7, 2005 at 275-31 1 (Cordis expert testimony regarding the Palmaz-Schatz stent); 342-46, 353-59, 416-425 (J. Palmaz testimony regarding the Palmaz-Schatz stent, the '984 patent and the connected z-stent art); 430-449, 452-58, 462-492 (R. Croce testimony regarding the Palmaz-Schatz stent); 500-507 (Cordis expert testimony regarding the '984 patent).

Trial Transcript from Mar. 8, 2005 at 609 (Cordis expert testimony regarding the '984 patent); 628-73, 724-740, 773, 801-839 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 9, 2005 at 936-49, 968-69 (Cordis expert testimony regarding the '984 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Mar. 10, 2005 at 1427-74, 178-1509, 1514-23 (AVE expert testimony regarding the alleged obviousness of the '984 patent); 1566-93 (AVE expert testimony regarding Palmaz-Schatz stent); 1634-49 (R. Schatz testimony).

Trial Transcript from Mar. 11, 2005 at 1846-47, 1891-1900, 1919 (Attorneys' closing arguments regarding '984 obviousness).

Trial Transcript from Mar. 14, 2005 at 1964-67 (reading of jury verdict).

Jury verdict dated Mar. 14, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for Judgment As A Infringement Claim dated Apr. 19, 2005.

Medtronic Vascular Inc.'s Opening Brief in Support of Its Motion for a New Trial dated Apr. 19, 2005.

D.I. 1407, Cordis' Combined Answering Brief In Opposition to AVE's Motion for JMOL on Infringement of the Palmaz '762 and Schatz '984 Patents and Its Motion for a New Trial dated May 5, 2005.

D.I. 1414, Medtronic Vascular Inc.'s Combined Reply Brief In Support of Its Motion for Judgment as a Matter of Law on Cordis Corp.'s Patent Infringement Claims and Its Motion for a New Trial dated May 19, 2005.

Trial Transcript from Feb. 8, 2001 at 372-412, 449-469 (B. Tobor testimony regarding the prosecution of the '417, '984 and '332 patents); 510-13 (J. Milnamow testimony regarding the prosecution of the '332 patent); 558-604 (J. Palmaz testimony regarding the prosecution of the '417, '984 and '332 patents and the prior art).

Trial Transcript from Feb. 9, 2001 at 637-45, 662-672, 682-85 (J. Palmaz testimony regarding the prior art); 699-742 (R. Schatz testimony); 769-770, 790-95 (Cordis expert testimony regarding prior art).

D.I. 1067, Medtronic AVE, Inc.'s Post-Trial Brief Relating to the Unenforceability of the '762 and '984 Patents Due to Inequitable Conduct.

D.I. 1077, Cordis' Combined Answering Brief in Opposition to AVE's BSC's Post-Hearing Briefs on Alleged Inequitable Conduct Concerning the '762, '984 and '332 Patents.

D.I. 1089, Reply Brief In Support of Medtronic AVE, Inc.'s Contention that the '762 and '984 Patents are Unenforceable Due to Inequitable Conduct dated May 7, 2001.

C.A. No. 00-886-SLR, Answer and Counterclaims of Def. Medtronic AVE, Inc. To First Amended Complaint of Plaintiff Cordis Corp.

BSC's Opening Post-Trial Brief in Support of Its Defense That the Patents in Suit Are Unenforceable, dated Mar. 16, 2001.

Reply Brief in Support of BSC's Defense That the Patents in Suit Are Unenforceable, dated May 7, 2001.

Court's Decision on allegations of inequitable conduct (194 F. Supp. 2d 323) Mar. 28, 2002.

Trial Transcript from Nov. 21, 2000 at 155-57 and 180-84 (Attorneys'opening remarks regarding '332 patent).

Trial Transcript from Nov. 27, 2000 at 227-51, 260-300 (Cordis expert testimony regarding the Palmaz-Schatz stent); 343-60, 363-67, 424-33 (J. Palmaz testimony regarding the Palmaz-Schatz stent and the '332 patent).

Trial Transcript from Nov. 28, 2000 at 649-71.

Trial Transcript from Nov. 29, 2000 at 791-816, 859-870, 953-62 (Cordis expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Nov. 30, 2000 at 1018 (Cordis expert testimony regarding the '332 patent); 1062-80, 1108-1111 (R. Croce testimony regarding the Palmaz-Schatz stent); 1169-70, 1205-17, 1236-45 (Cordis expert testimony regarding the '332 patent).

Trial Transcript from Dec. 1, 2000 at 1352-54 (Cordis expert testimony regarding the '332 patent); 1364-1442 (R. Schatz testimony); 1493-1508, 1552-69 (BSC expert testimony regarding the '332 patent and the Palmaz-Schatz stent).

Trial Transcript from Dec. 4, 2000 at 1602-12, 1638-51, 1713-14, 1730-61, 1811-14, 1823-36 (BSC expert testimony regarding the alleged obviousness of the '332 patent, the prior art and the Palmaz-Schatz stent).

Trial Transcript from Dec. 6, 2000 at 2318-27, 2342-58 (BSC expert testimony regarding the '332 patent).

Trial Transcript from Dec. 7, 2000 at 2549-52 (Cordis expert testimony regarding the '332 patent); 2575-2579, 2591-92, 2630-31, 2649, 2669-71, 2684-85, 2688, 2708-10, 2725-27 (Attorney closing argument regarding '332 patent); 2742-46 Q'ury instructions as to the meaning of the limitations fo the claims of the '332 patent).

Trial Transcript from Dec. 11, 2000 at 2817-22 (reading of jury verdict).

Jury verdict, dated Dec. 11, 2000.

D.I. 699, Motion by Defendant BSC and Scimed Life Systems, Inc. For Summary Judgment of Invalidity of U.S. Patent No. 5,902,332 dated Apr. 4, 2000.

D.I.896, Order Denying Motion for Summary Judgment of Invalidity and Unenforceability of Claims 1, 3, and 5 of the U.S. Patent No. 5,902,332 Denying {699-1} Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,902,332 dated Oct. 12, 2000.

Wright et al., Percutaneous Endovascular Stent: An Experimental Study (Abstract), RSNA Meeting (Nov. 28, 1984).

Hearing Transcript from Feb. 10, 1998 at 122-32, 146-80 (Attorneys' opening remarks regarding '417 patent); 180-312 (R. Schatz testimony) [Portions of This Transcript Have Been Removed As Confidential].

Hearing Transcript from Feb. 11, 1998 at 427-575, 577-651 (Cordis expert testimony regarding the '417 patent, the prior art and the Palmaz-Schatz stent).

Hearing Transcript from Feb. 13, 1998 at 1121-1261 (Guidant expert testimony regarding the alleged obviousness of the '417 patent, the prior art and the Palmaz-Schatz stent). [Portions of This Transcript Have Been Removed As Confidential].

Order by J. Robinson denying Cordis' Motion for a Preliminary Injunction Against ACS dated Jul. 17, 1998.

ACS, Inc.'s and Guidant Corp.'s Opening Brief in Support of Their Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,102,417 dated Aug. 27, 1998.

Plaintiffs' Answering Brief in Opposition to ACS' and BSC' Motion for Summary Judgment on Obviousness dated Sep. 24, 1998.

Order dated Mar. 31, 2000.

Schatz Deposition Testimony; May 15, 1996: 79-83, 89-92, 105-107 and 153-161.

Schatz Deposition Testimony; May 16, 1996: 555-564, 569-572.

Schatz Deposition Testimony; Jan. 18, 1998: 67-73, 108-110.

Schatz Deposition Testimony; Jul. 14, 1998: 69-77, 108-112, 119-123.

Schatz Deposition Testimony; Jul. 12, 1999: 88-91, 132-135, 144-149, 218-223, 231-242.

Schatz Deposition Testimony; Jul. 13, 1999: 251-334, 339-345, 374-416.

Schatz Deposition Testimony; Jul. 14, 1999: 454-550.

Schatz Deposition Testimony; Jul. 15, 1999: 560-614.

Schatz Deposition Testimony; Dec. 2, 1999: 906-911, 928-942, 945-963, 976-978, 1029-1034, 1038-1042.

Palmaz Deposition Testimony, Nov. 5, 1991: 160-172.

Palmaz Deposition Testimony, Feb. 5, 1995: 710-727.

Palmaz Deposition Testimony, Jul. 16, 1998: 55-56; 81-82.

Palmaz Deposition Testimony, Jul. 28, 1999: 560-568, 570-579.

Palmaz Deposition Testimony, Jul. 29, 1999: 778-785.

Palmaz Deposition Testimony, Aug. 31, 1999: 1403-1452.

Palmaz Deposition Testimony, Sep. 2, 1999: 1953-1960.

US 7,300,662 B2
Page 8

Palmaz Deposition Testimony, Oct. 14, 1999: 2201-2209; 2275-2342; 2371-2411.

Palmaz Deposition Testimony, Oct. 15, 1999: 2424-2497; 2508-2589.

Palmaz Deposition Testimony, Oct. 16, 1999: 2853-2860.

Tobor Deposition Testimony, Jun. 17, 1999: 837-958.

Tobor Deposition Testimony, Jun. 18, 1999: 1095-1184.

Tobor Deposition Testimony, Dec. 1, 1999: 1217-1371.

Tobor Deposition Testimony, Dec. 2, 1999: 1398-1414; 1444-1508; 1532-1548.

Tobor Deposition Testimony, Dec. 3, 1999: 1652-1653; 1662-1672; 1683-1694.

Kula Deposition Testimony, Apr. 20, 1999: 268-169.

Kula Deposition Testimony, Nov. 16, 1999: 660-675; 680-694; 748-755; 774-821.

Kula Deposition Testimony, Nov. 18, 1999; 176-223.

Expert Report of Dr. Rodney S. Badger on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Expert Report of Dr. Joseph Bonn on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Dr. Joseph Bonn dated Mar. 14, 2000.

Rebuttal Expert Report of Nigel Buller, B.Sc., M.D., F.R.C.P. (Mar. 2000).

Second Supplemental Rebuttal Expert Report of Nigel Buller, B.Sc., M.B., F.R.C.P. (Aug. 17, 2004).

Rebuttal Expert Report of John M. Collins, PH.D. (Feb. 2000).

Expert Report of David C. Cumberland, M.D. (Jan. 24, 2000).

Expert Report of John T. Goolkasian (Feb. 2000).

Deposition of Richard R. Heuser, M.D. (Sep. 7, 2004).

Deposition of Henry R. Piehler (Sep. 10, 2004).

Deposition of Ronald J. Solar (Mar. 22, 2000).

Deposition of Ronald J. Solar (Mar. 23, 2000).

Deposition of Ronald J. Solar (Apr. 12, 2000).

Expert Report of Dr. Arina Van Breda on Behalf of Medtronic AVE, Inc. (Jan. 31, 2000).

Deposition of Arina Van Breda (Mar. 24, 2000).

Deposition of Arina Van Breda (Aug. 21, 2004).

Expert Report of John F. Witherspoon (Jan. 24, 2000).

Supplemental Expert Report of John F. Witherspoon (Oct. 27, 2000).

Deposition of John F. Witherspoon (Mar. 8, 2000).

Palmaz et al., Article: Normal and Stenotic Renal Arteries: Experimental Balloon Expandable Intraluminal Stenting, Radiology, Sep. 1987. (AVE 84).

Julio C. Palmaz, Article: "Expandable vascular endoprosthesis." (AVE 132).

Duprat et. al., Article: Flexible Balloon-Expandable Stent for Small Vessels Duprat et. al. Radiology, vol. 162, pp. 276-278, 1987. (AVE 134).

Coons et. al., Article: "Large-Bore, Long Biliary Endoprosthesis (Biliary Stents) for Improved Drainage," Radiology, vol. 148, pp. 89-94, 1983. (AVE 143).

Honickman et al., Article: "Malpositioned Biliary Endoprosthesis, Technical Developments And Instrumentation," vol. 144, No. 2., 1982. (AVE 144).

Harries-Jones, et al., Article: "Repositioning of Biliary Endoprosthesis with Gruntzig Balloon Catheters," AJR, vol. 138, pp. 771-772, 1982. (AVE 153).

Charnsangavej et al., Article "Stenosis of the Vena Cava: Preliminary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (AVE 359).

Article "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 158, pp. 309-312, 1986. (AVE 364).

T. Yoshioka, et al., AIR Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs", vol. 151, pp. 673-676, 1988. (AVE 438).

Article: "Expandable Intraluminal Vascular Graft: A Feasibility Study," Surgery, vol. 99, pp. 199-205, 1986. (AVE 461).

Lawrence et al., Article: "Percutaneous Endovascular Graft: Experimental Evaluation." Radiology, vol. 163, pp. 357-360, 1987. (AVE 671).

Palmaz et al., Article: Expandable Intraluminal Graft: A Preliminary Study, Nov. 17-22, 1985, Radiology, vol. 156, pp. 73-77, 1985. (AVE 1224).

Fallone et al., "Elastic Characteristics of the Self-Expanding Metallic Stents," Investigative Radiology, vol. 23, pp. 370-376, 1988. (AVE 1953).

Palmaz Paper Entitled "Research Project Expandable Vascular Endoprosthesis" May 18, 1983.

Rousseau et al., Publication: "Percutaneous Vascular Stent: Experimental Studies & Preliminary Clinical Results in Peripheral Arterial Diseases," in Inter. Angio, vol. 6, 153-161, 1987. (AVE 3301).

Rousseau , et al., Publication: "Self-Expanding Endovascular Prostesis: An Experimental Study," Radiology, vol. 164, pp. 709-714, 1987. (AVE 3303).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications," Radiology, vol. 58, pp. 309-312, 1986. (DBX 2938).

Palmaz et al., Article: "Expandable Intraluminal Graft: A Preliminary Study," Radiology, vol. 156, pp. 73-77 (DBX 4595).

Program for the 12th Annual Course on Diagnostic Angiography and Interventional Radiology Mar. 23-26, 1987 sponsored by The Society of Cardiovascular and Interventional Radiology (DBX 6235).

Preliminary Motion for Judgment re: Wolff claims 1, 2-8, 10, 15 and 19 (DBX6759).

Palmaz Declaration (DBX 7069).

Letter from Gaterud to Dr. Palmaz dated Jul. 5, 1988 with attached document entitled: "Segmented, balloon-expandable stents." (DBX 7160).

Duprat et al., Article: "Flexible Balloon-Expandable Stent For Small Vessels," Radiology, vol. 168, pp. 276-278, 1987 (PX 82).

Drawing Sent to Bodic on Mar. 17, 1986 (PX 374).

Letter from Dr. Palmaz to R. Bowman enclosing a model of the flexible coronary graft dated Mar. 17, 1986 (PX 337).

Lab Notebook pages dated Jul. 30, 1987 from Rodney Wolff (COR 185596-597) (PX621A).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminary Assessment of Treatment with expandable Metallic Stents," Radiology, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (API 72).

J. Palmaz: The Current Status of Vascular Prostheses, published by SCIR in the Twelfth Annual Course on Diagnostic Angiography And Interventional Radiology Mar. 23-26, 1987. (API 73).

Amendment in Response to Office Action of Oct. 18, 1988 in re: Application of Julio Palmaz S/N 174,246. (API 152).

Article: Wallace, et al., Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work In Progress, Radiology, vol. 158, pp. 309-312. (API 295).

Reply of Senior Party Schatz To Patentee Wolff's Opposition To The Belated Motion For Judgment Of Applicant Schatz With Regard To Wolff Claims 1, 2-8, 10, 11, 13-17, And 19 (COR 186450-455) (API 310).

Brief Of Senior Party Schatz At Final Hearing (API 313).

Letter from Ron Sickles to Ben Tobor dated Feb. 10, 1988 (Exhibit 42).

Letter from R.O. Sickles to Mike Tatlow dated May 12, 1988 (Exhibit 43).

Letter from R. 0. Sickles to Richard Schatz dated Jun. 2, 1988 (Exhibit 44).

Letter from Richard Schatz to Raimund Erbel dated Jun. 3, 1988 (Exhibit 45).

Letter from Richard Schatz to Mike Schuler dated Aug. 29, 1991 (Exhibit 48).

Minutes of J&J Stent Project Review Meeting dated Jan. 21, 1988 (Exhibit 7).

Preliminary Motion for Judgment with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17, and 19. (Exhibit 67).

Declaration of Richard A. Schatz. (Exhibit 75).

Belated Motion for Judgement with Regard to Wolff Claims 1, 2-8, 10, 11, 13-17 and 19. (Schatz—Exhibit 77).

Letter from Dr. Schatz to Mr. Tobor, dated Jun. 3, 1988. (Exhibit 122).

Letter from Dr. Scharz to Mr. Romano, dated Nov. 28, 1988. (Exhibit 131).

Letter from Mr. Sickles to Mr. Tobor, dated Feb. 10, 1988 (Exhibit 145).

Richard A. Schatz, Article titled: "A View of Vascular Stents" Circulation, vol. 79, No. 2, pp. 445-457, 1989. (Exhibit 194).

Senior Party Schatz's reply to Patente Wolffs Opposition to the Preliminary Motion Of Applicant Schatz for Judgment with regard to Wolff Claims 1, 2-8, 10, 11, and 13-17. (Exhibit 69).

Wallace, et al., Article: "Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications' Work In Progress," Radiology, vol. 158, pp. 309-312, 1986. (Exhibit 165).

Charnsangavej, et al., Article: "Stenosis of The Vena Cava Preliminnary Assessment of Treatment with expandable Metallic Stents," Radioloby, vol. 161, No. 2, pp. 295-298 with attached photographs, 1986. (Exhibit 167).

David D. Lawrence et al., Publication: Percutaneous Endoyascular Graft: Experimental Evaluation[1], Radiology, pp. 357-360, 1987. (Exhibit 173).

Charles E. Putnam, M.D., Cover and article from "Investigative Radiology",vol. 23. No. 5, May 1988. (Exhibit 177).

Robert N. Berk, Cover and article from "American Journal of Roentology", pp. 673-676, 1988. (Exhibit 178).

Declaration of John S. Kula Under 37 CFR § 1.672. (Kula—Exhibit 77).

Yoshioka et al., Article: "Self-Expanding Endovascular Graft: An Experimental Study in Dogs" AJR, vol. 151, pp. 673-676, 1988. (PX 100).

Palmaz, et al., Article: Expandable Intraluminal Graft: A Preliminary Study Work in Progress[1], Radiology, vol. 156, No. 1, pp. 73-77, 1985. (PX 101).

Declaration of Richard Schatz Under 37 C.F.R.§ 1.672. (PX 106).

Charnsangavej et al., Article: "Stenosis of the Vena Cava: Preliminnary Assessment of Treatment with Expandable Metallic Stents," Radiology, vol. 161, pp. 295-298, 1986. (PX 143).

Wallace, et al., Article: Tracheobronchial Tree: Expandable Metallic Stents Used in Experimental and Clinical Applications Work in Progress[1], Radiology, vol. 158, pp. 309-312,1986. (PX 144).

Gina Kolata, News Article: NY Times, "Devices That Opens Clogged Arteries Gets a Falling Grade in a New Study", pp. 16-18, Jan. 3, 1991. (PX 186).

Duprat, et al., Article: "Flexible Balloon- Expanded Stent for Small Vessels Work in Progress[1]", Radiology, vol. 162, pp. 276-278, 1987. (PX 207).

Letter from Palmaz to Bowman dated Mar. 17, 1986. (PX 350).

Memo re: Minutes of Stent Project Review- San Antonia- Mar. 15, 1988. (PX 651).

Kuntz, et al., Article: Clinical Cardiology Frontiers: "Defining Coronary Restenosis, Newer Clinical and Angiographic Paradigms", Circulation, Sep. 1993, vol. 88, No. 3, pp. 1310-1323. (PX 854).

Belated Motion for Judgment with regard to Wolff Claimsl, 2-8, 10, 11, 13-17, and 19. (PX 1410).

Drawing of Sprial Stent (sent to Bodie Mar. 17, 1986). (PX2933).

Wright et al., Article: "Percutaneous Endovascular Stents: An Experimental Evaluation," Radiology, vol. 156, pp. 69-72, 1985. (PX 3093).

Charnsangavej et al., Article: "A New Expandable Metallic Stent for Dilation of Stenotic Tubular Structures: Experimental and Clinical Evaluation," Houston Medical Journal, vol. 3, pp. 41-51, Jun. 1987. (PX 3207).

In re Application of Wiktor, Appln. No. 69,636, Response to Office Action dated Mar. 17, 1988. (PX3236).

Transmittal Letter of Response to First Office Action in '417 patent. (PX 3993).

Letter from B. Tobor to R. Schatz dated Jul. 23, 1991. (PX 3996).

Mullins et al., Article: "Implantation of balloon-expandable intravascular grafts by catherization in pulmonary arteries and systemic veins," Circulation, vol. 77, No. 1, pp. 188-189,1988. (PX4049).

Schatz et al., Article: "Intravascular Stents for Angioplasty," Cardio, 1997. (PX 4050).

Schatz et al., Article: "New Technology in Angioplasty Balloon-Expandable Intravascular Stents, New Developments in Medicine," vol. 2, No. 2 pp. 59-75, 1987. (PX4051).

Richard A. Schatz, Article: "Introduction to Intravascular Stents," Cardiology Clinics, vol. 6, No. 3, pp. 357-372, 1988. (PX 4052).

Richard A. Schatz, Article: "A View of Vascular Stents," Circulation, vol. 79, No. 2, pp. 445-457, 1989. (PX4053).

Wang et al., Article: "An Update on Coronary Stents," Cardio, pp. 177-186, 1992. (PX 4054).

Richard A. Schatz, Article: "New Technology in Angioplasty: Balloon-Expandable Starts," Medicamundi, vol. 33, No. 3, pp. 112-116, 1988. (PX 4055).

Letter from Tobor to Schatz dated Sep. 29, 1988. (PX 1395).

Verified Statement of Facts by Unnamed Inventor R.A. Schatz document filed in U.S. Patent and Trademark Office on Sep. 8, 1989. (PX 3677).

Declaration of John S. Kula Under 37 CFR § 1.672 (Exhibit 329).

Letter to Mike Schular from R.A. Schatz dated Aug. 29, 1991. (Exhibit 402).

Articulated, Balloon—Expandable Stents, (DBX 7159).

J. Rosch et al., Experimental Intrahepatic Portacaval Anastomosis: Use of Expandable Gianturco Stents, Radiology, vol. 162, pp. 481-485, 1987.

J. Rosch et al., Modified Gianturco Expandable Wire Stents In Experimental and Clinical Use, Ann Radiol, vol. 31, No. 2, pp. 100-103, 1987.

J. Rosch et al., Gianturco Expandable Stents In the Treatment of Superior Vena Cava Syndrome Recurring After Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

I.E. Gordon, Structures or Why Things Don't Fall Down, Penguin Books, pp. 45-59, 132-148, 210-244, 377-383.

Maass et al., Radiological Follow-up of Transluminally Inserted Vascular Endoprostheses: An Experimental Study Using Expanding Spirals, Radiology, vol. 152, pp. 659-663, 1984.

Argument submitted re EP 861 15473 dated Jan. 20, 1995. (AVE 2478).

Verified Statement of Facts by Julio C. Palmaz dated Aug. 4, 1989. (PX 3662).

Papanicolaou et al., Insertion of a Biliary Endoprosthesis Using A Balloon Dilatation Catheter, Gastrointest Radiology, vol. 10, pp. 394-396, 1985.

Palmaz et al., Atheroscierotic Rabbit Aortas: Expandable Intraluminal Grafting, Radiology, vol. 168, pp. 723-726, 1986.

Palmaz, The Current Status of Vascular Prostheses; Rosch et al., Gianturco, Expandable Stents in Experimental and Clinical Use, SCIVR, pp. 118-124, 1987.

Rosch et al., Abstract: Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CIRSE, Porto Cervo, Sardinia, May 25-29, 1987.

Rosch et al., Gianturco Expandable Wire Stents in the Treatment of Superior Vena Cava Syndrome Recurring After Maximum-Tolerance Radiation, Cancer, vol. 60, pp. 1243-1246, 1987.

Mirich et al., Percutaneously Placed Endovascular Grafts for Aortic Aneurysms: Feasibility Study, Radiology, vol. 170, pp. 1033-1037, 1989.

Dotter, Transluminally-placed Coilspring Endarterial Tube Grafts, Investigative Radiology, vol. 4, Sept.-Oct., pp. 329-332, 1969.

Palmaz et al., Abstract: Expandable Intraluminal Graft: A Preliminary Study, Radiology, vol. 153 (P), Nov. 1983: 70th Scientific Assembly and Annual Meeting.

Cragg et al, Nonsurgical Placement of Arterial Endoprostheses: A New Technique Using Nitinol Wire, Radiology, vol. 147, pp. 261-263, Apr. 1983.

J. Rosch et al., Gianturco Expandable Stents in Experimental and Clinical Use, Program: "Twelfth Annual Course on Dignostic Angiography and Interventional Radiology" (Society of Cardiovascular and Interventional Radiology, Pittsburgh, PA), Mar. 23-26, 1987 (the second Monofilament Article).

Uchida et al., Modifications of Gianturco Expandable Wire Stents, AIR, vol. 150, pp. 1185-1187,1988.

Palmaz, Balloon-Expandable Intravascular Stent, AJR, vol. 1510, pp. 1263-1269.

**US 7,300,662 B2**

Page 10

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCMED Life System, Inc.*, Plaintiffs Complaint, Oct. 23, 1997 (Case No. 97-550-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership*, Plaintiffs First Amended Complaint for Declaratory Relief of Patent Validity, Unenforceability, Noninfiingement, and for Antitrust Violations, Jan. 27, 1998 (Civil Action No. 97-700).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim*, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership, Expandable-Graft Partnership's Answer*, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership*, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Cordis Corporation, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable-Grafts Partnership*, Reply of Plaintiff Arterial Vascular Engineering, Inc. To Counterclaims of Defendant Expandable Grafts Partnership, Mar. 31, 1998 (Civil Action No. 97-700-SLR).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc. and Guidant Corporation*Cordis Corporation's Motion for a Preliminary Injunction, Oct. 8, 1997 (Civil Action No. 97-550).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCJJVIED, Inc., Cordis 's Motion for Preliminary Injunction Against Arterial Vascular Engineering, Inc.*, Dec. 29, 1997 (Case No. 97-550-SLR).

Deposition of R. Schatz, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Jan. 8, 1998 (Civil Action No. 97-550 SLR).

Deposition of Lee P. Bendel in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Jan. 22, 1998 (Civil Action No. 97-550 SLR).

Deposition of Julio Cesar Palmaz in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Dec. 29, 1997 (Civil Action No. 97-550 SLR).

Deposition of Richard A. Bowman in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Jan. 9, 1998 (Civil Action No. 97-550 SLR).

Deposition of Gary Schneiderman in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Jan. 16, 1998 (Civil Action No. 97-550 SLR).

Deposition of David Pearle, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, taken on Jul. 10, 1998 (Civil Action No. 97-550 SLR).

Preliminary Injuction hearing testimony taken on Feb. 9-13, 1998 (Civil Action No. 97-550 SLR).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.*, et al., (Civil Action No. 97-550 SLR) and *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.* Et al. (Civil Action No. 98-65-SLR), Opening Post Hearing Brief of Plaintiff Cordis Corporation in Support of Motion for Preliminary Injunction, Mar. 6, 1998 (Portions relevant to patent claim construction and patent validity issues).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc.* et al., Post-Hearing Reply Brief of Plaintiff Cordis Corporation in Support of Its Motion for Preliminary Injunction, Apr. 10, 1998 (Case No. 97-550 SLR) (Portions relevant to patent validity issues).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc.*, et al., Plaintiffs Motion for a Preliminary Injunction Against Boston Scientific Corporation and SCLMED Life Systems, Inc. And Memorandum in Support, Apr. 13, 1998 (Case No. 97-550-SLR).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc.*, et al., Judge Robinson's

Order Denying Plaintiffs Motion for a Preliminary Injunction, Jul. 17, 1998 (Civil Action No. 97-550 SLR).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc.*, et al., Defendant Boston Scientific Corporation and SCTMED Life Systems, Inc.'s Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,102,417, Aug. 27, 1998 (Civil Action No. 97-550-SLR).

*Boston Scientific Limited*, et al. v. *Expandable Grafts Partnership*, Plaintiff's Statement of Claim, Mar. 13, 1997 (UK Action No. 1493).

*Boston Scientific Limited*, et al. v. *Expandable Grafts Partnership*, Defendant's Amended Defense and Counterclaim, Aug. 14, 1997 (UK Action No. 1493).

*Boston Scientific Limited*, et al. v. *Expandable Grafts Partnership*, Petition for Revocation, Mar. 13, 1997 (UK Action No. 1497).

*Boston Scientific Limited*, et al. v. *Expandable Grafts Partnership*, Particulars of Objections, Mar. 13, 1997 (UK Action No. 1497).

*Boston Scientific Limited*, et al. v. *Expandable Grafts Partnership and Boston Scientific Limited* et al., v. *Julio C. Palmaz, Boston's Skeleton Argument* (UK Action Nos. 1493, 1495, 1496, and 1497).

*Boston Scientific Limited*, et al. v. *Julio C. Palmaz and Expandable Grafts Partnership*, Skeleton Argument of Palmaz/EGP, Mar. 19, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

*Boston Scientific Limited*, et al. v. *Julio C. Palmaz and Expandable Grafts Partnership*, EGP's Final Submissions, Apr. 2, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

*Boston Scientific Limited*, et al. v. *Julio C. Palmaz and Expandable Grafts Partnership*, Judgment, Jun. 26, 1998 (UK Action Nos. 1493, 1495, 1496 and 1497).

Rosch, Modified Gianturco Expandable Wire Stents in Experimental and Clinical Use, CJJR.SE 1987 Presentation: *see* Witness Statement of Josef Rosch from U.K. Proceeding.

Statement of Claim by Boston Scientific et al. against Expandable Grafts Partnership et al., in *EPG* et al., v. *Boston Scientific* et al. in Netherlands (Mar. 13, 1997).

Motion for Joinder of Actions, Change of Claim and Statement of Claim filed by Expandable Grafts Partnership et al. in *EPG* et al. v. *Boston Scientific* et al. In Netherlands (Apr. 22, 1997).

Opinion of K.J. Merman filed in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Aug. 29, 1997).

Expert report of Dr. Nigel Buller in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Aug. 28, 1997).

Expert report of Lee P. Bendel in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Aug. 28, 1997).

Memorandum or Oral Pleading in *EPG* et al. v. *Boston Scientific* et al. in Netherland (Sep. 12, 1997).

Plea Notes of P. A.M. in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Mar. 10, 1998).

Decision of Court of Appeals in *EPG* et al. v. *Boston Scientific* et al. In Netherlands (Apr. 23, 1998).

Translation of Nullity Action Against EPO 0 364 787 by Biotronik in Germany.

Translation of Nullity Action Against EPO 0 335 341 by Biotronik in Germany.

Translation of EPG Response to Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of EPG Response to Nullity Action EP 0 335 341 by Biotronik in Germany.

Nullity Suit Against EP-B1-0 335 341 Brought by Boston Scientific in Germany.

Translation of Opposition filed by Terumo Corp. Against Japan Patent No. 2680901.

Translation of Decision on Opposition Against Japan Patent No. 2680901.

Memorandum Order of the Court dated Sep. 7, 2000, concerning disputed claim construction.

Translation of Judgment in Nullity Action Against EP 0 364 787 by Biotronik in Germany.

Translation of Judgment in Nullity Action Against EP 0 335 341 by Biotronik in Germany.

Trial transcript from Mar. 17, 2005 at 171-172, 191-192.

Trial transcript from Mar. 18, 2005 at 282-285, 325-327, 349-351.

Trial transcript from Mar. 21, 2005 at 721-726.

Trial transcript from Mar. 24, 2005 at 1387.

Trial transcript from Jul. 26, 2005.

BSC's Opening Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated Mar. 16, 2001.

Cordis' Answering Brief in Opposition to BSC's Motion for JMOL or a New Trial on the Palmaz '762 Patent and the Schatz '332 Patents, dated Apr. 17, 2001.

BSC'Reply Brief in Support of Its Motion for Judgment as a Matter of Law or, in the Alternative, for a New Trial, dated May 11, 2001.

J. Rosch et al., Abstract, Expandable Gianturco-Type Wire Stents in Experimental Intrahepatic Portacaval Shunts, Program: "72nd Scientific Assembly and Annual Meeting of the Radiological Society of North America", Nov. 30-Dec. 5, 1986, Radiology, vol. 161, pp. 40-41, 1986.

*Cordis Corporation* v. *Boston Scientific*, Order Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation* v. *Boston Scientific*, Judgment in a Civil Case Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation* v. *Boston Scientific*, Memorandum Opinion Dated Mar. 27, 2006 (97-550-SLR).

*Cordis Corporation and Expandable Grafts Partnership* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Answer and Counterclaims of Defendant Advanced Cardiovascular Systems, Inc., Apr. 8, 1998 (Case No. 97-550-SLR).

*Boston Scientific Limited* et al. v. *Expandable Grafts Partnership and Boston Scientific Limited* et al. v. *Julio C. Palmaz*, Boston's Closing Submissions (UK Action Nos. 1493, 1495, 1496 and 1497).

*Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc., Guidant Corporation, Arterial Vascular Engineering, Inc., Boston Scientific Corporation and SCIMED Life Systems, Inc.*, Defendants' Answer, Nov. 12, 1997 (Case No. 97-550-SLR).

Statement of Rejoinder in the Action on the Merits, Also Including an Amendment of Defendant's Final Position in the Principal Action, as Well as the Provisional Statement of Rejoinder in the Action on the Counterclaim in *EPG* et al. v. *Boston Scientific* et al. In Netherlands (Feb. 10, 1998).

Statement of Answer in the Ancillary Appeal in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Mar. 10, 1998).

Appeal filed by Expandable Grafts Partnership et al. in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Nov. 12, 1997).

Title filed by Boston Scientific et al. in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Jan. 22, 1998).

Deposition of Richard Schatz, M.D. in *Cordis Corporation* v. *Advanced Cardiovascular Systems, Inc.* taken on Jul. 14, 1998 (Civil Action No. 97-550-SLR).

Jury Verdict form from the *Cordis Corporation* et al v. *Boston Scientific Corporation*, et al liability trial, undated.

Trial testimony transcripts from the *Cordis Corporation* et al. v. *Boston Scientific Corporation* et al. liability trial dated Nov. 27-Dec. 1, Dec. 4-8 and Dec. 11, 2000.

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Stephen R. Hanson, Ph.D. (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Opening Expert Report of Robson F. Storey, Ph.D. (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc. and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Rebuttal Expert Report of Kinam Park, Ph.D. (Civil Action No. 03-283-SLR).

*Cordis Corporation* v. *Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) and *Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR) Combined Post-Hearing Brief In Support Of Cordis Corporation's Motion For Preliminary Injunction in C.A. No. 03-027-SLR, And In Opposition to Plaintiffs' Motion For Preliminary Injunction in C.A. No. 03-283-SLR.

*Cordis Corporation* v. *Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) *Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR), Boston Scientific's Opening Post-Hearing Brief.

*Cordis Corporation* v. *Boston Scientific Corporation and SCIMED Life Systems, Inc.* (C.A. No. 03-027-SLR) *Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.* (C.A. No. 03-283-SLR). Combined Post-Hearing Answering Brief In Support of Cordis Corporation's Motion For Preliminary Injunction In C.A. No. 03-027-SLR, And In Opposition To Plaintiffs Motion For Preliminary Injunction In C.A. No. 03-283-SLR.

Wu et al., Silicone-covered self-expanding metallic stents for the palliation of malignant esophageal obstruction and esophagorespiratory fistulas: experience in 32 patients and a review of the literature, *Gastrointestinal Endoscopy*, 1994, pp. 22-33, vol. 40, No. 1, Portland Oregon.

Binmoeller, et al., Silicone-Covered Expandable Metallic Stents in the Esophagus: An Experimental Study, Endoscopy, 1992, pp. 416-420, vol. 24, Georg Thieme Verlag Stuttgart New York.

*Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Answering Memorandum in Opposition to Plaintiffs Motion for a Preliminary Injunction and Appendix thereto (Civil Action No. 03-283-SLR).

*Boston Scientific SCIMED, Inc., and Boston Scientific Corporation* v. *Cordis Corporation and Johnson and Johnson, Inc.*, Plaintiff s Reply Brief in Support of Their Motion for Preliminary Injunction.

Rhine, Polymers for Sustained Macromolecule Release: Procedures to Fabricate Reproducible Delivery Systems and Control Release Kinetics, *Journal of Pharmaceutical Sciences*, 1980, pp. 265-270, vol. 69, No. 3.

Langer et al., Controlled Release of Macromolecules From Polymers, *Biomedical Polymers Polymeric Materials and Pharmaceuticals for Biomedical Use*, 1980, pp. 112-137, Academic Press, Inc., New York, NY.

Langer et al., Applications of Polymeric Delivery Systems for Macromolecules and Factors Controlling Release Kinetics.

Rhine et al., A Method to Achieve Zero-Order Release Kinetics From Polymer Matric Drug Delivery Systems, pp. 67-72.

Langer et al., Polymers for the Sustained Release of Macromolecules: Controlled and Magnetically Modulated Systems, *Better Therapy With Existing Drugs: New Uses and Delivery Systems*, 1981, pp. 179-216, Merck Sharp & Dohme International, Rahway, NJ.

Hsieh, et al., Zero-Order Controlled-Release Polymer Matrices for Micro-and-Macromolecules, *Journal of Pharmaceutical Sciences*, 1983 pp. 17-22, vol. 72, No. 1.

Brown et al., In Vivo and In Vitro Release of Macromolecules from Polymeric Drug Delivery Systems, *Journal of Pharmaceutical Sciences*, 1983, pp. 1181-1185, vol. 72, No. 10.

Langer, Implantable Controlled Release Systems, *Pharmac. Ther.*, 1983, pp. 35-51, vol. 21, printed in Great Britain.

Kost et al., Controlled Release of Bioactive Agents, *Trends in Biotechnology*, 1984, pp. 47-51, vol. 2, No. 2, Elsevier BV Amsterdam.

Bawa et al., An Explanation for the Controlled Release of Macromolecules from Polymers, *Journal of Controlled Release*, 1985, pp. 259-267, vol. 1 Elsevier Science BV Amsterdam.

Leong et al., Polymeric controlled drug delivery, 1987, pp. 199-233, vol. 1/3, Elsevier Science Publishers BV Amsterdam.

Langer, Polymeric Delivery Systems, *Targeting of Drugs 2 Optimization Strategies*, 1989, pp. 165-174, Plenum Press, New York and London.

Langer, Biomaterials in Controlled Drug Delivery; New Perspectives from Biotechnological Advances; *Pharmaceutical Technology*, 1989, pp. 18, 23-24, 26, 28, 30.

Langer, Controlled Release Systems, pp. 115-124.

Laurencin et al., Polymeric Controlled Release Systems: New Methods for Drug Delivery, *Clinics in Laboratory Medicine*, 1987, pp. 301-323, vol. 7, No. 2, WB Saunders Company, Philadelphia.

Langer, Biopolymers in Controlled Release Systems, *Polymeric Biomaterials*, pp. 161-169.

Tsong-Pin Hsu et al., Polymers for the Controlled Release of Macromolecules: Effect of Molecular Weight of Ethylene-vinyl Acetate Copolymer, *Journal of Biomedical Materials Research*, 1985, pp. 445-460, vol. 19.

Langer, Polymers and Drug Delivery Systems, *Long-Acting Contraceptive Delivery Systems*, 1983, pp. 23-32, Harper & Row, Philadelphia, PA.

Langer, New Drug Delivery Systems: What the Clinician Can Expect, *Drug Therapy*, 1983, pp. 217-231.

Langer, et al., Chemical and Physical Structure of Polymers as Carriers for Controlled Release of Bioactive Agents: A Review, *Rev. Macromol. Chem. Phys.*, 1983, pp. 61-126.

Langer, Polymeric Delivery Systems for Controlled Drug Release, *Chem. Eng. Commun.* 1980, pp. 1-48-vol. 6, Gordon and Breach Science Publishers, Inc. USA.

Langer, et al., Biocompatibility of Polymeric Delivery Systems for Macromolecules, *Journal of Biomedical Materials Research*, 1981, pp. 267-277, vol. 15.

Langer, Controlled Release: A New Approach to Drug Delivery, *Technology Review*, 1981, pp. 26-34.

Langer, et al Sustained Release of Macromolecules from Polymers, *Polymeric Delivery Systems*, PGS. 175-176, Gordon and Breach Science Publishers, New York.

Langer, Polymers for the Sustained Release of Proteins and other Macromolecules, *Nature*, 1976, pp. 797, 263, 799-800, vol. 263, No. 5580.

Baker, et al., Controlled Release: Mechanisms and Rates (1974).

Hanson, et al., In Vivo Evaluation of Artificial Surfaces with a Nonhum Primate Model of Arterial Thrombosis,/ *Lab Clin. Med.*, Feb. 1980, pp. 289-304.

Baker, Controlled Release of Biologically Active Agents (1987) pp. 1-275.

*Cordis Corporation v. Boston Scientific Corporation* (CA. No. 03-27-SLR) and *Boston Scientific Scimed, Inc.*, v. *Cordis Corporation and Johnson & Johnson, Incorporated* (CA. No. 03-283-SLR) Hearing Transcripts for Jul. 21, 2003, Jul. 22, 2003, Jul. 23, 2003.

*Cordis Corporation v. Boston Scientific Corporational* et al. (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc.* et al. v. *Cordis Corporation* et al. (CA. No. 03-283-SLR), Boston Scientific's Post-Hearing Reply Brief and Exhibits Thereto, Sep. 12, 2003.

*Cordis Corporation v. Boston Scientific Corporation* et al. (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc.* et al. v. *Cordis Corporation* et al. (CA. 03-283-SLR), Memorandum Order, Nov. 21, 2003.

*Cordis Corporation v. Boston Scientific Corporation* et al. (CA. No. 03-027-SLR), and *Boston Scientific Scimed, Inc.* et al. v. *Cordis Corporation* et al (CA. No. 03-283-SLR), Deposition Transcript of Julio C. Palmaz.

*Arterial Vascular Engineering, Inc.* v. *Cordis Corporation, Johnson & Johnson and Expandable Grafts Partnership*, Cordis Corporation and Johnson & Johnson's Answer and Counterclaim, Feb. 27, 1998 (Civil Action No. 97-700-SLR).

Plea Notes in *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Sep. 12, 1997).

Provisional Judgment *EPG* et al. v. *Boston Scientific* et al. in Netherlands (Oct. 29, 1997).

Trial testimony transcripts from the Cordis Corporation et al. v. Medtronic AVE Inc., et al. liability trial dated Nov. 6-9, 13-17 and 20-21, 2000.

Jury verdict form from the *Cordis Corporation* et al. v. *Medtronic AVE, Inc.* et al. liability trial.

Hearing testimony transcript from the consolidated *Cordis Corporation* et al. v. *Medtronic AVE, Inc.* et al. and *Boston Scientific Corporation* et al. inequitable conduct hearing dated Feb. 7-9 and 12, 2001.

*Cordis Corporation* v. *Medtronic Ave., Inc.* et al, OPINION, 97-550-SLR, dated Mar. 28, 2002.

*Cordis Corporation v. Advanced Cardiovascular Systems, Inc.* et al. (CA. No. 97-550-SLR), *Medtronic AVE, Inc.* v. *Cordis Corporation* et al. (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc.* etal. (CA. No. 98-19-SLR), Expert Report of John T. Goolkasian, Esq.

*Cordis Corporation v. Advanced Cardiovascular Systems, Inc* et al. (CA. No. 97-550-SLR), *Medtronic A VE, Inc.* v. *Cordis Corporation* et al (CA. No. 97-700-SLR), *Boston Scientific Corporation* v. *Athicon, Inc.* et al (CA. 98-19-SLR), Expert Report of John F. Witherspoon.

Ruef, Johannes MD, et al.; "Flavopiridol Inhibits Smooth Muscle Cell Proliferation In Vitro and Neointimal Formation In Vivo After Carotid Injury In The Rat"; From the Division of Cardiology and Sealy Center for Molecular Cardiology, University of Texas Medical Branch, Galveston; Accepted Apr. 9, 1999; Circulation Aug. 10, 1999; pp. 659-665.

European Search Report EP 05 25 2466 dated Jul. 26, 2005.

European Search Report EP 05 25 2631 dated Jul. 26, 2005.

European Search Report EP 05 25 2478 dated Jul. 26, 2005.

Schuler, W. et al., "SDZ RAD, A New Rapamycin Derivative: Pharmacological Properties In Vitro and In Vivo," *Transplantation*, Jul. 5, 1997, 64(1), 36-42.

* cited by examiner

# FIG. 1



## *FIG. 2*



## *FIG. 3*



US 7,300,662 B2

1

## DRUG/DRUG DELIVERY SYSTEMS FOR THE PREVENTION AND TREATMENT OF VASCULAR DISEASE

### CROSS REFERENCE TO RELATED APPLICATIONS

This application is a continuation-in-part of U.S. application Ser. No. 09/850,293, filed May 7, 2001, now abandoned, which in turn claims priority of U.S. Provisional Application No. 60/263,979, filed Jan. 25, 2001, U.S. Provisional Application No. 60/263,806, filed January 24, 2001, U.S. Provisional Application No. 60/262,614, filed Jan. 18, 2001, U.S. Provisional Application No. 60/262,461, filed Jan. 18, 2001, and is a continuation-in-part of U.S. Application No. 09/575,480, filed May 19, 2000, now pending, which in turn claims priority of U.S. Provisional Application No. 60/204,4 17, filed May 12, 2000.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to drugs and drug delivery systems for the prevention and treatment of vascular disease, and more particularly to drugs and drug delivery systems for the prevention and treatment of neointimal hyperplasia.

2. Discussion of the Related Art

Many individuals suffer from circulatory disease caused by a progressive blockage of the blood vessels that perfuse the heart and other major organs with nutrients. More severe blockage of blood vessels in such individuals often leads to hypertension, ischemic injury, stroke, or myocardial infarction. Atherosclerotic lesions, which limit or obstruct coronary blood flow, are the major cause of ischemic heart disease. Percutaneous transluminal coronary angioplasty is a medical procedure whose purpose is to increase blood flow through an artery. Percutaneous transluminal coronary angioplasty is the predominant treatment for coronary vessel stenosis. The increasing use of this procedure is attributable to its relatively high success rate and its minimal invasiveness compared with coronary bypass surgery. A limitation associated with percutaneous transluminal coronary angioplasty is the abrupt closure of the vessel which may occur immediately following the procedure and restenosis which occurs gradually following the procedure. Additionally, restenosis is a chronic problem in patients who have undergone saphenous vein bypass grafting. The mechanism of acute occlusion appears to involve several factors and may result from vascular recoil with resultant closure of the artery and/or deposition of blood platelets and fibrin along the damaged length of the newly opened blood vessel.

Restenosis after percutaneous transluminal coronary angioplasty is a more gradual process initiated by vascular injury. Multiple processes, including thrombosis, inflammation, growth factor and cytokine release, cell proliferation, cell migration and extracellular matrix synthesis each contribute to the restenotic process.

While the exact mechanism of restenosis is not completely understood, the general aspects of the restenosis process have been identified. In the normal arterial wall, smooth muscle cells proliferate at a low rate, approximately less than 0.1 percent per day. Smooth muscle cells in the vessel walls exist in a contractile phenotype characterized by eighty to ninety percent of the cell cytoplasmic volume occupied with the contractile apparatus. Endoplasmic reticulum, Golgi, and free ribosomes are few and are located in the perinuclear region. Extracellular matrix surrounds the

2

smooth muscle cells and is rich in heparin-like glycosylaminoglycans which are believed to be responsible for maintaining smooth muscle cells in the contractile phenotypic state (Campbell and Campbell, 1985).

Upon pressure expansion of an intracoronary balloon catheter during angioplasty, smooth muscle cells within the vessel wall become injured, initiating a thrombotic and inflammatory response. Cell derived growth factors such as platelet derived growth factor, fibroblast growth factor, epidermal growth factor, thrombin, etc., released from platelets, invading macrophages and/or leukocytes, or directly from the smooth muscle cells provoke proliferative and migratory responses in medial smooth muscle cells. These cells undergo a change from the contractile phenotype to a synthetic phenotype characterized by only a few contractile filament bundles, extensive rough endoplasmic reticulum, Golgi and free ribosomes. Proliferation/migration usually begins within one to two days post-injury and peaks several days thereafter (Campbell and Campbell, 1987; Clowes and Schwartz, 1985).

Daughter cells migrate to the intimal layer of arterial smooth muscle and continue to proliferate and secrete significant amounts of extracellular matrix proteins. Proliferation, migration and extracellular matrix synthesis continue until the damaged endothelial layer is repaired at which time proliferation slows within the intima, usually within seven to fourteen days post-injury. The newly formed tissue is called neointima. The further vascular narrowing that occurs over the next three to six months is due primarily to negative or constrictive remodeling.

Simultaneous with local proliferation and migration, inflammatory cells invade the site of vascular injury. Within three to seven days post-injury, inflammatory cells have migrated to the deeper layers of the vessel wall. In animal models employing either balloon injury or stent implantation, inflammatory cells may persist at the site of vascular injury for at least thirty days (Tanaka et al., 1993; Edelman et al., 1998). Inflammatory cells therefore are present and may contribute to both the acute and chronic phases of restenosis.

Numerous agents have been examined for presumed anti-proliferative actions in restenosis and have shown some activity in experimental animal models. Some of the agents which have been shown to successfully reduce the extent of intimal hyperplasia in animal models include: heparin and heparin fragments (Clowes, A. W. and Karnovsky M., Nature 265: 25-26, 1977; Guyton, J. R. et al., Circ. Res., 46: 625-634, 1980; Clowes, A. W. and Clowes, M. M., Lab. Invest. 52: 611-616, 1985; Clowes, A. W. and Clowes, M. M., Circ. Res. 58: 839-845, 1986; Majesky et al., Circ. Res. 61: 296-300, 1987; Snow et al., Am. J. Pathol. 137: 313-330, 1990; Okada, T. et al., Neurosurgery 25: 92-98, 1989; colchicine (Currier, J. W. et al., Circ. 80: 11-66, 1989), taxol (Sollot, S. J. et al., J. Clin. Invest. 95: 1869-1876, 1995), angiotensin converting enzyme (ACE) inhibitors (Powell, J. S. et al., Science, 245: 186-188, 1989), angiopeptin (Lundergan, C. F. et al. Am. J. Cardiol. 17(Suppl. B):132B-136B, 1991), cyclosporin A (Jonasson, L. et al., Proc. Natl., Acad. Sci., 85: 2303, 1988), goat-anti-rabbit PDGF antibody (Ferns, G. A. A., et al., Science 253: 1129-1132, 1991), terbinafine (Nemecek, G. M. et al., J. Pharmacol. Exp. Thera. 248: 1167-1174, 1989), trapidil (Liu, M. W. et al., Circ. 81: 1089-1093, 1990), tranilast (Fukuyama, J. et al., Eur. J. Pharmacol. 318: 327-332, 1996), interferon-gamma (Hansson, G. K. and Holm, J., Circ. 84: 1266-1272, 1991), rapamycin (Marx, S. O. et al., Circ. Res. 76: 412-417, 1995), corticosteroids (Colburn, M. D. et al., J. Vasc. Surg. 15:

US 7,300,662 B2

3

510-518, 1992), see also Berk, B. C. et al., J. Am. Coll. Cardiol. 17: 111B-117B, 1991), ionizing radiation (Weinberger, J. et al., Int. J. Rad. Onc. Biol. Phys. 36: 767-775, 1996), fusion toxins (Farb, A. et al., Circ. Res. 80: 542-550, 1997) antisense oligonucleotides (Simons, M. et al., Nature 359: 67-70, 1992) and gene vectors (Chang, M. W. et al., J. Clin. Invest. 96: 2260-2268, 1995). Anti-proliferative effects on smooth muscle cells in vitro have been demonstrated for many of these agents, including heparin and heparin conjugates, taxol, tranilast, colchicine, ACE inhibitors, fusion toxins, antisense oligonucleotides, rapamycin and ionizing radiation. Thus, agents with diverse mechanisms of smooth muscle cell inhibition may have therapeutic utility in reducing intimal hyperplasia.

However, in contrast to animal models, attempts in human angioplasty patients to prevent restenosis by systemic pharmacologic means have thus far been unsuccessful. Neither aspirin-dipyridamole, ticlopidine, anti-congulant therapy (acute heparin, chronic warfarin, hirudin or hirulog), thromboxane receptor antagonism nor steroids have been effective in preventing restenosis, although platelet inhibitors have been effective in preventing acute reocclusion after angioplasty (Mak and Topol, 1997; Lang et al., 1991; Popma et al., 1991). The platelet GP IIb/IIIa receptor, antagonist, Reopro is still under study but has not shown promising results for the reduction in restenosis following angioplasty and stenting. Other agents, which have also been unsuccessful in the prevention of restenosis, include the calcium channel antagonists, prostacyclin mimetics, angiotensin converting enzyme inhibitors, serotonin receptor antagonists, and anti-proliferative agents. These agents must be given systemically, however, and attainment of a therapeutically effective dose may not be possible; anti-proliferative (or anti-restenosis) concentrations may exceed the known toxic concentrations of these agents so that levels sufficient to produce smooth muscle inhibition may not be reached (Mak and Topol, 1997; Lang et al., 1991; Popma et al., 1991).

Additional clinical trials in which the effectiveness for preventing restenosis utilizing dietary fish oil supplements or cholesterol lowering agents has been examined showing either conflicting or negative results so that no pharmacological agents are as yet clinically available to prevent post-angioplasty restenosis (Mak and Topol, 1997; Franklin and Faxon, 1993; Serruys, P. W. et al., 1993). Recent observations suggest that the antilipid/antioxidant agent, probucol may be useful in preventing restenosis but this work requires elucidation (Tardif et al., 1997; Yokoi, et al., 1997). Probucol is presently not approved for use in the United States and a thirty-day pretreatment period would preclude its use in emergency angioplasty. Additionally, the application of ionizing radiation has shown significant promise in reducing or preventing restenosis after angioplasty in patients with stents (Teirstein et al., 1997). Currently, however, the most effective treatments for restenosis are repeat angioplasty, atherectomy or coronary artery bypass grafting, because no therapeutic agents currently have Food and Drug Administration approval for use for the prevention of post-angioplasty restenosis.

Unlike systemic pharmacologic therapy, stents have proven effective in significantly reducing restenosis. Typically, stents are balloon-expandable slotted metal tubes (usually, but not limited to, stainless steel), which, when expanded within the lumen of an angioplastied coronary artery, provide structural support through rigid scaffolding to the arterial wall. This support is helpful in maintaining vessel lumen patency. In two randomized clinical trials,

4

stents increased angiographic success after percutaneous transluminal coronary angioplasty, by increasing minimal lumen diameter and reducing, but not eliminating, the incidence of restenosis at six months (Serruys et al., 1994; Fischman et al., 1994).

Additionally, the heparin coating of stents appears to have the added benefit of producing a reduction in sub-acute thrombosis after stent implantation (Serruys et al., 1996). Thus, sustained mechanical expansion of a stenosed coronary artery with a stent has been shown to provide some measure of restenosis prevention, and the coating of stents with heparin has demonstrated both the feasibility and the clinical usefulness of delivering drugs locally, at the site of injured tissue.

Accordingly, there exists a need for effective drugs and drug delivery systems for the effective prevention and treatment of neointimal thickening that occurs after percutaneous transluminal coronary angioplasty and stent implantation.

## SUMMARY OF THE INVENTION

The drugs and drug delivery systems of the present invention provide a means for overcoming the difficulties associated with the methods and devices currently in use as briefly described above.

In accordance with one aspect, the present invention is directed to a method for the prevention of constrictive remodeling. The method comprises the controlled delivery, by release from an intraluminal medical device, of a compound in therapeutic dosage amounts.

In accordance with another aspect, the present invention is directed to a drug delivery device. The drug delivery device comprises an intraluminal medical device and a therapeutic dosage of an agent releasably affixed to the intraluminal medical device for the treatment of constrictive vascular remodeling.

The drugs and drug delivery systems of the present invention utilize a stent or graft in combination with rapamycin or other drugs/agents/compounds to prevent and treat neointimal hyperplasia, i.e. restenosis, following percutaneous transluminal coronary angioplasty and stent implantation. It has been determined that rapamycin functions to inhibit smooth muscle cell proliferation through a number of mechanisms. It has also been determined that rapamycin eluting stent coatings produce superior effects in humans, when compared to animals, with respect to the magnitude and duration of the reduction in neointimal hyperplasia. Rapamycin administration from a local delivery platform also produces an anti-inflammatory effect in the vessel wall that is distinct from and complimentary to its smooth muscle cell anti-proliferative effect. In addition, it has also been demonstrated that rapamycin inhibits constrictive vascular remodeling in humans.

Other drugs, agents or compounds which mimic certain actions of rapamycin may also be utilized in combination with local delivery systems or platforms.

The local administration of drugs, agents or compounds to stented vessels have the additional therapeutic benefit of higher tissue concentration than that which would be achievable through the systemic administration of the same drugs, agents or compounds. Other benefits include reduced systemic toxicity, single treatment, and ease of administration. An additional benefit of a local delivery device and drug, agent or compound therapy may be to reduce the dose of the therapeutic drugs, agents or compounds and thus limit their toxicity, while still achieving a reduction in restenosis.

US 7,300,662 B2

5

## BRIEF DESCRIPTION OF THE DRAWINGS

The foregoing and other features and advantages of the invention will be apparent from the following, more particular description of preferred embodiments of the invention, as illustrated in the accompanying drawings.

FIG. 1 is a chart indicating the effectiveness of rapamycin as an anti-inflammatory relative to other anti-inflammatories.

FIG. 2 is a view along the length of a stent (ends not shown) prior to expansion showing the exterior surface of the stent and the characteristic banding pattern.

FIG. 3 is a perspective view of the stent of FIG. 1 having reservoirs in accordance with the present invention.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

As stated above, the proliferation of vascular smooth muscle cells in response to mitogenic stimuli that are released during balloon angioplasty and stent implantation is the primary cause of neointimal hyperplasia. Excessive neointimal hyperplasia can often lead to impairment of blood flow, cardiac ischemia and the need for a repeat intervention in selected patients in high risk treatment groups. Yet repeat revascularization incurs risk of patient morbidity and mortality while adding significantly to the cost of health care. Given the widespread use of stents in interventional practice, there is a clear need for safe and effective inhibitors of neointimal hyperplasia.

Rapamycin is a macrocyclic triene antibiotic produced by streptomyces hygroscopicus as disclosed in U.S. Pat. No. 3,929,992. It has been found that rapamycin inhibits the proliferation of vascular smooth muscle cells in vivo. Accordingly, rapamycin may be utilized in treating intimal smooth muscle cell hyperplasia, restenosis and vascular occlusion in a mammal, particularly following either biologically or mechanically mediated vascular injury, or under conditions that would predispose a mammal to suffering such a vascular injury. Rapamycin functions to inhibit smooth muscle cell proliferation and does not interfere with the re-endothelialization of the vessel walls.

Rapamycin functions to inhibit smooth muscle cell proliferation through a number of mechanisms. In addition, rapamycin reduces the other effects caused by vascular injury, for example, inflammation. The operation and various functions of rapamycin are described in detail below. Rapamycin as used throughout this application shall include rapamycin, rapamycin analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin.

Rapamycin reduces vascular hyperplasia by antagonizing smooth muscle proliferation in response to mitogenic signals that are released during angioplasty. Inhibition of growth factor and cytokine mediated smooth muscle proliferation at the late G1 phase of the cell cycle is believed to be the dominant mechanism of action of rapamycin. However, rapamycin is also known to prevent T-cell proliferation and differentiation when administered systemically. This is the basis for its immunosuppresive activity and its ability to prevent graft rejection.

The molecular events that are responsible for the actions of rapamycin, a known anti-proliferative, which acts to reduce the magnitude and duration of neointimal hyperplasia, are still being elucidated. It is known, however, that rapamycin enters cells and binds to a high-affinity cytosolic protein called FKBP12. The complex of rapamycin and

6

FKPB12 in turn binds to and inhibits a phosphoinositide (PI)-3 kinase called the "mammalian Target of Rapamycin" or TOR. TOR is a protein kinase that plays a key role in mediating the downstream signaling events associated with mitogenic growth factors and cytokines in smooth muscle cells and T lymphocytes. These events include phosphorylation of p27, phosphorylation of p70 s6 kinase and phosphorylation of 4BP-1, an important regulator of protein translation.

It is recognized that rapamycin reduces restenosis by inhibiting neointimal hyperplasia. However, there is evidence that rapamycin may also inhibit the other major component of restenosis, namely, negative remodeling. Remodeling is a process whose mechanism is not clearly understood but which results in shrinkage of the external elastic lamina and reduction in lumenal area over time, generally a period of approximately three to six months in humans.

Negative or constrictive vascular remodeling may be quantified angiographically as the percent diameter stenosis at the lesion site where there is no stent to obstruct the process. If late lumen loss is abolished in-lesion, it may be inferred that negative remodeling has been inhibited. Another method of determining the degree of remodeling involves measuring in-lesion external elastic lamina area using intravascular ultrasound (IVUS). Intravascular ultrasound is a technique that can image the external elastic lamina as well as the vascular lumen. Changes in the external elastic lamina proximal and distal to the stent from the post-procedural timepoint to four-month and twelve-month follow-ups are reflective of remodeling changes.

Evidence that rapamycin exerts an effect on remodeling comes from human implant studies with rapamycin coated stents showing a very low degree of restenosis in-lesion as well as in-stent. In-lesion parameters are usually measured approximately five millimeters on either side of the stent i.e. proximal and distal. Since the stent is not present to control remodeling in these zones which are still affected by balloon expansion, it may be inferred that rapamycin is preventing vascular remodeling.

The data in Table 1 below illustrate that in-lesion percent diameter stenosis remains low in the rapamycin treated groups, even at twelve months. Accordingly, these results support the hypothesis that rapamycin reduces remodeling.

TABLE 1.0

| Angiographic In-Lesion Percent Diameter Stenosis (%, mean ± SD and "n=") In Patients Who Received a Rapamycin-Coated Stent | | | |
|---|---|---|---|
| Coating Group | Post Placement | 4–6 month Follow Up | 12 month Follow Up |
| Brazil | 10.6 ± 5.7 (30) | 13.6 ± 8.6 (30) | 22.3 ± 7.2 (15) |
| Netherlands | 14.7 ± 8.8 | 22.4 ± 6.4 | — |

Additional evidence supporting a reduction in negative remodeling comes from intravascular ultrasound data that was obtained from a first-in-man clinical program as illustrated in Table 2 below.

US 7,300,662 B2

7

TABLE 2.0

Matched IVUS data in Patients Who Received
a Rapamycin-Coated Stent

| IVUS Parameter | Post (n=) | 4-Month Follow-Up (n=) | 12-Month Follow-Up (n=) |
|---|---|---|---|
| Mean proximal vessel area (mm²) | 16.53 ± 3.53 (27) | 16.31 ± 4.36 (28) | 13.96 ± 2.26 (13) |
| Mean distal vessel area (mm²) | 13.12 ± 3.68 (26) | 13.53 ± 4.17 (26) | 12.49 ± 3.25 (14) |

The data illustrated that there is minimal loss of vessel area proximally or distally which indicates that inhibition of negative remodeling has occurred in vessels treated with rapamycin-coated stents.

Other than the stent itself, there have been no effective solutions to the problem of vascular remodeling. Accordingly, rapamycin may represent a biological approach to controlling the vascular remodeling phenomenon.

It may be hypothesized that rapamycin acts to reduce negative remodeling in several ways. By specifically blocking the proliferation of fibroblasts in the vascular wall in response to injury, rapamycin may reduce the formation of vascular scar tissue. Rapamycin may also affect the translation of key proteins involved in collagen formation or metabolism.

Rapamycin used in this context includes rapamycin and all analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin.

8

In a preferred embodiment, the rapamycin is delivered by a local delivery device to control negative remodeling of an arterial segment after balloon angioplasty as a means of reducing or preventing restenosis. While any delivery device may be utilized, it is preferred that the delivery device comprises a stent that includes a coating or sheath elutes or releases rapamycin. The delivery system for such a device may comprise a local infusion catheter that delivers rapamycin at a rate controlled by the administrator.

Rapamycin may also be delivered systemically using an oral dosage form or a chronic injectible depot form or a patch to deliver rapamycin for a period ranging from about seven to forty-five days to achieve vascular tissue levels that are sufficient to inhibit negative remodeling. Such treatment is to be used to reduce or prevent restenosis when administered several days prior to elective angioplasty with or without a stent.

Data generated in porcine and rabbit models show that the release of rapamycin into the vascular wall from a nonerodible polymeric stent coating in a range of doses (35-430 ug/5-18 mm coronary stent) produces a peak fifty to fifty-five percent reduction in neointimal hyperplasia as set forth in Table 3 below. This reduction, which is maximal at about twenty-eight to thirty days, is typically not sustained in the range of ninety to one hundred eighty days in the porcine model as set forth in Table 4 below.

TABLE 3.0

Animal Studies with Rapamycin-coated stents.
Values are mean ± Standard Error of Mean

| Study | Duration | Stent[1] | Rapamycin | N | Neointimal Area (mm²) | % Change From Polyme | % Change From Metal |
|---|---|---|---|---|---|---|---|
| Porcine | | | | | | | |
| 98009 | 14 days | Metal | | 8 | 2.04 ± 0.17 | | |
| | | 1X + rapamycin | 153 µg | 8 | 1.66 ± 0.17* | −42% | −19% |
| | | 1X + TC300 + rapamycin | 155 µg | 8 | 1.51 ± 0.19* | −47% | −26% |
| 99005 | 28 days | Metal | | 10 | 2.29 ± 0.21 | | |
| | | | | 9 | 3.91 ± 0.60** | | |
| | | 1X + TC30 + rapamycin | 130 µg | 8 | 2.81 ± 0.34 | | +23% |
| | | 1X + TC100 + rapamycin | 120 µg | 9 | 2.62 ± 0.21 | | +14% |
| 99006 | 28 days | Metal | | 12 | 4.57 ± 0.46 | | |
| | | EVA/BMA 3X | | 12 | 5.02 ± 0.62 | | +10% |
| | | 1X + rapamycin | 125 µg | 11 | 2.84 ± 0.31* ** | −43% | −38% |
| | | 3X + rapamycin | 430 µg | 12 | 3.06 ± 0.17* ** | −39% | −33% |
| | | 3X + rapamycin | 157 µg | 12 | 2.77 ± 0.41* ** | −45% | −39% |
| 99011 | 28 days | Metal | | 11 | 3.09 ± 0.27 | | |
| | | | | 11 | 4.52 ± 0.37 | | |
| | | 1X + rapamycin | 189 µg | 14 | 3.05 ± 0.35 | | −1% |
| | | 3X + rapamycin/dex | 182/363 µg | 14 | 2.72 ± 0.71 | | −12% |
| 99021 | 60 days | Metal | | 12 | 2.14 ± 0.25 | | |
| | | 1X + rapamycin | 181 µg | 12 | 2.95 ± 0.38 | | +38% |
| 99034 | 28 days | Metal | | 8 | 5.24 ± 0.58 | | |
| | | 1X + rapamycin | 186 µg | 8 | 2.47 ± 0.33** | | −53% |
| | | 3X + rapamycin/dex | 185/369 µg | 6 | 2.42 ± 0.64** | | −54% |
| 20001 | 28 days | Metal | | 6 | 1.81 ± 0.09 | | |
| | | 1X + rapamycin | 172 µg | 5 | 1.66 ± 0.44 | | −8% |
| 20007 | | | | | | | |
| | 30 days | Metal | | 9 | 2.94 ± 0.43 | | |
| | | 1XTC + rapamycin | 155 µg | 10 | 1.40 ± 0.11* | | −52%* |
| Rabbit | | | | | | | |
| 99019 | 28 days | Metal | | 8 | 1.20 ± 0.07 | | |

US 7,300,662 B2

9　　　　　　　　　　　　　　　　　　　　　　　　10

TABLE 3.0-continued

Animal Studies with Rapamycin-coated stents.
Values are mean ± Standard Error of Mean

| Study | Duration | Stent[1] | Rapamycin | N (mm²) | Neointimal Area | % Change From Polyme | % Change From Metal |
|---|---|---|---|---|---|---|---|
| | | EVA/BMA 1X | | 10 | 1.26 ± 0.16 | | +5% |
| | | 1X + rapamycin | 64 µg | 9 | 0.92 ± 0.14 | −27% | −23% |
| | | 1X + rapamycin | 196 µg | 10 | 0.66 ± 0.12* ** | −48% | −45% |
| 99020 | 28 days | Metal | | 12 | 1.18 ± 0.10 | | |
| | | EVA/BMA 1X + rapamycin | 197 µg | 8 | 0.81 ± 0.16 | | −32% |

[1]Stent nomenclature: EVA/BMA 1X, 2X, and 3X signifies approx. 500 µg, 1000 µg, and 1500 µg total mass
(polymer + drug), respectively. TC, top coat of 30 µg, 100 µg, or 300 µg drug-free BMA; Biphasic; 2 × 1X
layers of rapamycin in EVA/BMA spearated by a 100 µg drug-free BMA layer.
²0.25 mg/kg/d × 14 d preceeded by a loading dose of 0.5 mg/kg/d × 3 d prior to stent implantation.
*p < 0.05 from EVA/BMA control.
**p < 0.05 from Metal;
#Inflammation score: (0 = essentially no intimal involvement; 1 = <25% intima involved; 2 =≧25% intima
involved; 3 = >50% intima involved).

TABLE 4.0

180 day Porcine Study with Rapamycin-coated stents.
Values are mean ± Standard Error of Mean

| Study | Duration | Stent[1] | Rapamycin | N | Neointimal Area (mm²) | % Change From Polyme | % Change From Metal | Inflammation Score # |
|---|---|---|---|---|---|---|---|---|
| 20007 | 3 days | Metal | | 10 | 0.38 ± 0.06 | | | 1.05 ± 0.06 |
| (ETP-2-002233-P) | | 1XTC + rapamycin | 155 µg | 10 | 0.29 ± 0.03 | | −24% | 1.08 ± 0.04 |
| | 30 days | Metal | | 9 | 2.94 ± 0.43 | | | 0.11 ± 0.08 |
| | | 1XTC + rapamycin | 155 µg | 10 | 1.40 ± 0.11* | | −52%* | 0.25 ± 0.10 |
| | 90 days | Metal | | 10 | 3.45 ± 0.34 | | | 0.20 ± 0.08 |
| | | 1XTC + rapamycin | 155 µg | 10 | 3.03 ± 0.29 | | −12% | 0.80 ± 0.23 |
| | | 1X + rapamycin | 171 µg | 10 | 2.86 ± 0.35 | | −17% | 0.60 ± 0.23 |
| | 180 days | Metal | | 10 | 3.65 ± 0.39 | | | 0.65 ± 0.21 |
| | | 1XTC + rapamycin | 155 µg | 10 | 3.34 ± 0.31 | | −8% | 1.50 ± 0.34 |
| | | 1X + rapamycin | 171 µg | 10 | 3.87 ± 0.28 | | +6% | 1.68 ± 0.37 |

The release of rapamycin into the vascular wall of a human from a nonerodible polymeric stent coating provides superior results with respect to the magnitude and duration of the reduction in neointimal hyperplasia within the stent as compared to the vascular walls of animals as set forth above.

Humans implanted with a rapamycin coated stent comprising rapamycin in the same dose range as studied in animal models using the same polymeric matrix, as described above, reveal a much more profound reduction in neointimal hyperplasia than observed in animal models, based on the magnitude and duration of reduction in neointima. The human clinical response to rapamycin reveals essentially total abolition of neointimal hyperplasia inside the stent using both angiographic and intravascular ultrasound measurements. These results are sustained for at least one year as set forth in Table 5 below.

TABLE 5.0

Patients Treated (N = 45 patients) with a Rapamycin-coated Stent

| Effectiveness Measures | Sirolimus FIM (N = 45 Patients, 45 Lesions) | 95% Confidence Limit |
|---|---|---|
| Procedure Success (QCA) 4-month In-Stent Diameter Stenosis (%) | 100.0% (45/45) | [92.1%, 100.0%] |
| Mean ± SD (N) Range (min, max) 6-month In-Stent Diameter Stenosis (%) | 4.8% ± 6.1% (30) (−8.2%, 14.9%) | [2.6%, 7.0%] |
| Mean ± SD (N) Range (min, max) 12-month In-Stent Diameter Stenosis (%) | 8.9% ± 7.6% (13) (−2.9%, 20.4%) | [4.8%, 13.0%] |
| Mean ± SD (N) Range (min, max) | 8.9% ± 6.1% (15) (−3.0%, 22.0%) | [5.8%, 12.0%] |

TABLE 5.0-continued

Patients Treated (N = 45 patients) with a Rapamycin-coated Stent

| Effectiveness Measures | Sirolimus FIM (N = 45 Patients, 45 Lesions) | 95% Confidence Limit |
|---|---|---|
| 4-month In-Stent Late Loss (mm) | | |
| Mean ± SD (N) | 0.00 ± 0.29 (30) | [-0.10, 0.10] |
| Range (min, max) | (-0.51, 0.45) | |
| 6-month In-Stent Late Loss (mm) | | |
| Mean ± SD (N) | 0.25 ± 0.27 (13) | [0.10, 0.39] |
| Range (min, max) | (-0.51, 0.91) | |
| 12-month In-Stent Late Loss (mm) | | |
| Mean ± SD (N) | 0.11 ± 0.36 (15) | [-0.08, 0.29] |
| Range (min, max) | (-0.51, 0.82) | |
| 4-month Obstruction Volume (%) (IVUS) | | |
| Mean ± SD (N) | 10.48% ± 2.78% (28) | [9.45%, 11.51%] |
| Range (min, max) | (4.60%, 16.35%) | |
| 6-month Obstruction Volume (%) (IVUS) | | |
| Mean ± SD (N) | 7.22% ± 4.60% (13) | [4.72%, 9.72%], |
| Range (min, max) | (3.82%, 19.88%) | |
| 12-month Obstruction Volume (%) (IVUS) | | |
| Mean ± SD (N) | 2.11% ± 5.28% (15) | [0.00%, 4.78%], |
| Range (min, max) | (0.00%, 19.89%) | |
| 6-month Target Lesion Revascularization (TLR) | 0.0% (0/30) | [0.0%, 9.5%] |
| 12-month Target Lesion Revascularization (TLR) | 0.0% (0/15) | [0.0%, 18.1%] |

QCA = Quantitative Coronary Angiography
SD = Standard Deviation
IVUS = Intravascular Ultrasound

Rapamycin produces an unexpected benefit in humans when delivered from a stent by causing a profound reduction in in-stent neointimal hyperplasia that is sustained for at least one year. The magnitude and duration of this benefit in humans is not predicted from animal model data. Rapamycin used in this context includes rapamycin and all analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin.

These results may be due to a number of factors. For example, the greater effectiveness of rapamycin in humans is due to greater sensitivity of its mechanism(s) of action toward the pathophysiology of human vascular lesions compared to the pathophysiology of animal models of angioplasty. In addition, the combination of the dose applied to the stent and the polymer coating that controls the release of the drug is important in the effectiveness of the drug.

As stated above, rapamycin reduces vascular hyperplasia by antagonizing smooth muscle proliferation in response to mitogenic signals that are released during angioplasty injury. Also, it is known that rapamycin prevents T-cell proliferation and differentiation when administered systemically. It has also been determined that rapamycin exerts a local inflammatory effect in the vessel wall when administered from a stent in low doses for a sustained period of time (approximately two to six weeks). The local anti-inflammatory benefit is profound and unexpected. In combination with the smooth muscle anti-proliferative effect, this dual mode of action of rapamycin may be responsible for its exceptional efficacy.

Accordingly, rapamycin delivered from a local device platform, reduces neointimal hyperplasia by a combination of anti-inflammatory and smooth muscle anti-proliferative effects. Rapamycin used in this context means rapamycin and all analogs, derivatives and congeners that bind FKBP12 and possess the same pharmacologic properties as rapamycin. Local device platforms include stent coatings, stent sheaths, grafts and local drug infusion catheters or porous balloons or any other suitable means for the in situ or local delivery of drugs, agents or compounds.

The anti-inflammatory effect of rapamycin is evident in data from an experiment, illustrated in Table 6, in which rapamycin delivered from a stent was compared with dexamethasone delivered from a stent. Dexamethasone, a potent steroidal anti-inflammatory agent, was used as a reference standard. Although dexamethasone is able to reduce inflammation scores, rapamycin is far more effective than dexamethasone in reducing inflammation scores. In addition, rapamycin significantly reduces neointimal hyperplasia, unlike dexamethasone.

TABLE 6.0

| Group Rapamycin Rap | N= | Neointimal Area (mm$^2$) | % Area Stenosis | Inflammation Score |
|---|---|---|---|---|
| Uncoated | 8 | 5.24 ± 1.65 | 54 ± 19 | 0.97 ± 1.00 |
| Dexamethasone (Dex) | 8 | 4.31 ± 3.02 | 45 ± 31 | 0.39 ± 0.24 |
| Rapamycin (Rap) | 7 | 2.47 ± 0.94* | 26 ± 10* | 0.13 ± 0.19* |
| Rap + Dex | 6 | 2.42 ± 1.58* | 26 ± 18* | 0.17 ± 0.30* |

*= significance level P < 0.05

Rapamycin has also been found to reduce cytokine levels in vascular tissue when delivered from a stent. The data in FIG. 1 illustrates that rapamycin is highly effective in reducing monocyte chemotactic protein (MCP-1) levels in

US 7,300,662 B2

13

the vascular wall. MCP-1 is an example of a proinflammatory/chemotactic cytokine that is elaborated during vessel injury. Reduction in MCP-1 illustrates the beneficial effect of rapamycin in reducing the expression of proinflammatory mediators and contributing to the anti-inflammatory effect of rapamycin delivered locally from a stent. It is recognized that vascular inflammation in response to injury is a major contributor to the development of neointimal hyperplasia.

Since rapamycin may be shown to inhibit local inflammatory events in the vessel it is believed that this could explain the unexpected superiority of rapamycin in inhibiting neointima.

As set forth above, rapamycin functions on a number of levels to produce such desired effects as the prevention of T-cell proliferation, the inhibition of negative remodeling, the reduction of inflammation, and the prevention of smooth muscle cell proliferation. While the exact mechanisms of these functions are not completely known, the mechanisms that have been identified may be expanded upon.

Studies with rapamycin suggest that the prevention of smooth muscle cell proliferation by blockade of the cell cycle is a valid strategy for reducing neointimal hyperplasia. Dramatic and sustained reductions in late lumen loss and neointimal plaque volume have been observed in patients receiving rapamycin delivered locally from a stent. The present invention expands upon the mechanism of rapamycin to include additional approaches to inhibit the cell cycle and reduce neointimal hyperplasia without producing toxicity.

The cell cycle is a tightly controlled biochemical cascade of events that regulate the process of cell replication. When cells are stimulated by appropriate growth factors, they move from $G_0$ (quiescence) to the G1 phase of the cell cycle. Selective inhibition of the cell cycle in the G1 phase, prior to DNA replication (S phase), may offer therapeutic advantages of cell preservation and viability while retaining anti-proliferative efficacy when compared to therapeutics that act later in the cell cycle i.e. at S, G2 or M phase.

Accordingly, the prevention of intimal hyperplasia in blood vessels and other conduit vessels in the body may be achieved using cell cycle inhibitors that act selectively at the G1 phase of the cell cycle. These inhibitors of the G1 phase of the cell cycle may be small molecules, peptides, proteins, oligonucleotides or DNA sequences. More specifically, these drugs or agents include inhibitors of cyclin dependent kinases (cdk's) involved with the progression of the cell cycle through the G1 phase, in particular cdk2 and cdk4.

Examples of drugs, agents or compounds that act selectively at the G1 phase of the cell cycle include small molecules such as flavopiridol and its structural analogs that have been found to inhibit cell cycle in the late G1 phase by antagonism of cyclin dependent kinases. Therapeutic agents that elevate an endogenous kinase inhibitory protein$^{kip}$ called P27, sometimes referred to as P27$^{kip1}$, that selectively inhibits cyclin dependent kinases may be utilized. This includes small molecules, peptides and proteins that either block the degradation of P27 or enhance the cellular production of P27, including gene vectors that can transfect the gene to produce P27. Staurosporin and related small molecules that block the cell cycle by inhibiting protein kinases may be utilized. Protein kinase inhibitors, including the class of tyrphostins that selectively inhibit protein kinases to antagonize signal transduction in smooth muscle in response to a broad range of growth factors such as PDGF and FGF may also be utilized.

Any of the drugs, agents or compounds discussed above may be administered either systemically, for example,

14

orally, intravenously, intramuscularly, subcutaneously, nasally or intradermally, or locally, for example, stent coating, stent covering or local delivery catheter. In addition, the drugs or agents discussed above may be formulated for fast-release or slow release with the objective of maintaining the drugs or agents in contact with target tissues for a period ranging from three days to eight weeks.

As set forth above, the complex of rapamycin and FKPB12 binds to and inhibits a phosphoinositide (PI)-3 kinase called the mammalian Target of Rapamycin or TOR. An antagonist of the catalytic activity of TOR, functioning as either an active site inhibitor or as an allosteric modulator, i.e. an indirect inhibitor that allosterically modulates, would mimic the actions of rapamycin but bypass the requirement for FKBP12. The potential advantages of a direct inhibitor of TOR include better tissue penetration and better physical/chemical stability. In addition, other potential advantages include greater selectivity and specificity of action due to the specificity of an antagonist for one of multiple isoforms of TOR that may exist in different tissues, and a potentially different spectrum of downstream effects leading to greater drug efficacy and/or safety.

The inhibitor may be a small organic molecule (approximate mw<1000), which is either a synthetic or naturally derived product. Wortmanin may be an agent which inhibits the function of this class of proteins. It may also be a peptide or an oligonucleotide sequence. The inhibitor may be administered either sytemically (orally, intravenously, intramuscularly, subcutaneously, nasally, or intradermally) or locally (stent coating, stent covering, local drug delivery catheter). For example, the inhibitor may be released into the vascular wall of a human from a nonerodible polymeric stent coating. In addition, the inhibitor may be formulated for fast-release or slow release with the objective of maintaining the rapamycin or other drug, agent or compound in contact with target tissues for a period ranging from three days to eight weeks.

As stated previously, the implantation of a coronary stent in conjunction with balloon angioplasty is highly effective in treating acute vessel closure and may reduce the risk of restenosis. Intravascular ultrasound studies (Mintz et al., 1996) suggest that coronary stenting effectively prevents vessel constriction and that most of the late luminal loss after stent implantation is due to plaque growth, probably related to neointimal hyperplasia. The late luminal loss after coronary stenting is almost two times higher than that observed after conventional balloon angioplasty. Thus, inasmuch as stents prevent at least a portion of the restenosis process, the use of drugs, agents or compounds which prevent inflammation and proliferation, or prevent proliferation by multiple mechanisms, combined with a stent may provide the most efficacious treatment for post-angioplasty restenosis.

The local delivery of drugs, agents or compounds from a stent has the following advantages; namely, the prevention of vessel recoil and remodeling through the scaffolding action of the stent and the drugs, agents or compounds and the prevention of multiple components of neointimal hyperplasia. This local administration of drugs, agents or compounds to stented coronary arteries may also have additional therapeutic benefit. For example, higher tissue concentrations would be achievable than that which would occur with systemic administration, reduced systemic toxicity, and single treatment and ease of administration. An additional benefit of drug therapy may be to reduce the dose of the therapeutic compounds, thereby limiting their toxicity, while still achieving a reduction in restenosis.

15

There are a multiplicity of different stents that may be utilized following percutaneous transluminal coronary angioplasty. Although any number of stents may be utilized in accordance with the present invention, for simplicity, one particular stent will be described in exemplary embodiments of the present invention. The skilled artisan will recognize that any number of stents may be utilized in connection with the present invention.

A stent is commonly used as a tubular structure left inside the lumen of a duct to relieve an obstruction. Commonly, stents are inserted into the lumen in a non-expanded form and are then expanded autonomously, or with the aid of a second device in situ. A typical method of expansion occurs through the use of a catheter-mounted angioplasty balloon which is inflated within the stenosed vessel or body passageway in order to shear and disrupt the obstructions associated with the wall components of the vessel and to obtain an enlarged lumen. As set forth below, self-expanding stents may also be utilized.

FIG. 2 illustrates an exemplary stent 100 which may be utilized in accordance with an exemplary embodiment of the present invention. The expandable cylindrical stent 100 comprises a fenestrated structure for placement in a blood vessel, duct or lumen to hold the vessel, duct or lumen open, more particularly for protecting a segment of artery from restenosis after angioplasty. The stent 100 may be expanded circumferentially and maintained in an expanded configuration, that is circumferentially or radially rigid. The stent 100 is axially flexible and when flexed at a band, the stent 100 avoids any externally-protruding component parts.

The stent 100 generally comprises first and second ends with an intermediate section therebetween. The stent 100 has a longitudinal axis and comprises a plurality of longitudinally disposed bands 102, wherein each band 102 defines a generally continuous wave along a line segment parallel to the longitudinal axis. A plurality of circumferentially arranged links 104 maintain the bands 102 in a substantially tubular structure. Essentially, each longitudinally disposed band 102 is connected at a plurality of periodic locations, by a short circumferentially arranged link 104 to an adjacent band 102. The wave associated with each of the bands 102 has approximately the same fundamental spatial frequency in the intermediate section, and the bands 102 are so disposed that the wave associated with them are generally aligned so as to be generally in phase with one another. As illustrated in the figure, each longitudinally arranged band 102 undulates through approximately two cycles before there is a link to an adjacent band.

The stent 100 may be fabricated utilizing any number of methods. For example, the stent 100 may be fabricated from a hollow or formed stainless steel tube that may be machined using lasers, electric discharge milling, chemical etching or other means. The stent 100 is inserted into the body and placed at the desired site in an unexpanded form. In one embodiment, expansion may be effected in a blood vessel by a balloon catheter, where the final diameter of the stent 100 is a function of the diameter of the balloon catheter used.

It should be appreciated that a stent 100 in accordance with the present invention may be embodied in a shape-memory material, including, for example, an appropriate alloy of nickel and titanium. In this embodiment, after the stent 100 has been formed it may be compressed so as to occupy a space sufficiently small as to permit its insertion in a blood vessel or other tissue by insertion means, wherein the insertion means include a suitable catheter, or flexible rod. On emerging from the catheter, the stent 100 may be configured to expand into the desired configuration where

16

the expansion is automatic or triggered by a change in pressure, temperature or electrical stimulation.

FIG. 3 illustrates an exemplary embodiment of the present invention utilizing the stent 100 illustrated in FIG. 2. As illustrated, the stent 100 may be modified to comprise a reservoir 106. Each of the reservoirs may be opened or closed as desired. These reservoirs 106 may be specifically designed to hold the drug, agent, compound or combinations thereof to be delivered. Regardless of the design of the stent 100, it is preferable to have the drug, agent, compound or combinations thereof dosage applied with enough specificity and a sufficient concentration to provide an effective dosage in the lesion area. In this regard, the reservoir size in the bands 102 is preferably sized to adequately apply the drug/drug combination dosage at the desired location and in the desired amount.

In an alternate exemplary embodiment, the entire inner and outer surface of the stent 100 may be coated with various drug and drug combinations in therapeutic dosage amounts. A detailed description of exemplary coating techniques is described below.

Rapamycin or any of the drugs, agents or compounds described above may be incorporated into or affixed to the stent in a number of ways and utilizing any number of biocompatible materials. In the exemplary embodiment, the rapamycin is directly incorporated into a polymeric matrix and sprayed onto the outer surface of the stent. The rapamycin elutes from the polymeric matrix over time and enters the surrounding tissue. The rapamycin preferably remains on the stent for at least three days up to approximately six months and more preferably between seven and thirty days.

Any number of non-erodible polymers may be utilized in conjunction with rapamycin. In the exemplary embodiment, the polymeric matrix comprises two layers. The base layer comprises a solution of ethylene-co-vinylacetate and polybutylmethacrylate. The rapamycin is incorporated into this layer. The outer layer comprises only polybutylmethacrylate and acts as a diffusion barrier to prevent the rapamycin from eluting too quickly and entering the surrounding tissues. The thickness of the outer layer or top coat determines the rate at which the rapamycin elutes from the matrix. Essentially, the rapamycin elutes from the matrix by diffusion through the polymer molecules. Polymers tend to move, thereby allowing solids, liquids and gases to escape therefrom. The total thickness of the polymeric matrix is in the range from about 1 micron to about 20 microns or greater. In a preferred exemplary embodiment, the base layer, including the polymer and drug, has a thickness in the range from about 8 microns to about 12 microns and the outer layer has a thickness in the range from about 1 micron to about 2 microns.

The ethylene-co-vinylacetate, polybutylmethacrylate and rapamycin solution may be incorporated into or onto the stent in a number of ways. For example, the solution may be sprayed onto the stent or the stent may be dipped into the solution. In a preferred embodiment, the solution is sprayed onto the stent and then allowed to dry. In another exemplary embodiment, the solution may be electrically charged to one polarity and the stent electrically changed to the opposite polarity. In this manner, the solution and stent will be attracted to one another. In using this type of spraying process, waste may be reduced and more control over the thickness of the coat may be achieved.

Since rapamycin works by entering the surrounding tissue, it is preferably only affixed to the surface of the stent making contact with one tissue. Typically, only the outer surface of the stent makes contact with the tissue. Accord-

17

ingly, in a preferred embodiment, only the outer surface of the stent is coated with rapamycin. For other drugs, agents or compounds, the entire stent may be coated.

It is important to note that different polymers may be utilized for different stents. For example, in the above-described embodiment, ethylene-co-vinylacetate and polybutylmethacrylate are utilized to form the polymeric matrix. This matrix works well with stainless steel stents. Other polymers may be utilized more effectively with stents formed from other materials, including materials that exhibit superelastic properties such as alloys of nickel and titanium.

Although shown and described is what is believed to be the most practical and preferred embodiments, it is apparent that departures from specific designs and methods described and shown will suggest themselves to those skilled in the art and may be used without departing from the spirit and scope of the invention. The present invention is not restricted to the particular constructions described and illustrated, but should be constructed to cohere with all modifications that may fall within the scope of the appended claims.

What is claimed is:

1. A drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said device provides an in-stent late loss in diameter at 12 months following implantation in a human of less than about 0.5 mm, as measured by quantitative coronary angiography.

2. A drug delivery device according to claim 1 that provides an in- stent late loss in diameter at 12 months following implantation in a human of less than about 0.3 mm, as measured by quantitative coronary angiography.

3. A drug delivery device according to claim 1 or 2 that provides an in-stent diameter stenosis at 12 months following implantation in a human of less than about 22%, as measured by quantitative coronary angiography.

4. A drug delivery device according to claim 3 that provides an in-stent diameter stenosis at 12 months following implantation in a human of less than about 15%, as measured by quantitative coronary angiography.

5. A drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said device provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.

6. A drug delivery device according to claim 5 that provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.3 mm, as measured by quantitative coronary angiography.

7. A drug delivery device according to claim 5 or 6 that provides a mean in-stent diameter stenosis in a human population at 12 months following implantation of less than about 22%, as measured by quantitative coronary angiography.

8. A drug delivery device according to claim 7 that provides a mean in-stent diameter stenosis in a human population at 12 months following implantation of less than about 15%, as measured by quantitative coronary angiography.

18

9. A method of inhibiting neointimal proliferation in a human coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said method provides an in-stent late loss in diameter at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.

10. A method according to claim 9 that provides an in-stent late loss in diameter at 12 months following implantation of less than about 0.3 mm, as measured by quantitative coronary angiography.

11. A method according to claim 9 or 10 that provides an in-stent diameter stenosis at 12 months following implantation of less than about 22%, as measured by quantitative coronary angiography.

12. A method according to claim 11 that provides an in-stent diameter stenosis at 12 months following implantation of less than about 15%, as measured by quantitative coronary angiography.

13. A method of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and from about 64 µg to about 197 µg of rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating, wherein said method provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.5 mm, as measured by quantitative coronary angiography.

14. A method according to claim 13 that provides a mean in-stent late loss in diameter in a human population at 12 months following implantation of less than about 0.3 mm, as measured by quantitative coronary angiography.

15. A method according to claim 13 or 14 that provides a mean in-stent diameter stenosis in a human population at 12 months following implantation of less than about 22%, as measured by quantitative coronary angiography.

16. A method according to claim 15 that provides a mean in-stent diameter stenosis in a human population at 12 months following implantation of less than about 15%, as measured by quantitative coronary angiography.

17. The drug delivery device according to any one of claims 1, 2, 4 or 5 wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 64 µg to about 125 µg.

18. The drug delivery device according to to any one of claims 1, 2, 4 or 5 that releases a portion of said dose of rapamycin or a macrocyclic triene analog thereof at about six weeks following intraluminal implantation.

19. The drug delivery device according to any one of claims 1, 2, 4 or 5 wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 2 µg to about 30 µg per millimeter of stent length.

20. The drug delivery device according to claim 19 wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 3 µg to about 13 µg per millimeter of stent length.

US 7,300,662 B2

19

21. The drug delivery device according to claim 19 that releases a portion of said dose of rapamycin or a macrocyclic triene analog thereof at about six weeks following intraluminal implantation.

22. The method according to any one of claims 9, 10, 13 or 14, wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 64 μg to about 125 μg.

23. The method according to any one of claims 9, 10, 13 or 14, wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 2 μg to about 30 μg per millimeter of stent length.

20

24. The method according to any one of claims 9, 10, 13 or 14, wherein said rapamycin or macrocyclic triene analog thereof is incorporated into the polymeric coating at a dose of from about 3 μg to about 13 μg per millimeter of stent length.

25. The method according to any one of claims 9, 10, 13 or 14, wherein said drug delivery device releases a portion of said dose of rapamycin or a macrocyclic triene analog thereof at about six weeks following intraluminal implantation.

* * * * *

# EXHIBIT 2
# PART 2

Exhibit B

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)                    **PATENT**
**Application No.:** 10/829,074

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Application of:                          Confirmation No.: **5950**
**Robert Falotico, et al.**

Application No.: **10/829,074**            Group Art Unit: **3743**

Filing Date: **April 21, 2004**            Examiner: **Not yet assigned**

For:    **Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular
        Disease**

08/09/2006 HDESTA1 00000001 10829074
04 FC:1464                    130.00 OP

        Commissioner for Patents
        P.O. Box 1450
        Alexandria, VA 22313-1450

        Sir:

## PETITION TO MAKE SPECIAL BECAUSE OF ACTUAL INFRINGEMENT
### (37 CFR § 1.102 and MPEP § 708.02)

        Applicant hereby petitions to make this application special because of actual
infringement.

1.      Accompanying material

        Accompanying this petition is:

        a.      A Declaration by Attorney in Support of Petition to Make Special Because
                of Actual Infringement; and

        b.      Supplemental Information Disclosure Statement.

2.      Fee (37 CFR § 1.17(i))

        The fee required is to be paid by:

        ☒       A check in the amount of **$130.00** is attached.

BEST AVAILABLE COPY

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)                    **PATENT**
**Application No.:** 10/829,074

☐    Please charge Deposit Account No. 23-3050 in the amount of **$130.00**. This
     sheet is attached in duplicate.

☒    The Commissioner is hereby authorized to charge any deficiency or credit any
     overpayment of the fees associated with this communication to Deposit
     Account No. 23-3050.

Date: August 7, 2006

S. Maurice Valla
Registration No. 43,966

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA 19103
Telephone: (215) 568-3100
Facsimile: (215) 568-3439

© 2005 WW



DOCKET NO.: CRDS-0062 (CRD0931CIP)                    **PATENT**
Application No.: 10/829,074

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:                    Confirmation No.: **5950**
**Robert Falotico, et al.**

Application No.: **10/829,074**          Group Art Unit: **3743**

Filing Date: **April 21, 2004**         Examiner: **Not yet assigned**

For:   **Drug/Drug Delivery Systems for the Prevention and Treatment of Vascular Disease**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

### DECLARATION BY ATTORNEY IN SUPPORT OF PETITION TO MAKE SPECIAL BECAUSE OF ACTUAL INFRINGEMENT (MPEP § 708.02)

I, S. Maurice Valla, Woodcock Washburn LLP, One Liberty Place, 46th Floor, Philadelphia PA, 19103, Registration No. 43,966, Telephone No. 215-564-3100, am the attorney of record for Applicants and make the following declarations.

1.     Claims 15 to 30 are presently pending. Each of the claims is directed to devices comprising an intraluminal stent, a nonerodible polymeric coating affixed to the stent, and rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the coating; the devices provide an in-stent late loss in diameter at 12 months following implantation in a human of less than about 0.5 mm, as measured by quantitative coronary angiography. Claim 16 specifies an in-stent late loss in diameter of less than about 0.3 mm, and claims 17 and 18 specify that the stent provides an in-stent diameter stenosis at 12 months following implantation in a human of less than about 22% or 15%, respectively, as

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)          **PATENT**
**Application No.:** 10/829,074

measured by quantitative coronary angiography. Claims 19 to 22 are similar to claims 15 to 18, but specify mean in-stent late loss and in-stent diameter stenosis values for in a human population. Claims 23 to 30 are directed to methods of inhibiting neointimal proliferation in a coronary artery resulting from percutaneous transluminal coronary angioplasty, comprising implanting in the lumen of said coronary artery a drug delivery device comprising: an intraluminal stent; a biocompatible, nonerodible polymeric coating affixed to the intraluminal stent; and rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the polymeric coating. These methods provide in-stent late loss and/or in-stent diameter stenosis values as recited in claims 15 to 22.

2.      Attached as exhibits hereto are press releases issued by Guidant Corporation ("Guidant") describing certain of its activities relating to drug eluting stents. In a release dated January 30, 2006 (Exhibit 1), Guidant announced that it has received Conformité Européene (CE) Mark Approval for its XIENCE™ V Everolimus Eluting Coronary Stent System. In the same press release, Guidant states that it "is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE™ V beginning in the second quarter of 2006."

3.      In a release dated October 19, 2005 (Exhibit 2), Guidant announced that inspection of its manufacturing facilities in Temecula, California had been successfully concluded as part of its submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. Guidant reported that its European Notified Body found no nonconformities and would recommend certification for Guidant's manufacturing facility for XIENCE™ V.

4.      Since Guidant's approved manufacturing facility for XIENCE™ V  is in Temecula, California, I conclude that the "ramping up manufacturing and building inventory to . . . support the European launch of XIENCE™ V" to which Guidant's January 30, 2006, release refers is being performed in the United States. Thus, on the basis of these public statements by Guidant, I conclude that Guidant is "making" XIENCE™ V and building inventory in the United States to support launch of the product in Europe.

5.      Guidant's vascular business has recently been acquired by Abbott Laboratories (Exhibit 3). Abbott has announced that it intends to launch XIENCE™ V in Europe in the third quarter of 2006 (Exhibit 4).

6.      I have made a rigid comparison of the XIENCE™ V product, as described in Guidant press releases and other publicly available documents, with the claims of the instant application. In my opinion, the XIENCE™ V product is unquestionably within the scope of claims 15 to 30 on file in this application.

7.      Everolimus is a macrocyclic triene analog of rapamycin, bearing a stable 2-hydroxyethyl chain substitution at position 40 on the rapamycin structure (Exhibits 5,6). An article published in EuroIntervention in 2005 (Exhibit 7) confirms that everolimus binds with FKBP12 (*see* page 59, col. 1), and that XIENCE™ V product comprises a stent bearing a coating that comprises a nonerodible polymer blended with everolimus (*see* page 59, col. 2). On the basis of this information, I conclude that the XIENCE™ V product comprises an intraluminal stent, a nonerodible polymeric coating affixed to the stent, and rapamycin or a macrocyclic triene analog thereof that binds FKBP12 incorporated into the coating, as recited in claims 15 to 30 on file in this application.

8.      Another article published in EuroIntervention in 2005 (Exhibit 8) reports on one-year results from Guidant's SPIRIT FIRST clinical trial, in which intravascular ultrasound and quantitative angiographic analyses were performed one year following intraluminal implantation of XIENCE™ V stents in the coronary arteries of human patients. The article reports that mean in-stent late loss  and diameter stenosis values were 0.24mm and 18%, respectively (*see* abstract), which is within the limits recited in claims 15 to 30 on file in this application.

9.      It is therefore my opinion that Guidant is making a product in the United States to support the European launch that is unquestionably within the scope of claims 15 to 30 of the instant application, and that a patent containing these claims could immediately be asserted upon issue.

**DOCKET NO.:** CRDS-0062 (CRD0931CIP)                    **PATENT**
**Application No.:** 10/829,074

10.    I have a knowledge of the pertinent prior art by virtue of the prosecution histories of
the parents of the instant application and other patents owned by the assignee of the instant
application. All such material art is provided to the Examiner as

  ☒    having been filed
  ☒    being filed

in a respective Information Disclosure Statement.

11.    I declare further that all statements made herein of my own knowledge are true and
that all statements made on information and belief are believed to be true; and further that
these statements were made with the knowledge that willful false statements and the like so
made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the
United States Code, and that such willful false statements may jeopardize the validity of the
application or any patent issuing thereon.

Date:  August 7, 2006

S. Maurice Valla
Registration No. 43,966

Woodcock Washburn LLP
One Liberty Place - 46th Floor
Philadelphia PA  19103
Telephone:  (215) 568-3100
Facsimile:  (215) 568-3439

© 2005 WW

**EXHIBIT 1**

Page 1 of 2





# Guidant Receives European Approval for Drug Eluting Coronary Stent

Company Achieves CE Mark Approval Ahead of Schedule; XIENCE V Launch Slated for Second Quarter

**Indianapolis, Ind. and Brussels — January 30, 2006 —** Guidant Corporation (NYSE: GDT) today announced that the company has received Conformité Européene (CE) Mark approval for the XIENCE™ V Everolimus Eluting Coronary Stent System. This regulatory certification allows Guidant to begin marketing the drug eluting stent in the 25 countries of the European Union. In addition, the CE Mark Approval is used to support market registrations in other regulated countries including those within Asia, Latin America and Eastern Europe.

"This early approval represents a significant milestone in Guidant's drug eluting stent program and demonstrates our ongoing commitment to advancing the field of cardiovascular therapy through innovative solutions," said John M. Capek, Ph.D., president, Vascular Intervention, Guidant. "The development of XIENCE V represents years of hard work and dedication by our employees and by trial investigators. We look forward to bringing this next-generation therapy to physicians and patients."

The XIENCE V Everolimus Eluting Coronary Stent System utilizes Guidant's most advanced coronary stent system, the highly deliverable cobalt chromium MULTI-LINK VISION®, which is available on the preferred rapid-exchange platform. Everolimus has been shown to reduce tissue proliferation in the coronary vessels following stent implantation.

"Completion of the CE Mark approval process for XIENCE V follows on the heels of impressive clinical results from the SPIRIT FIRST trial, which demonstrated the benefits of an everolimus drug eluting stent," said Prof. Patrick W. Serruys, M.D., of the Thoraxcenter, Erasmus University Hospital, Rotterdam, who served as the study's principal investigator. "With this approval, physicians in Europe will have an excellent treatment option for patients requiring a drug eluting stent."

Guidant is ramping up manufacturing and building inventory to supply ongoing clinical trials and to support the European launch of XIENCE V beginning in the second quarter of 2006.

In November, Guidant announced completion of enrollment in only four months of SPIRIT II, a 300-patient, randomized clinical trial evaluating XIENCE V. The single-blind, prospective, randomized, non-inferiority study further evaluates the XIENCE V compared to the TAXUS® Express 2™ Paclitaxel-eluting coronary stent system for the treatment of coronary artery disease.

Guidant's 1,380-patient SPIRIT III global clinical trial is evaluating the XIENCE V Stent System in the United States and Japan. The randomized U.S. cohort, which will support U.S. Premarket Approval submission, has enrolled more than 70 percent of the required patients and is expected to complete enrollment later this quarter.

Guidant Corporation pioneers lifesaving technology, giving an opportunity for better life today to millions of cardiac and vascular patients worldwide. The company develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information visit www.guidant.com.

This release includes forward-looking statements concerning XIENCE V. The statements are based on assumptions about many important factors, including satisfactory enrollment and completion of the clinical trial, associated regulatory processes and timelines, and other factors identified on Exhibit 99 to the company's most recent filing on Form 10-Q. Actual results may differ materially. The company does not undertake to update its forward-looking statements.

[ << Back ]

[ Print this page ]     [ Close window ]

**EXHIBIT 2**



Print this page

# Guidant Provides Update

Indianapolis, Ind. — October 19, 2005 — Guidant Corporation (NYSE: GDT), a world leader in the treatment of cardiac and vascular disease, today responded to statements by Johnson & Johnson on its pending acquisition of the Company and provided an update on its two major businesses.

## Transaction Update

In response to Johnson & Johnson's comments yesterday, Ronald W. Dollens, president and CEO of Guidant Corporation, stated, "While neither company depends on this transaction for its continued future success, Guidant believes that the strategic rationale for combining the two companies is as strong today as when we entered into the Merger Agreement." Guidant anticipates that the pending transaction will receive FTC clearance in October. The Company does not expect to make any specific comments on the pending transaction until after FTC approval.

## Business Performance

"Guidant's third quarter results will reflect the temporary unavailability of the CONTAK RENEWAL 3 and 4 family of heart failure devices during the full month of July and part of August, partially offset by sequential growth of U.S. coronary stent revenue, and continuing sales growth of our emerging businesses," Dollens reported.  "At the end of the quarter, data suggest our implantable defibrillator implant rate exceeded 80 percent of the pre-product notification level and is over 100 percent of the rate one year ago."

Dollens continued, "As previously announced, Guidant is launching several recently approved cardiac rhythm management systems during the fourth quarter, including the revolutionary Latitude Patient Management system. Physicians are expressing enthusiasm for the new wireless capability to monitor patients, improve their compliance, and monitor device status independent of patient effort." Dollens further observed, "Our drug eluting stent development program continues to make important progress toward European launch during the first half of next year. We are expanding manufacturing capacity, increasing productivity, and recently received FDA approval to expand clinical trial enrollment."

"While recent events and the publicity surrounding them will impact our short-term results, we believe that the fundamentals of our business and the markets that we serve remain strong and our outlook is positive," Dollens noted.  "Our track record of success over the years has been driven in large part by the dedication of our people to the needs of patients and physicians who use our products.  We continue to be committed to providing the highest quality products for patients who critically need them and we are confident that the value of the Company remains strong."

## Cardiac Rhythm Management Products Update

Consistent with an anticipated new product cycle, several significant new products were approved (cleared) by FDA during the third quarter. They include:

- VITALITY HE implantable defibrillator; Guidant's first high-energy product to offer the advanced functionality of the VITALITY family.

- CONTAK RENEWAL 3 RF cardiac resynchronization-defibrillator; this is Guidant's first wireless and wandless CRT-D and is designed to enhance the speed and convenience of patient care.

- ZOOM LATITUDE programmer; this next generation programmer is designed to interface with devices that include remote monitoring capability.

- LATITUDE Communicator and secure data storage system; these elements represent the final components of the Latitude Patient Management system.

Actions taken by the Company during the quarter reflect Guidant's commitment to provide more timely information to physicians and patients about our devices. Our products continue to demonstrate high performance and reliability, and tens of thousands of people are alive today and hundreds of thousands feel better as a result of Guidant's technologies. Guidant will continue to focus on meeting and exceeding the expectations of physicians, patients and the FDA.

## Drug Eluting Stent Progress

Guidant announced today that its drug eluting stent development program continues to demonstrate progress and the Company has enrolled more than 500 patients in the SPIRIT II and III clinical trials since June. SPIRIT III is a large-scale pivotal clinical trial evaluating XIENCE™ V, an everolimus eluting coronary stent system utilizing Guidant's cobalt chromium rapid-exchange MULTI-LINK VISION® RX Coronary Stent System platform. Guidant plans to use the results of the SPIRIT III trial to obtain FDA approval for XIENCE V for the treatment of coronary artery disease. Results of the SPIRIT II study will provide additional clinical data to support the launch of XIENCE V in Europe and several countries outside the United States.

Earlier in the quarter, Guidant announced attainment of an enrollment milestone in the Company's exclusive license agreement with Novartis Pharma AG. Novartis supplies everolimus to Guidant for use in drug eluting stents and provides access to data supporting Guidant filings with regulatory agencies.

In addition, the Company plans to present one-year follow up data from SPIRIT I at the American Heart Association meeting in November 2005. SPIRIT I is a prospective, randomized, single-blind pilot study evaluating XIENCE V versus an uncoated MULTI-LINK VISION Coronary Stent System control in de novo (previously untreated) lesions.

During the quarter, the Company also announced that it successfully concluded an inspection of its drug eluting stent manufacturing and quality systems at its Temecula site. This inspection was conducted by Guidant's European Notified Body, which is also reviewing the Company's submission for CE Mark approval to market the XIENCE™ V Everolimus Eluting Coronary Stent System in Europe. The Notified Body found no nonconformities and will recommend certification for Guidant's manufacturing facility.

## Guidant Corporation

Guidant Corporation pioneers lifesaving technology, giving an opportunity for a better life today to millions of cardiac and vascular patients worldwide. The Company, driven by a strong entrepreneurial culture of more than 12,000 employees, develops, manufactures and markets a broad array of products and services that enable less invasive care for some of life's most threatening medical conditions. For more information, visit www.guidant.com.

This release includes forward-looking statements that are based on assumptions about many important factors, including market trends and competition, particularly in connection with expanded indications and reimbursement for cardiac rhythm management products; satisfactory clinical and regulatory progress; progress with respect to the merger, including satisfaction of conditions to closing, including antitrust approvals; economic conditions, including exchange rates; litigation developments; and the factors listed on exhibit 99 to Guidant's most recent 10-Q. As such, they involve risks that could cause actual results to differ materially. The company does not undertake to update its forward-looking statements.



**EXHIBIT 3**

### ABBOTT COMPLETES ACQUISITION OF GUIDANT VASCULAR BUSINESS

*—COMBINATION OF ABBOTT'S AND GUIDANT'S VASCULAR ORGANIZATIONS CREATES
LEADING VASCULAR DEVICES BUSINESS —*

Abbott Park, Illinois, April 21, 2006 — Abbott today announced it has completed the acquisition of Guidant's vascular business, which, combined with Abbott's current vascular business, creates one of the leading global vascular devices companies. This acquisition was made in connection with Boston Scientific's acquisition of Guidant Corporation.

"The acquisition of Guidant's vascular business builds on our broad-based business strategy to develop leading positions in attractive health care markets – shaping Abbott for greater balance and strengthening our business mix and breadth of pipeline opportunities," said Miles D. White, chairman and chief executive officer, Abbott.

"The combined Abbott and Guidant business offers a broad line of leading coronary and endovascular products, a pre-eminent sales force, and global manufacturing operations, as well as a state-of-the-art R&D organization, which is developing innovative technologies and devices such as the XIENCE™ V and ZoMaxx™ drug-eluting stents," White said. "Our newly expanded vascular organization has the tools and the talent to transform the way physicians treat vascular disease, impacting the lives of millions of patients around the world."

#### Broad Vascular Devices Product Portfolio
For the past several years, Abbott has built a competitive vascular business through acquisitions, licensing agreements, and internal scientific and commercial development. With the addition of Guidant's vascular business, Abbott offers physicians, catheterization labs and clinics a complete line of products and technologies for interventional procedures including: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. In addition, the combined business has a broad portfolio of intellectual property, including rapid exchange technology and stent designs, enabling the company to operate effectively in the competitive vascular devices market.

#### Innovative Research and Development Programs
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for treating vascular disease. With Guidant, Abbott now has two drug-eluting stents in development: ZoMaxx, a state-of-the-art stent coated with a proprietary immunosuppressant drug, zotarolimus, designed specifically to combat vessel re-narrowing; and XIENCE V, an everolimus-eluting stent on the MULTI-LINK VISION® cobalt chromium stent platform, which recently received approval in Europe. The combined organization also is leading the industry with a number of next-generation research programs including a stent that elutes two drugs targeted at difficult-to-treat patients such as diabetics, and a bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

#### Guidant Vascular Sales and Employees
The transaction provides Abbott with Guidant's vascular intervention and endovascular solutions business units, which had combined sales of more than $1 billion in 2005. These business units add nearly 6,000 employees worldwide to Abbott in three primary locations: Santa Clara, California; Temecula, California; and Clonmel, Ireland. The addition of Guidant's California-based employees boosts Abbott's presence in the state – currently the headquarters

of Abbott's diabetes care and vascular businesses – from more than 3,000 to more than 7,000 employees.

**Financial Details**
Abbott paid $4.1 billion in cash for Guidant's vascular business. In addition, Abbott will pay Boston Scientific milestone payments of $250 million at U.S. Food and Drug Administration approval of Guidant's drug-eluting stent, and an additional payment of $250 million upon a similar approval in Japan. Abbott also provided Boston Scientific with a five-year, $900 million interest-bearing loan. In addition, Abbott has purchased approximately 64 million shares of Boston Scientific stock for $1.4 billion, which represents less than 5 percent of the company.

Abbott expects that the Guidant transaction will be accretive to earnings per share in 2007 and beyond. Further information, including financial details, will be provided on the conference call scheduled for 8 a.m. Central time today (9 a.m. Eastern), as previously announced. A live webcast of the conference call will be accessible through Abbott's Investor Relations Web site at www.abbottinvestor.com. An archived edition of the call will be available after 11 a.m. Central time. Abbott also furnished an 8-K today regarding the Guidant transaction.

**About Abbott**
Abbott is a global, broad-based health care company devoted to the discovery, development, manufacture and marketing of pharmaceuticals and medical products, including nutritionals, devices and diagnostics. The company now employs 65,000 people and markets its products in more than 130 countries.

---

**Private Securities Litigation Reform Act of 1995 —**
**A Caution Concerning Forward-Looking Statements**
Some statements in this news release may be forward-looking statements for the purposes of the Private Securities Litigation Reform Act of 1995. We caution that these forward-looking statements are subject to risks and uncertainties that may cause actual results to differ materially from those indicated. Economic, competitive, governmental, technological and other factors that may affect Abbott's operations are discussed in the "Risk Factors" section and Exhibit 99.1 of our Securities and Exchange Commission Form 10-K for the period ended December 31, 2005, and are incorporated by reference. We undertake no obligation to release publicly any revisions to forward-looking statements as the result of subsequent events or developments.

---

Contact:

Media
Melissa Brotz          (847) 935-3456
Jonathon Hamilton      (847) 935-8646

Financial Community
John Thomas            (847) 938-2655
Tina Ventura           (847) 935-9390

---

Back to Top

| Privacy Policy | Terms of Use |
Copyright © 1996, 2006 Abbott Laboratories. Abbott Park, Illinois, U.S.A.

**EXHIBIT 4**



# Abbott's Vascular Business
# Fact Sheet

*The combined Abbott and Guidant vascular business offers physicians, catheterization labs and clinics a complete line of products to treat patients with cardiac, vascular and biliary disease. Products and technologies for interventional procedures include: a comprehensive line of coronary and endovascular stents; a full offering of guide wires, catheters and balloons; and innovative vessel closure devices. Bolstered by the acquisition of Guidant's vascular business in April 2006, Abbott began building its vascular presence with the 1999 acquisition of Perclose, a pioneer in vessel closure technologies. Over the next few years, Abbott strategically assembled a comprehensive vascular devices business through a series of acquisitions, licensing agreements and internal development.*

### Abbott's Vascular Business – At a Glance

| | |
|---|---|
| Worldwide headquarters: | San Francisco Bay Area |
| Web address: | www.abbottvascular.com |
| Primary businesses: | Coronary, Endovascular and Vessel Closure Devices |
| Employees: | 8,000 (including nearly 6,000 from Guidant) |
| Facilities: | More than 10 commercial, R&D and manufacturing facilities worldwide |

### Product Portfolio

Abbott offers comprehensive product lines throughout the world in three key areas of focus: coronary, endovascular and vessel closure devices. Key product lines and products include:

### Coronary Products:

With Abbott's long history in health care and the advanced medical devices developed by Abbott Vascular and Guidant, the company is uniquely positioned to bring physicians and their patients innovative products for the treatment of coronary artery disease.

Drug-eluting Coronary Stents: The *Xience V* stent, approved for sale in Europe, is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus.

Bare Metal Coronary Stents: Comprehensive line of bare metal stents designed for a variety of vessel sizes and clinical situations (*Multi-Link Vision* family). The *TriMaxx* bare metal stent is available outside the United States.

Guide Wires: Full lines of coronary guide wires to assist the interventional cardiologist in accessing treatment area (*Hi-Torque* and *Asahi PTCA*).

Catheters: A variety of balloon dilatation catheters and specialty catheters designed to restore blood flow to stenosed arteries (*Tornus* specialty catheter; *Mercury* balloons and *Jography* catheters; *Voyager, CrossSail, PowerSail* and *HighSail*).



**Endovascular Products:**
Abbott delivers an advanced portfolio of endovascular and biliary products to assist clinicians in a broad range of diagnostic and interventional procedures outside the coronary area (including carotid arteries, renal arteries and bile ducts).

Carotid Stents and Embolic Protection Devices: For the treatment of carotid artery disease. *RX Acculink* is an open-cell, self-expanding nitinol stent available on a rapid exchange delivery system. It is used in conjunction with *RX Accunet* embolic protection device, a polyurethane filter with a nitinol basket. *Xact* is a closed-cell, self-expanding stent used in conjunction with *Emboshield Embolic Protection System*, which features *Barewire*, a proprietary technology allowing for excellent stent placement.

Biliary stent systems: Broad lines of self-expanding and balloon expanding stents for a variety of applications (*RX Herculink, Omnilink* and *Jostent* balloon-expandable stent systems; and the *Absolute, Dynalink, Xceed* and *Xpert* self-expanding stent systems).

Peripheral Catheters and Guide wires: Full product lines of catheters and guide wires for various vessels and obstructions (*Agiltrac, Viatrac, Fox PTA*, and *Jocath* catheters; *Hi-Torque* guide wires).

**Vessel Closure Products:**
A pioneer in vessel closure technologies, Abbott offers products designed to facilitate faster, safer and more secure closure of the vascular access site following catheterizations.

Clip-based closure: The *StarClose Vascular Closure System* delivers a tiny circumferential flexible clip onto the surface of the femoral artery, mechanically closing the access site in the femoral artery securely in a matter of seconds following diagnostic catheterization procedures.

Suture-mediated closure: Minimally invasive vessel closure devices that utilize sutures and automate the surgical closure of femoral artery puncture sites following diagnostic or interventional procedures (*Perclose ProGlide, Perclose AT* and *Closer S*).

**Leading Vascular R&D Program**
In addition to its broad product portfolio, Abbott is conducting advanced research and development programs that are focused on finding innovative solutions for vascular disease.

**Drug-eluting stents**
Abbott has two drug-eluting stents in development: *Xience V* and *ZoMaxx*.

* The *Xience V* stent is an everolimus-eluting stent utilizing the *Multi-Link Vision* cobalt chromium stent platform and Novartis' everolimus. *Xience V* recently received regulatory approval in Europe and is expected to be launched in the third quarter of 2006. The product is also currently an investigational device in the United States and Japan.

* The *ZoMaxx* stent elutes zotarolimus, a proprietary immunosuppressant drug, and utilizes the *TriMaxx* stent platform, formed from a unique tri-layer composite that allows for thin struts while maintaining optimal visibility via X-ray. *ZoMaxx* is currently in clinical trials in both the United States and internationally, with an expected European launch in 2006.



The company also has a number of next-generation drug-eluting stent programs in development, including:

- A second-generation stent that elutes two drugs (zotarolimus and dexamethasone) intended for difficult-to-treat patients, such as diabetics, where restenosis rates are high.
- A bioabsorbable drug-eluting coronary stent designed to be fully absorbed by the vascular tissue following the restoration of blood flow.

**Carotid stent clinical trials:**

Abbott is a leader in studying carotid stenting as a minimally invasive alternative to surgery for patients with carotid artery disease, a leading cause of stroke. The company is sponsoring/participating in three clinical trials designed to investigate the benefits of carotid stenting in patients who are at risk of stroke from carotid artery disease.

- ACT I is the first company-sponsored clinical trial to compare carotid artery stenting to carotid artery surgery in asymptomatic patients who normally would be referred for surgery. ACT I utilizes Abbott's *Xact* stent and *Emboshield* embolic protection device.
- CAPTURE 2 is a 10,000-patient post-approval study of high-risk patients using the *RX Acculink* stent and *RX Accunet* embolic protection device.
- Abbott is also participating in the CREST study comparing carotid artery stenting to carotid surgery in normal-risk, symptomatic and asymptomatic patients who normally would be referred for surgery. CREST is sponsored by the National Institute of Neurological Disorders and Stroke (NINDS), and the National Institutes of Health (NIH). CREST utilizes the *RX Acculink* stent and *RX Accunet* embolic protection device.

###

---

\* Trademarks are shown in italics in the text of this fact sheet.



# EXHIBIT 5

1: Clin Pharmacokinet. 2004;43(2):83-95.

Clinical pharmacokinetics of everolimus.

Kirchner GI, Meier-Wiedenbach I, Manns MP.

Department of Gastroenterology, Hepatology and Endocrinology, Zentrum Innere Medizin, Medizinische Hochschule Hannover, Hannover, Germany. Kirchner.Gabriele@MH-Hannover.de

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl chain substitution at position 40 on the sirolimus (rapamycin) structure. Everolimus, which has greater polarity than sirolimus, was developed in an attempt to improve the pharmacokinetic characteristics of sirolimus, particularly to increase its oral bioavailability. Everolimus has a mechanism of action similar to that of sirolimus. It blocks growth-driven transduction signals in the T-cell response to alloantigen and thus acts at a later stage than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and ciclosporin show synergism in immunosuppression both in vitro and in vivo and therefore the drugs are intended to be given in combination after solid organ transplantation. The synergistic effect allows a dosage reduction that decreases adverse effects. For the quantification of the pharmacokinetics of everolimus, nine different assays using high performance liquid chromatography coupled to an electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have been developed. Oral everolimus is absorbed rapidly, and reaches peak concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and steady-state peak and trough concentrations, and area under the concentration-time curve (AUC), are proportional to dosage. In adults, everolimus pharmacokinetic characteristics do not differ according to age, weight or sex, but bodyweight-adjusted dosages are necessary in children. The interindividual pharmacokinetic variability of everolimus can be explained by different activities of the drug efflux pump P-glycoprotein and of metabolism by cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system for everolimus biotransformation leads to drug-drug interactions with other drugs metabolised by this cytochrome system. In patients with hepatic impairment, the apparent clearance of everolimus is significantly lower than in healthy volunteers, and therefore the dosage of everolimus should be reduced by half in these patients. The advantage of everolimus seems to be its lower nephrotoxicity in comparison with the standard immunosuppressants ciclosporin and tacrolimus. Observed adverse effects with everolimus include hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections, thrombocytopenia and leucocytopenia. Because of the variable oral bioavailability and narrow therapeutic index of everolimus, blood concentration monitoring seems to be important. The excellent correlation between steady-state trough concentration and AUC makes the former a simple and reliable index for monitoring everolimus exposure. The target trough concentration of everolimus should range between 3 and 15 microg/L in combination therapy with ciclosporin (trough concentration 100-300 microg/L) and prednisone.

Publication Types:
    Review

PMID: 14748618 [PubMed - indexed for MEDLINE]

**EXHIBIT 7**

# A randomized comparison of a durable polymer Everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial

Patrick W. Serruys, MD, PhD[1]; Andrew T. L. Ong, MBBS, FRACP[1]; Jan J. Piek, MD, PhD[2]; Franz-Josef Neumann, MD[3]; Willem J. van der Giessen, MD, PhD[1]; Marcus Wiemer, MD[4]; Andreas Zeiher, MD[5]; Eberhard Grube, MD[6]; Jürgen Haase, MD, PhD[7]; Leif Thuesen, MD[8]; Christian Hamm, MD[9]; Patricia C. Otto-Terlouw, MSc[10]

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herzzentrum, Bad Krozingen, Germany. 4. Herzzentrum, Bad Oeynhausen, Germany. 5. Uni. Klinikum Frankfurt, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik Bad Nauheim, Germany. 10. Cardialysis B.V., Rotterdam, The Netherlands.

Conflict of interest: All authors declare no conflict of interest.



**KEYWORDS**
Stent, everolimus, randomized

## Abstract

*Background:* Everolimus is a sirolimus analogue with similar efficacy in animal models, and has been previously successfully tested in humans using an erodable polymer.

*Methods:* This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus eluting from a durable polymer on a cobalt chromium stent in patients with de novo native coronary artery lesions. Sixty patients were allocated to stent implantation with an everolimus-eluting stent (n=28) or an identical bare metal stent (n=32). Patients had either stable, unstable angina or silent ischaemia. Suitable lesions treated were single de novo native coronary lesions with 50-99% stenosis and could be covered by a 18 mm stent. The primary endpoint was in-stent late loss at 180 days, analysed on a per treatment basis. The major secondary endpoint was percent in-stent volume obstruction (%VO) as measured by intravascular ultrasound (IVUS) at 180 days. The clinical secondary endpoint was major adverse cardiac events (MACE) at 180 days.

*Results:* At 6 months, (matched pairs angiographic analysis), the in-stent late loss, percentage diameter stenosis and percentage of patients with binary restenosis were 0.10 mm, 16% and 0% respectively, in the everolimus arm (n=23), as compared with 0.87 mm, 39% and 25.9%, respectively in the bare stent arm (n=27, p<0.001 for late loss and diameter stenosis, p = 0.01 for restenosis). Significantly less neointimal hyperplasia was observed in the everolimus group compared to the bare stent group (10 ± 13 mm³ vs 38 ± 19 mm³, p<0.001) and similarly, less volume obstruction (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). A major adverse cardiac event occurred in 2 patients in the everolimus arm versus 6 in the bare stent arm.

*Conclusion:* Everolimus eluted from a durable polymer on a cobalt chromium stent effectively suppresses neointimal growth at 6 months compared to an identical bare stent.

Corresponding to: Professor P.W. S. Serruys, MD, PhD, FESC, FACC Thoraxcenter, Bd-406, Erasmus Medical Center, Dr. Molewaterplein 40, 3015 GD Rotterdam, The Netherlands, Telephone: +31-10-463.5260, Fax: +31-10-436.9154, E-mail: p.w.j.c.serruys@erasmusmc.nl

Funding sources: This study was sponsored by Guidant Corporation.



## Introduction

Recent studies that have evaluated the local application of anti-proliferative drugs (sirolimus and paclitaxel) for the prevention of restenosis via a stent delivery system have shown that these therapies successfully inhibit the development of neointimal hyperplasia[1,2].

Everolimus is an effective anti-proliferative agent[3]. On a molecular level, everolimus forms a complex with the cytoplasmic protein FKBP12. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of protein synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of mammalian Target Of Rapamycin (mTOR), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with its function. Disabling mTOR explains the cell cycle arrest at the late G1 stage caused by everolimus and sirolimus.

The feasibility of using everolimus on a drug eluting stent was determined by the FUTURE I trial[4]. This trial utilized an S-stent and bioabsorbable polymer system (both Biosensors International, Singapore) and confirmed the safety of the everolimus-eluting stent at 6 and 12 months. At 6 months, a 7.7% Major Adverse Cardiac Event (MACE) rate was observed with no thrombosis and no late incomplete apposition. The efficacy was demonstrated by significant reduction of in-stent tissue proliferation at 6 months: both angiographic in-stent late loss and IVUS% neointimal volume were reduced by 87%. No angiographic in-stent binary restenosis was observed in the everolimus-eluting stent arm. The 12 month FUTURE I results showed sustained safety and efficacy with no new MACE events, no aneurysms, no late stent malapposition, and no thrombosis observed between 6 and 12 months. Minimal Lumen Area and Luminal Volume Index were maintained up to 12 months and no in-stent binary restenosis was observed up to 12 months.

The SPIRIT First clinical trial represents the first clinical evaluation of the Guidant XIENCE™ V Everolimus Eluting Coronary Stent System (XIENCE™ V Everolimus Eluting CSS), to investigate the potential benefits of the local application of everolimus in a durable polymer in combination with a thin strut cobalt chromium stent.

## Methods

### Patient selection

This randomized single-blind trial was performed at 9 medical centers and enrolled patients from December 2003 to April 2004. It was approved by the ethics committee at each participating institution, and all patients gave written informed consent.

Patients were eligible for the study if they were aged above 18 years and had received a diagnosis of stable or unstable angina or silent ischaemia. Additional eligibility criteria were the presence of a single primary de novo coronary lesion that was 3.0 mm in diameter as assessed by on-line QCA, that could be covered by an 18 mm stent, a stenosis of between 50-99% of the luminal diameter, and a Thrombolysis In Myocardial Infarction (TIMI) flow grade of 1 or more. Patients were not eligible for enrollment if they had an evolving myocardial infarction, stenosis of an unprotected left main coro-

nary artery, an ostial location, located within 2 mm of a bifurcation, a lesion with moderate to heavy calcification, an angiographically visible thrombus within the target lesion, a left ventricular ejection fraction of less than 30%, were awaiting a heart transplant, or had a known hypersensitivity or contraindication to aspirin, heparin, clopidogrel, cobalt, chromium, nickel, tungsten, everolimus, acrylic and fluoro polymers or contrast sensitivity that could not be adequately pre-medicated.

## The Everolimus-eluting stent

The Guidant XIENCE™ V Everolimus Eluting CSS is comprised of the Guidant MULTI-LINK VISION® Stent and delivery system, and a drug eluting coating. The Guidant MULTI-LINK VISION® Stent is a balloon expandable stent, which consists of serpentine rings connected by links fabricated from a single piece of medical grade L-605 cobalt chromium alloy.

Everolimus is blended in a nonerodable polymer (this drug layer was coated over another nonerodable polymer primer layer). This coating includes of acrylic and fluoro polymers, both approved for use in blood contacting applications. This layer of everolimus-polymer matrix with a thickness of 5-6 microns is applied to the surface of the stent and is loaded with 100 micrograms of everolimus per square centimeter of stent surface area with no top coat polymer layer. The stent is designed to release approximately 70% of the drug within 30 days after implantation.

Everolimus (Certican®, Novartis Corporation) has been evaluated in clinical trials in the US and Europe for use as an immunosuppressant following cardiac and renal transplantation[5]. Everolimus has received market approval in the European Union.

## Study procedure

Following the confirmation of angiographic inclusion and exclusion criteria and prior to the procedure, patients were allocated through a telephone randomization service and assigned in a 1:1 ratio to either an everolimus eluting stent or bare metal stent. A single stent 3.0 mm in diameter, 18 mm long was used in the study.

Lesions were treated using standard interventional techniques with mandatory pre-dilatation and stent implantation at a pressure not exceeding the rated burst pressure. Due to packaging differences, physicians were not blinded to the device. Post-dilatation was allowed with a balloon shorter than the implanted stent. In the event of a dissection occurring at the edge of the implanted stent, it was recommended that a single additional bare Guidant MULTI-LINK VISION® stent be implanted as animal data only on single everolimus stent implantation were available at the onset of the study; these patients were a priori excluded from the per-treatment analysis but are part of the acute success population. IVUS was performed after angiographically optimal stent placement had been obtained and was repeated if additional post-dilatation was performed.

Intravenous boluses of heparin were administered according to local standard practice. Treatment with aspirin, at a minimum dose of 80 mg per day, was started at least 24 hours before the procedure and continued indefinitely. A loading dose of 300 mg of clopidogrel was administered 24 hours before the procedure, followed



by 75 mg daily for three months. Treatment with ticlopidine was permitted in case of clopidogrel hypersensitivity. Device success was defined as a final in-stent diameter stenosis of less than 50 percent by QCA using the assigned device. Clinical success was defined as the successful implantation of any device, with stenosis of less than 50 percent of the vessel diameter by QCA and no major cardiac events during the hospital stay.

## Follow-up

Patients were evaluated at 30 days and 6 months. Further evaluations will be performed at 9 months and 1 year, with annual evaluations out to 5 years. At outpatient visits, patients were asked specific questions about the interim development of angina according to the Canadian Cardiovascular Society classification of stable angina. They were also monitored for MACE. Angiographic and IVUS evaluations were performed at 6 months, and will be repeated at 1 year. Prior to performing a follow-up angiogram, the physician was required to record in the source documents whether a revascularization (if required) was clinically indicated – defined as the presence of ischaemic symptoms and/or a positive functional ischaemia study.

## Quantitative coronary angiography evaluation

Quantitative coronary angiography was performed using the CAAS II analysis system (Pie Medical BV, Maastricht, Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: computer-defined Minimal Luminal Diameter (MLD), reference diameter obtained by an interpolated method, and percentage diameter stenosis. Binary restenosis was defined in every segment as diameter stenosis ≥50% at follow-up. Late loss was defined as the difference between MLD post-procedure and MLD at follow-up. Results are presented as matched pairs in the manuscript and as unmatched pairs in the Appendix. Unmatched pairs data is most commonly presented and utilises the mean QCA results of all projections obtained. Matched pairs data is more accurate as it compares the same views post-procedure and at follow-up and uses only QCA data of identical projections.

## Intravascular ultrasound analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased array intravascular ultrasound using automated pullback at 0.5 mm per second. The coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was examined. A computer-based contour detection program was used for automated 3-D reconstruction of the stented and adjacent segments. The lumen, stent boundaries and external elastic membrane (vessel boundaries) were detected using a minimum cost algorithm. The Stent Volume (SV) and Lumen Volume (LV) were calculated according to Simpson's rule. The intra-stent neointimal volume was calculated as the difference between SV and LV. The percentage obstruction of the stent volume was calculated as intra-stent neointimal volume/stent volume*100. Feasibility, reproducibility and inter- and intra-observer variability of

this system have been validated *in vitro* and *in vivo*[6]. Incomplete apposition was defined as one or more stent struts separated from the vessel wall with evidence of blood speckles behind the strut on ultrasound, while late incomplete apposition was defined as incomplete apposition of the stent at follow-up which was not present post-procedure.

## Study endpoints

The primary angiographic endpoint was in-stent luminal late loss, as determined by quantitative angiography. Secondary endpoints (QCA and IVUS) at 6 months and 1 year included the in-stent and in-segment late loss, angiographic binary restenosis rate, percentage diameter stenosis; and in-stent percentage volume obstruction. In-stent was defined as within the margins of the stent while in-segment was defined as located either within the margins of the stent or 5 mm proximal or distal to the stent. Late loss was calculated as the difference between the follow-up and post-procedure minimum luminal diameter. Secondary clinical endpoints were a composite of major cardiac events, including cardiac death, Q-wave or non-Q-wave myocardial infarction, clinically driven surgical or percutaneous revascularization of the target lesion (MACE) or vessel (Target Vessel Failure) at 30 days, 6 months, 9 months, and annually up to 5 years after the index procedure; and acute device, procedure and clinical success. All deaths that could not be clearly attributed to another cause were considered cardiac deaths. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase-MB, in the absence of new Q waves on electrocardiography.

The endpoints were adjudicated by an independent clinical events committee. In addition, a data and safety monitoring board that was not affiliated with the study sponsor reviewed the data to identify any safety issues related to the conduct of the study.

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population which consisted of patients who had no bailout stenting and no major protocol deviations, as evaluated in a blinded manner. Acute success was analyzed on the entire patient population.

The sample size for the study was determined based on the primary endpoint of in-stent late loss at 180 days and on the following assumptions: a single comparison of active to uncoated; one-tailed t-test, unequal and unknown variances in the two groups being compared; $\alpha=0.05$; true mean difference between the bare stent group and the treatment group of 0.48 mm. This assumption was made based on the results of the VISION Registry (mean late loss=0.83 mm)[7], SIRIUS trial (mean late loss=0.17 mm)[8] and TAXUS IV trial (mean late loss=0.39 mm)[9]. (Assume the true mean late loss for the treatment group is 0.35 mm, the difference between the bare stent group and treatment group is calculated as: 0.83 mm - 0.35 mm = 0.48 mm). The standard deviation was assumed to be 0.56 mm in the bare stent group and 0.38 mm in the treatment group (based on the results of the VISION Registry study and SIRIUS trial); approximately 20% rate of lost to follow-up or dropout; approximate-





ly 10% of patients with bailout stents. Given the above assumptions, 30 patients per arm (with the analysis of 22 evaluable patients per arm) will provide 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) would provide more than 96% power.

Binary variables were compared using Fisher's Exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon Rank-Sum test, except for the primary endpoint which was evaluated with a one sided t-test. Final 6-month results are presented in the manuscript, while the Appendix contains results that were available at the time that the 180-day report was prepared.

## Results
### Patient characteristics

Between December 2003 and April 2004, 28 patients were randomly assigned to receive the everolimus-eluting stent, and 32 were assigned to receive the bare stent. As defined in the protocol, all results (except acute success) are presented for the per-treatment population (27 patients in the everolimus group, 29 patients in the bare stent group, Figure 1). In the everolimus group there was one bailout procedure, and in the bare stent group there were two bailout procedures and one major protocol deviation (the patient was on the heart transplant waiting list). With the exception of a significantly higher number of patients with hypertension requiring treatment in the everolimus group, the two groups were similar with respect to clinical variables examined (Table 1).

**Table 1.** Baseline characteristics of the per-treatment patient population and of each treatment group.*

| | Everolimus stent (n=27) | Bare stent (n=29) | All patients (n=56) |
|---|---|---|---|
| Age(yrs) | 64 ± 10 | 61 ± 9 | 63 ± 9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left anterior descending | 48 | 45 | 46 |
| Left circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC Lesion Class (%)** | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference Vessel Diameter (mm ± SD) | 2.61 ± 0.40 | 2.71 ± 0.28 | 2.66 ± 0.34 |
| Lesion length (mm ± SD) | 10.1 ± 2.6 | 10.9 ± 3.3 | 10.5 ± 3.0 |

* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)

** AHA / ACC = American Heart Association / American College of Cardiology

### FIGURE 1



*Fig. 1: Flowchart of patients*

## Procedural characteristics

The lesions in the two groups were treated similarly with the use of conventional techniques. Glycoprotein IIb/IIIa inhibitors, used at the investigators' discretion, were administered to 7.4% of the patients in the everolimus group and 3.4% of those in the bare stent group. The two groups did not differ significantly with respect to the rate of device success (96.4% in the everolimus group and 93.8% in the bare stent group) or clinical success (96.4% in the everolimus group and 100% in the bare stent group).

## Quantitative coronary angiography analysis

Angiographic data at 6 months were available for 50 of the 56 analysable patients (89.3%). The mean reference diameter of the target vessel, the mean length of the lesion at baseline, the reference vessel diameter and mean MLD of the stented segment were similar in the two groups (Tables 1 and 2). At six months, with matched pairs analysis, the mean MLD of the stented segment was significantly greater in the everolimus group. The mean in-stent late loss, percentage of stenosis, and percentage of patients with 50 percent or more stenosis were 0.10 mm, 16%, and 0%, respectively, in the everolimus group, as compared with 0.87 mm, 39%, and 25.9%, respectively, in the bare stent group (p<0.001 for late loss and diameter stenosis, p=0.01 for restenosis). Figure 2 shows the cumulative frequency of stenosis immediately after the index procedure and at six months in each treatment group. Table 2 and Figure 3 show the results of sub-segmental quantitative angiographic analyses for matched pairs. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus group than in the bare stent group (p <0.01 for proximal and p=0.04 for distal). The late luminal loss in the stented segment was significantly less in the everolimus group than in the bare stent group (p ≤0.001).

## Intravascular ultrasound evaluation

At six months follow-up, intravascular ultrasound evaluation showed no significant differences between the two groups with respect to the volume of the stent or the vessel volume (Table 3). Significantly



Fig. 2: Cumulative frequency of stenosis (in-stent) immediately after stenting and at six months



Fig. 3: Comparison of in-segment / in-stent late loss

Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Matched Pairs).

| | Proximal Edge Everolimus (n=28) | Bare Stent (n=24) | P Value | In-Stent Everolimus (n=28) | Bare Stent (n=24) | P Value | Distal Edge Everolimus (n=28) | Bare Stent (n=24) | P Value | In-Segment Everolimus (n=28) | Bare Stent (n=24) | P Value |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Reference Vessel Diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.80 ± 0.33 | 3.04 ± 0.38 | 0.06* | 2.71 ± 0.28 | 2.89 ± 0.35 | 0.11* | 2.64 ± 0.30 | 2.80 ± 0.39 | 0.21* | 2.65 ± 0.30 | 2.84 ± 0.41 | 0.10* |
| At 6 months | 2.78 ± 0.32 | 2.67 ± 0.40 | 0.22* | 2.70 ± 0.31 | 2.58 ± 0.37 | 0.25* | 2.61 ± 0.37 | 2.46 ± 0.36 | 0.19* | 2.61 ± 0.36 | 2.59 ± 0.36 | 0.89* |
| **Minimal Luminal Diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.56 ± 0.44 | 2.61 ± 0.45 | 0.79* | 2.38 ± 0.25 | 2.45 ± 0.31 | 0.50* | 2.23 ± 0.41 | 2.26 ± 0.45 | 0.77* | 2.11 ± 0.35 | 2.14 ± 0.40 | 1.00* |
| At 6 months | 2.45 ± 0.46 | 2.19 ± 0.49 | 0.04* | 2.28 ± 0.33 | 1.58 ± 0.41 | < 0.001* | 2.18 ± 0.38 | 2.00 ± 0.45 | 0.21* | 2.04 ± 0.40 | 1.54 ± 0.41 | < 0.001* |
| Late Loss (mm) | 0.11 ± 0.15 | 0.42 ± 0.39 | <0.01* | 0.10 ± 0.21 | 0.87 ± 0.37 | < 0.001*** | 0.05 ± 0.20 | 0.26 ± 0.40 | 0.04* | 0.07 ± 0.19 | 0.61 ± 0.37 | < 0.001* |
| **Diameter Stenosis (%DS)** | | | | | | | | | | | | |
| After procedure | 9 ± 11 | 14 ± 9 | 0.07* | 12 ± 5 | 15 ± 6 | 0.05* | 16 ± 10 | 20 ± 10 | 0.16* | 20 ± 8 | 24 ± 9 | 0.05* |
| At 6 months | 12 ± 12 | 17 ± 17 | 0.26* | 16 ± 8 | 39 ± 14 | < 0.001* | 16 ± 10 | 19 ± 14 | 0.82* | 22 ± 11 | 41 ± 14 | < 0.001* |
| Binary Restenosis Rates | 4.3% | 3.7% | 1.00** | 0.0% | 25.9% | 0.01** | 0.0% | 7.4% | 0.49** | 4.3% | 33.3% | 0.01** |

* two-sided Wilcoxon rank sum test ** two-sided Fisher's Exact test *** One-sided t-test † Fisher's Exact test



Table 3. IVUS measurements at 6 month follow-up.

| | Everolimus (n=26) | Bare stent (n=28) | p-value |
|---|---|---|---|
| Vessel volume (mm³) | 291 ± 82 | 296 ± 73 | 0.64 |
| Stent volume (mm³) | 134 ± 28 | 139 ± 33 | 0.69 |
| In-stent neo-intimal volume (mm³) | 10 ± 13 | 38 ± 19 | <0.001 |
| Luminal volume (mm³) | 124 ± 32 | 100 ± 31 | 0.04 |
| In-stent volume obstruction (%)** | 8.0 ± 10.4 | 28.1 ± 14.0 | <0.001 |

* This final table contains an additional 13 patients not included in the 180-day report prepared for the sponsor. In 8 patients (4 in each group), an imputed stent length of 18mm was used due to non-continuous pullback. In a further 5 patients (all bare stent group) results were unavailable at the time of the 180-day report. (see Appendix)

** In-stent volume obstruction = 100*
(In-stent neo-intimal volume / Stent volume)

less neointimal hyperplasia was observed in the everolimus-stent group compared to the bare-stent group (10 ± 13 vs. 38 ± 19 mm³, p<0.001) and similarly, significantly less volume obstruction, (8.0 ± 10.4% versus 28.1 ± 14.0%, p<0.001). Figure 4 is a cumulative curve of percentage volume obstruction. No in-stent volume obstruction was detected in almost half of the patients in the everolimus-stent group, whereas in the bare stent group, some degree of obstruction by neointima was present in all patients (Figure 4). No evidence of an "edge effect," aneurysm formation, in-stent thrombosis, persistent dissection or late incomplete apposition were observed.



F I G U R E   4

Fig. 4: Percentage in-stent volume obstruction versus cumulative frequency of patients. Values are expressed as mean ± standard deviation for each group.

## Major adverse cardiac events

Major adverse cardiac events are listed in Table 4. There was one Q-wave myocardial infarction in the everolimus group in a patient who underwent additional revascularization for angina in a non-target vessel 18 days after the study procedure and suffered thrombosis of this non-study stent 12 days later. The everolimus stent was patent with no evidence of thrombus at the time of the thrombotic occlusion of the non study stent. One patient in the everolimus arm underwent a clinically driven target lesion revascularization at 3 weeks for symptomatic persistent dissection at the proximal edge left untreated at the time of the procedure. There were no clinically driven target revascularizations in the everolimus group for restenosis. There were six clinically driven target lesion revascularizations in the bare stent group, five were treated percutaneously for restenosis and the sixth by bypass surgery. No adverse effects were attributable to everolimus or the polymer coating of the stents.

Table 4. Hierarchical major adverse cardiac events at 180 days in per-treatment population*.

| | Everolimus stent (n=26) | | Bare stent (n=28) | |
|---|---|---|---|---|
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | | | | |
| Q-wave | 1‡ | 3.8 | 0 | 0 |
| Non-Q-wave | 0 | 0 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 1§ | 3.8 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 2 | 7.7 | 6 | 21.4 |
| Major adverse cardiac events | 2 | 7.7 | 6 | 21.4 |

* One patient in each group withdrew consent after treatment
** No statistical significance was detected between groups for all endpoints tested.
‡ Q-wave MI due to thrombosis of a non-study stent in a non-target vessel.
§ Clinically driven TLR for persistent dissection proximal to the stent 3 weeks after the index procedure.

## Discussion

The main finding of this randomized first-in-man study is that an everolimus-eluting stent coated with a durable polymer was associated with an in-stent angiographic late loss of 0.10 mm, significantly less than the corresponding bare cobalt chromium metal stent of 0.87 mm, which satisfied the primary endpoint of this trial and confirmed the efficacy of this system. Correspondingly, in-segment late loss was also significantly less in the everolimus-stent group.

Currently, two different drug-eluting systems (sirolimus and paclitaxel) are available. Although no published scientific comparative data is to date available, it appears that, from historical randomized trials, a difference of approximately 0.2 mm in-stent late loss exists between sirolimus and paclitaxel. Even if the impact of restenosis and MACE is currently unknown, some slight difference in restenosis rates and MACE can be expected. New devices should at least equal the incumbents in performance. This performance may be judged on late

loss, restenosis rate and / or the need for reintervention. With an in-stent late loss ranging from zero to 0.2 mm, it has been difficult to find a compound with the same efficacy, without resorting to the -limus family (Figure 5). With the sirolimus molecule being rather large and complex, it is therefore not surprising that major pharmaceutical companies have thoroughly explored its numerous analogues in order to develop a suitable competitor to sirolimus. The drug used in this study, everolimus differs from sirolimus by a substitution of a hydrogen radical/side-branch with a methyl sidechain.

### FIGURE 5



*Fig. 5: Comparison of in-stent late loss from drug-eluting trials.*

The reason for developing new compounds is to improve on the side effects of the existing compounds such as delayed healing with re-endothelialization and fibrin[11], early[12] and late stent thrombosis[13]. The success of the device lies in its three components - the drug, the polymer properties and the stent. The use of a sirolimus analogue is not in itself a guarantee of success since some of them have intrinsically, a potency in inhibition of up to 100 times less (e.g. tacrolimus), and some other analogues with equal *in vitro* inhibitory effects nevertheless fail to equally inhibit neointimal growth *in vivo*, because their duration of elution was suspected to be too short. However it has already been demonstrated that everolimus in clinical trials using a bioerodable polymer with a slower elution profile than sirolimus is effective in reducing late loss to below 0.2 mm[4]. Therefore the remaining challenge was to establish whether everolimus eluted from a durable polymer was also efficient and is addressed in this report.

Although the 6-month results are promising, one year angiographic and IVUS follow-up results are awaited to confirm the long-term results of this device in light of recent findings regarding an increasing late loss seen with other devices over time.

At the time of the publication of RAVEL, it was argued that the restenosis rate of the bare stent was excessively high at 26%. Similarly, in the present trial the restenosis rate in the bare stent arm was 25.9%. Nevertheless, it must be emphasized that in both cases these restenosis rates correspond to the value predicted and derived from multivariate analyses including as determinant parameters vessel size, MLD post, incidence of LAD disease and diabetics. Of inter-

est, the late loss of the bare stent groups in RAVEL and this study were similar, corresponding to their restenosis rates. This is at variance with the VISION registry, and publications on stent strut thickness, but may be explained by the mismatch in stent size and reference diameter. This study was powered for late loss and not for clinical events, and it was not surprising that the 3 fold reduction in events failed to be statistically significant. At the time of trial design, safety studies with overlapping eluting-stents in animal models had not been completed, requiring the use of bare stents for bailout. As a result of this confounder, these patients were *a priori* excluded from the pre-treatment analysis. This study was however designed as a first in man trial with everolimus on an untested new durable polymer in combination with a cobalt chromium stent.

### Acknowledgements

The authors would like to acknowledge the invaluable assistance of Susan Veldhof, RN, Cecile Dorange, MSc, Sophie Henry, MSEE from Guidant Europe, Diegem, Belgium for the conduct and reporting of this study.

### References

1. Morice MC, Serruys PW, Sousa JE, Fajadet J, Ban Hayashi E, Perin M, Colombo A, Schuler G, Barragan P, Guagliumi G, Molnar F, Falotico R. A randomized comparison of a sirolimus-eluting stent with a standard stent for coronary revascularization. *N Engl J Med.* 2002;346:1773-80.

2. Colombo A, Drzewiecki J, Banning A, Grube E, Hauptmann· K, Silber S, Dudek D, Fort S, Schiele F, Zmudka K, Guagliumi G, Russell ME. Randomized study to assess the effectiveness of slow- and moderate-release polymer-based paclitaxel-eluting stents for coronary artery lesions. *Circulation.* 2003;108:788-94.

3. Farb A, John M, Acampado E, Kolodgie FD, Prescott MF, Virmani R. Oral everolimus inhibits in-stent neointimal growth. *Circulation.* 2002;106:2379-84.

4. Grube E, Sonoda S, Ikeno F, Honda Y, Kar S, Chan C, Gerckens U, Lansky AJ, Fitzgerald PJ. Six- and twelve-month results from first human experience using everolimus-eluting stents with bioabsorbable polymer. *Circulation.* 2004;109:2168-71.

5. Formica RN, Jr., Lorber KM, Friedman AL, Bia MJ, Lakkis F, Smith JD, Lorber MI. The evolving experience using everolimus in clinical transplantation. *Transplant Proc.* 2004;36:495S-499S.

6. Hamers R, Bruining· N, Knook M, Sabate M, Roelandt J. A novel approach to quantitative analysis of intravascular Ultrasound Images. *Computers in Cardiology.* 2001;28:589-592.

7. Kereiakes DJ, Cox DA, Hermiller JB, Midei MG, Bachinsky WB, Nukta ED, Leon MB, Fink S, Marin L, Lansky AJ. Usefulness of a cobalt chromium coronary stent alloy. *Am J Cardiol.* 2003;92:463-6.

8. Moses JW, Leon MB, Popma JJ, Fitzgerald PJ, Holmes DR, O'Shaughnessy C, Caputo RP, Kereiakes DJ, Williams DO, Teirstein PS, Jaeger JL, Kuntz RE. Sirolimus-eluting stents versus standard stents in patients with stenosis in a native coronary artery. *N Engl J Med.* 2003;349:1315-23.

9. Stone GW, Ellis SG, Cox DA, Hermiller J, O'Shaughnessy C, Mann JT, Turco M, Caputo R, Bergin P, Greenberg J, Popma JJ, Russell ME. A polymer-based, paclitaxel-eluting stent in patients with coronary artery disease. *N Engl J Med.* 2004;350:221-31.

10. Leon MB, Bakhai A. Drug-eluting stents and glycoprotein IIb/IIIa inhibitors: combination therapy for the future. *Am Heart J.* 2003;146:S13-7.



11. Virmani R, Guagliumi G, Farb A, Musumeci G, Grieco N, Motta T, Mihalcsik L, Tespili M, Valsecchi O, Kolodgie FD. Localized hypersensitivity and late coronary thrombosis secondary to a sirolimus-eluting stent: should we be cautious? *Circulation.* 2004;109:701-5.

12. Ong AT, Hoye A, Aoki J, Van Mieghem CA, Rodriguez Granillo GA, Sonnenschien K, Regar E, Mc Fadden EP, Sianos G, van der Giessen WJ, de Jaegere PT, van Domburg RT, Serruys PW. Thirty-Day Incidence and Six-Month Clinical Outcome of Thrombotic Stent Occlusion Following Bare Metal, Sirolimus- or Paclitaxel Stent Implantation. *J Am Coll Cardiol.* 2005;45:947-953.

13. McFadden EP, Stabile E, Regar E, Cheneau E, Ong AT, Kinnaird T, Suddath WO, Weissman NJ, Torguson R, Kent KM, Pichard AD, Satler LF, Waksman R, Serruys PW. Late thrombosis in drug-eluting coronary stents after discontinuation of antiplatelet therapy. *Lancet.* 2004;364:1519-21.

14. Degertekin M, Serruys PW, Tanabe K, Lee CH, Sousa JE, Colombo A, Morice MC, Ligthart JM, de Feyter PJ. Long-term follow-up of Incomplete stent apposition in patients who received sirolimus-eluting stent for *de novo* coronary lesions: an intravascular ultrasound analysis. *Circulation.* 2003;108:2747-50.

# Appendix

Sponsor: Guidant Corporation, Santa Clara, California, USA.

Principal Investigator: Patrick W. Serruys (The Netherlands).

Executive Committee: P.W. Serruys (Principal Investigator and Chairman, Rotterdam, The Netherlands); Gary Johnson (Vice President of Regulatory Affairs/Clinical Research, Guidant Corporation); Stan Fink (Director of Clinical Research USA, Guidant Corporation).

Data Safety Monitoring Board (DSMB) - J.G.P. Tijssen, Amsterdam, The Netherlands; F.W.A. Verheugt, Nijmegen, The Netherlands; W. Wijns, Aalst, Belgium.

Clinical Events Committee (CEC) - J. Vos, Amphia Ziekenhuis, Breda, The Netherlands; B.J.W.M. Rensing, Sint Antonius Ziekenhuis, Nieuwegein, the Netherlands; C. Hanet, Clinique Universitaire de Saint-Luc, Brussels, Belgium.

Data management - Angiographic and IVUS core laboratories: Cardialysis BV, Rotterdam, The Netherlands; Data Coordination Centre and Site Monitoring: Guidant Europe, Diegem, Belgium.

The following Investigators and Institutions participated in the SPIRIT First trial:

Clinical sites: J.J. Piek, Academisch Medisch Centrum, Amsterdam, The Netherlands (18 patients); F.J. Neumann, Herzzentrum, Bad Krozingen, Germany (14 patients); P.W. Serruys, Thoraxcentre, Erasmus Medical Centre, Rotterdam, The Netherlands (5 patients); M. Wiemer, HZ Herzzentrum, Bad Oeynhausen, Germany (5 patients); A. Zeiher, Uni. Klinikum Frankfurt, Frankfurt, Germany (4 patients); E. Grube, Heart Center Siegburg, Siegburg, Germany (4 patients); J. Haase, Red Cross Hospital, Frankfurt, Germany (4 patients); L. Thuesen, Skejby Sygehus, Aarhus, Denmark (4 patients); C. Hamm, Kerckhoff Klinik, Bad Nauheim, Germany (2 patients).

Table A2. Appendix: results of intra vascular ultra sound analysis as per 180-day progress report – Clinical investigation plan 02-350 The SPIRIT first clinical trial. Guidant Corporation, Data on file.

| | Everolimus (N=19) | Bare (N=15) | P-value |
|---|---|---|---|
| Vessel volume (mm³) | 299 ± 87 | 284 ± 77 | 0.76 |
| Stent volume (mm³) | 138 ± 30 | 139 ± 39 | 1.00 |
| In-stent neo-intimal volume (mm³) | 11.2 ± 14.0 | 41.4 ± 20.1 | <0.001 |
| Luminal volume (mm³) | 126 ± 35 | 98 ± 34 | 0.06 |
| In-stent volume obstruction (%) | 8.6 ± 10.7 | 29.0 ± 13.9 | <0.001 |

Table A1. Appendix: results of sub-segmental quantitative coronary angiographic analysis (Unmatched Pairs) as per 180-day progress report - Clinical investigation plan 02-350 The SPIRIT first clinical trial. Guidant Corporation, Data on file.

| | Proximal edge | | | In-stent | | | Distal edge | | | In-segment analysis | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value | Everolimus (Post N=27 Fup N=23) | Bare (Post N=29 Fup N=26) | P-value |
| **Minimum luminal diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.49 ± 0.44 | 2.57 ± 0.39 | 0.44* | 2.34 ± 0.26 | 2.42 ± 0.31 | 0.41* | 2.18 ± 0.44 | 2.25 ± 0.42 | 0.67* | 2.07 ± 0.37 | 2.14 ± 0.37 | 0.74* |
| At 6 months | 2.45 ± 0.46 | 2.19 ± 0.50 | 0.05* | 2.28 ± 0.33 | 1.58 ± 0.42 | <0.001* | 2.18 ± 0.38 | 1.99 ± 0.46 | 0.19* | 2.04 ± 0.40 | 1.53 ± 0.41 | <0.001* |
| Late loss (mm) | 0.10 ± 0.17 | 0.38 ± 0.38 | 0.01* | 0.10 ± 0.23 | 0.84 ± 0.36 | <0.001*** | 0.07 ± 0.20 | 0.26 ± 0.41 | 0.14* | 0.09 ± 0.20 | 0.60 ± 0.36 | <0.001* |
| **Diameter stenosis (%)** | | | | | | | | | | | | |
| After procedure | 10 ± 10 | 15 ± 9 | 0.13* | 12 ± 4 | 15 ± 6 | 0.02* | 17 ± 10 | 19 ± 9 | 0.39* | 21 ± 8 | 24 ± 8 | 0.14* |
| At 6 months | 12 ± 12 | 18 ± 17 | 0.21* | 16 ± 8 | 39 ± 14 | <0.001* | 16 ± 10 | 20 ± 14 | 0.67* | 22 ± 11 | 41 ± 14 | <0.001* |
| Binary restenosis rates | 4.3% | 3.8% | 1.00** | 0.0% | 26.9% | 0.01** | 0.0% | 7.7% | 0.49** | 4.3% | 34.6% | 0.01** |

* Two-sided Wilcoxon rank sum test ** Two-sided Fisher's Exact test *** One-sided t-test





Euro**Intervention**

**EXHIBIT 8**

# One-year results of a durable polymer everolimus-eluting stent in *de novo* coronary narrowings (The SPIRIT FIRST Trial)

Keiichi Tsuchida[1], MD, PhD; Jan J. Piek[2], MD, PhD; Franz-Josef Neumann[3], MD; Willem J. van der Giessen[1], MD, PhD; Marcus Wiemer[4], MD; Andreas M. Zeiher[5], MD; Eberhard Grube[6], MD; Jürgen Haase[7], MD, PhD; Leif Thuesen[8], MD; Christian W. Hamm[9], MD; Susan Veldhof[10], RN; Cécile Dorange[10], MSc; Patrick W. Serruys[1]*, MD, PhD

1. Thoraxcenter, Erasmus Medical Center, Rotterdam, The Netherlands. 2. Academisch Medisch Centrum, Amsterdam, The Netherlands. 3. Herz-zentrum Bad Krozingen, Bad Krozingen, Germany. 4. Herz- und Diabeteszentrum Nordrhein-Westfalen der Rhur-Univasität Bochum, Bad Oeynhausen, Germany. 5. Klinikum de J. W. Goethe Univasität, Frankfurt, Germany. 6. Heart Center Siegburg, Siegburg, Germany. 7. Red Cross Hospital Cardiology Center, Frankfurt, Germany. 8. Skejby Sygehus, Aarhus, Denmark. 9. Kerckhoff Klinik, Bad Nauheim, Germany. 10. Guidant Corporation, Santa Clara, California, USA.

This study was sponsored by Guidant Corporation, Santa Clara, California, USA.
Ms. Veldhof and Ms. Dorange are employees of Guidant Corporation. The other authors declare no conflict of interests.
Presented in part at The Scientific Sessions of The American Heart Association, Dallas, Texas, 13 - 16 November, 2005.



KEYWORDS
Coronary artery, everolimus-eluting stent, durable polymer, randomized trial

### Abstract
**Aim:** Short-term results of durable polymer everolimus-eluting stents have shown significant improvements in clinical and angiographic outcomes. This report presents the 1-year clinical and angiographic data from the SPIRIT FIRST Trial.

**Methods and results:** This first-in-man single blind multi-centre randomized controlled trial assessed the safety and efficacy of everolimus and a durable polymer on a cobalt chromium stent in patients with *de novo* native coronary artery lesions. Of the 60 patients enrolled, a total of 56 patients (27 everolimus arm and 29 bare stent arm) were qualified to per-treatment analyses at 1 year. Quantitative angiographic and intravascular ultrasound (IVUS) analyses were performed. Angiographic late loss, IVUS neointimal volume obstruction and major adverse cardiac events (MACE) at 1 year were assessed as the study endpoints. At 1 year, the in-stent late loss and diameter stenosis of patients were 0.24 mm and 18% in the everolimus arm (n=20), as compared with 0.84 mm and 37% in the bare stent arm (n=25, p < 0.001). Significantly less neointimal hyperplasia was observed in the everolimus arm compared to the bare stent arm (neointimal volume, $13\pm9$ mm$^3$ vs. $37\pm17$ mm$^3$, p < 0.001; volume obstruction, $10\pm7\%$ vs. $28\pm12\%$, p < 0.001). The overall MACE rate was 15.4% in the everolimus arm and 21.4% in the bare stent arm.

**Conclusion:** The safety and efficacy of everolimus-eluting stent with a durable polymer observed at 6 months was sustained at 1 year.

*Corresponding author: Thoraxcenter, Ba 583, Erasmus Medical Center, Dr. Molewaterplein 40, 3015 GD Rotterdam, The Netherlands
E-mail: p.w.j.c.serruys@erasmusmc.nl

© Europa Edition 2005. All rights reserved.



## Introduction

To date percutaneous coronary intervention (PCI) using drug-eluting stents is considered the most secure treatment option for *de novo* single coronary artery disease. The two clinically available stents coated with an anti-proliferative drug, sirolimus or paclitaxel, have shown promising clinical and angiographic outcomes as proven in several randomized trials[1-3]. Beside these two drugs, the efficacy of newly developed antiproliferative drugs has been clinically investigated[4-9] and their potent effects in preventing restenosis have been reported[5-9].

Everolimus is a powerful anti-proliferative agent and has shown effect in preventing rejection in kidney and heart transplantation[10-12]. In the presence of everolimus, the growth factor-stimulated phosphorylation of p70 S6 kinase and 4E-BP1 is inhibited. The latter proteins are key proteins involved in the initiation of DNA synthesis. Since phosphorylation of both p70 S6 kinase and 4E-BP1 is under the control of FRAP (FKBP-12-rapamycin associated protein, also called mTOR, mammalian Target Of Rapamycin), this finding suggests that, like sirolimus, the everolimus-FKBP12 complex binds to and thus interferes with the function of FRAP.

The SPIRIT FIRST clinical trial represents the first evaluation of the everolimus-eluting stent which studied the potential benefits of the local application of everolimus in a durable polymer in combination with a stent with a thin strut design[5]. Compared to identical bare metal stents, everolimus-eluting stents have demonstrated effective suppression of neointimal growth at 6 months[5]. This paper presents the 1-year clinical and angiographic/intravascular ultrasound (IVUS) follow-up results from the experience with the durable polymer everolimus-eluting stent.

## Methods

### Study population

The SPIRIT FIRST clinical trial was a prospective, controlled, randomized, single-blinded, parallel 2-arm, multicentre clinical evaluation of a durable polymer everolimus-eluting stent (XIENCE™ V, Guidant, Santa Clara, CA, USA) in patients with *de novo* native coronary artery lesions. Patient eligibility criteria, device description and study procedure were previously reported, along with 6-month clinical, angiographic and IVUS analyses[5]. Briefly, study patients had single *de novo* stenoses of < 18 mm lesion length, coverable by 1 study stent, > 50% diameter stenosis, and vessel reference diameter 3.0 mm as assessed by on-line quantitative coronary angiography (QCA). Patients were ineligible if they had any of the followings: evolving myocardial infarction; stenosis of an unprotected left main coronary artery, an ostial location, or located within 2 mm of a bifurcation; a lesion with moderate to heavy calcification, or an angiographically visible thrombus; a left ventricular ejection fraction < 30%; were awaiting a heart transplant, or had a contraindication to aspirin, clopidogrel, heparin and any other drugs related to this study.

### Follow-up and study endpoint

Clinical evaluation was scheduled at 1, 6, and 12 months with annual evaluation up to 5 years. Angiographic and IVUS imaging was obtained at baseline, 6- and 12-month follow-up.

The primary endpoint was in-stent late loss at 6 months. The major secondary endpoint was percent (%) in-stent volume obstruction at 6 months based on IVUS analysis. Other secondary endpoints included the followings: a) in-stent late loss at 1 year; b) in-segment late loss at 6 months and 1 year including proximal and distal evaluations; c) in-stent% volume obstruction at 1 year; d) in-stent and in-segment% diameter stenosis at 6 months and 1 year; e) in-stent and in-segment angiographic binary restenosis (ABR) at 6 months and 1 year; f) persisting incomplete apposition, late incomplete apposition, aneurysm formation, thrombus, persisting dissection at 6 months and 1 year; g) major adverse cardiac events (MACE) rate in-hospital and at 1, 6, 9 months and annually up to 5 years. MACE is comprised of death, myocardial infarction (MI), or clinically driven target lesion revascularization (TLR); g) acute device, procedural and clinical success. All deaths that could not be clearly attributed to another cause were considered a cardiac death. A non-Q-wave myocardial infarction was defined by an increase in the creatine kinase level to more than twice the upper limit of the normal range, accompanied by an increased level of creatine kinase MB, in the absence of new Q waves on the surface electrocardiogram.

## Quantitative Coronary Angiography evaluation

QCA was performed by means of the CAAS II analysis system (Pie Medical B.V., Maastricht, The Netherlands). In each patient, the stented segment and the peri-stent segments (defined by a length of 5 mm proximal and distal to the stent edge) were analyzed. The following QCA parameters were computed: minimal luminal diameter (MLD), reference diameter, and% diameter stenosis. ABR was defined in every segment as diameter stenosis >50% at follow-up. Late loss was defined as the difference between MLD at post-procedure and MLD at follow-up.

## Intravascular Ultrasound Analysis

Post-procedure and follow-up stented vessel segments were examined with mechanical or phased-array IVUS using automated pullback at 0.5 mm per second. A coronary segment beginning 5 mm distal to and extending 5 mm proximal to the stented segment was also examined. A computer-based contour detection program (Curad B.V., Wijk bij Duurstede, The Netherlands) was used for automated 3-D reconstruction of the stented and the peri-stent segments. The lumen, stent boundaries and external elastic membrane were detected using a minimum cost algorithm. The stent volume (SV) and lumen volume (LV) were calculated according to Simpson's rule. The in-stent neointimal volume was calculated as "SV-LV". The % obstruction of the stent volume was calculated as in-stent neointimal volume/stent volume _100. Feasibility, reproducibility and inter- and intra-observer variability of this system have been validated *in vitro* and *in vivo*[13].

## Statistical analysis

The primary endpoint and all trial endpoints were analyzed on the per-treatment evaluable population. Acute success was analyzed on the safety population. The per-treatment evaluable population consisted of patients who had no bailout and no major protocol deviations. The data for each patient were reviewed in a blinded



manner to determine whether the patient should be included in this analysis population. Analyses based on the per-treatment evaluable population were as "treated". Patients were included in the treatment arm corresponding to the study stent actually received.

The overall sample size calculation for this trial was determined based on the primary endpoint of in-stent late loss at 6 months and on the following assumptions: a single comparison of active to control; one-tailed t-test, unequal and unknown variances in the 2 groups being compared; $\alpha = 0.05$; true mean difference between the control group and the treatment group is 0.48 mm. This assumption was made based on the results of VISION Registry (mean late loss = 0.83 mm)[14], SIRIUS trial (mean late loss = 0.17 mm)[2] and TAXUS IV trial (mean late loss = 0.39 mm)[15]. Assuming the true mean late loss for the treatment group was 0.35 mm, the difference between the control group and treatment group is calculated as: 0.83 mm − 0.35 mm = 0.48 mm. The standard deviation was assumed to be 0.56 mm in the control group and 0.38 mm in the treatment group (based on the results of VISION Registry study and SIRIUS trial with standard deviation for DES adjusted downward from 0.44 mm to 0.38 mm to take into account of 6-month angiography as opposed to 8-month angiography); approximately 20% rate of lost to follow-up or dropout; approximately 10% of patients with bailout stents; given the above assumptions, enrolling 30 patients per arm (analysis of 22 evaluable patients per arm) would have provided 95% power for comparison. Although the trial was not powered based on the major secondary endpoint, percent volume obstruction at 180 days, enrolling 30 patients per arm (analysis of 22 patients per arm) provides more than 96% power. Binary variables were compared using Fisher's exact test. For continuous variables, means and standard deviations were calculated and groups compared using the Wilcoxon's rank sum test. Time-to-event variables were compared with Kaplan-Meier analysis and the log rank statistic.

## Results

A total of 60 study patients were randomized and consecutively enrolled at 9 investigational sites between December 2003 and April 2004. The safety population is composed of these 60 patients. Of the 60 patients, 3 were excluded from the per-treatment population (1 from the everolimus arm and 2 from the bare stent arm) because of bailout stenting (2) and major protocol deviation (1 patient on a heart transplant waiting list from bare stent arm). Hence the per-treatment population includes 56 patients (27 everolimus arm and 29 control) as illustrated in the trial profile (Figure 1). The control arm and the everolimus arm shared similar demographic characteristics except for patients with hypertension which was significantly higher in the everolimus group than in control (Table 1). Procedural characteristics were explained previously[9].

## One-year quantitative coronary angiographic analysis (Table 2)

Nine patients did not have qualifying follow-up angiogram up to 1 year for the following reasons: a) patients withdrew from the clinical trial after the 30-day follow-up visit (1 patient in the everolimus



Figure 1. Flowchart of patients. QCA, quantitative coronary angiography; IVUS, intravascular ultrasound.

Table 1. Baseline characteristics of the per-treatment patient population and of each treatment group.*

| | Everolimus Stent (n=30) | Bare Stent (n=29) | All patients (n=56) |
|---|---|---|---|
| Age (yrs) | 64±10 | 61±9 | 63±9 |
| Male gender (%) | 70 | 76 | 73 |
| Current smokers (%) | 28 | 31 | 30 |
| Diabetes (%) | 11 | 10 | 11 |
| Hypertension requiring Medication (%) | 70 | 41 | 55 |
| Hyperlipidemia requiring Medication (%) | 70 | 76 | 73 |
| Prior intervention (%) | 19 | 7 | 13 |
| Prior MI (%) | 24 | 14 | 19 |
| Stable angina (%) | 78 | 79 | 79 |
| Unstable angina (%) | 19 | 14 | 16 |
| Target vessel (%) | | | |
| Left Anterior Descending | 48 | 45 | 46 |
| Left Circumflex | 22 | 21 | 21 |
| RCA | 30 | 34 | 32 |
| AHA / ACC# Lesion class (%) | | | |
| A | 0 | 10 | 5 |
| B1 | 41 | 28 | 34 |
| B2 | 59 | 62 | 61 |
| C | 0 | 0 | 0 |
| Reference vessel diameter (mm±SD) | 2.61±0.40 | 2.71±0.28 | 2.66±0.34 |
| Lesion length (mm±SD) | 10.1±2.6 | 10.9±3.3 | 10.5±3.0 |

* There were no significant differences between the treatment groups except for Hypertension Requiring Medication (P=0.04)
# AHA / ACC = American Heart Association / American College of Cardiology.



Table 2. Results of sub-segmental quantitative coronary angiographic analysis (Serial analysis)

| | Proximal Edge | | | In-Stent | | | Distal Edge | | | In-Segment Analysis | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value | Everolimus-Stent (n = 20*) | Uncoated Stent (n = 25*) | P-value |
| **Reference vessel diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.81±0.36 | 2.98±0.33 | 0.27 | 2.74±0.29 | 2.80±0.32 | 0.61 | 2.70±0.31 | 2.71±0.32 | 0.95 | 2.69±0.33 | 2.74±0.34 | 0.81 |
| At 6 months | 2.79±0.34 | 2.64±0.43 | 0.10 | 2.74±0.31 | 2.57±0.39 | 0.12 | 2.66±0.37 | 2.44±0.38 | 0.06 | 2.65±0.36 | 2.58±0.38 | 0.50 |
| At 1 year | 2.75±0.34 | 2.64±0.39 | 0.29 | 2.65±0.32 | 2.52±0.38 | 0.22 | 2.59±0.39 | 2.40±0.39 | 0.12 | 2.59±0.37 | 2.53±0.38 | 0.62 |
| **Minimal luminal diameter (mm)** | | | | | | | | | | | | |
| After procedure | 2.56±0.44 | 2.60±0.43 | 0.93 | 2.40±0.25 | 2.42±0.26 | 0.91 | 2.29±0.38 | 2.20±0.45 | 0.54 | 2.15±0.32 | 2.11±0.37 | 0.56 |
| At 6 months | 2.47±0.48 | 2.15±0.51 | 0.04 | 2.28±0.33 | 1.53±0.40 | < 0.001 | 2.23±0.32 | 1.99±0.46 | 0.08 | 2.07±0.38 | 1.49±0.39 | < 0.001 |
| At 1 year | 2.44±0.47 | 2.12±0.48 | 0.03 | 2.16±0.37 | 1.58±0.44 | < 0.001 | 2.26±0.38 | 1.96±0.43 | 0.05 | 2.01±0.41 | 1.52±0.42 | < 0.001 |
| **Late loss (mm)** | | | | | | | | | | | | |
| At 6 months | 0.09±0.19 | 0.45±0.42 | <0.01 | 0.12±0.22 | 0.89±0.39 | < 0.001 | 0.06±0.21 | 0.21±0.41 | 0.10 | 0.08±0.20 | 0.62±0.39 | < 0.001 |
| At 1 year | 0.12±0.25 | 0.48±0.39 | < 0.001 | 0.24±0.27 | 0.84±0.45 | < 0.001 | 0.03±0.05 | 0.25±0.42 | 0.04 | 0.14±0.24 | 0.59±0.42 | < 0.001 |
| **Diameter stenosis (%DS)** | | | | | | | | | | | | |
| After procedure | 9±11 | 13±9 | 0.53 | 12±6 | 13±7 | 0.36 | 15±10 | 19±11 | 0.22 | 20±6 | 23±9 | 0.18 |
| At 6 months | 12±14 | 18±18 | 0.17 | 17±7 | 41±14 | < 0.001 | 16±8 | 19±14 | 0.95 | 22±11 | 42±13 | < 0.001 |
| At 1 year | 11±13 | 19±15 | 0.12 | 18±13 | 37±17 | < 0.001 | 13±8 | 18±14 | 0.24 | 22±15 | 40±16 | < 0.001 |

*Patients who underwent angiography at 6 months as well as 1 year.

arm and 1 in the control arm); b) patients refused (3 in the everolimus arm and 3 in the control arm); c) angiogram was not analyzable (1 in the everolimus arm). Serial angiographic follow-up data, which is reported in this paper, were available in 80.4% (45/56) of the per-treatment population, with 74.1% (20/27) in the everolimus arm and 86.2% (25/29) in the control arm (Table 2). The follow-up in-stent MLD was significantly larger in the everolimus arm than in the control arm and the preservation of MLD between 6 months and 1 year was observed (2.28±0.33 mm at 6 months; 2.16±0.37 mm at 1 year) The mean in-stent late loss and % diameter stenosis were 0.24 mm and 18%, respectively, in the everolimus-stent group, as compared with 0.84 mm and 37%, respectively, in the control arm (p < 0.001 for each comparison). Figure 2 shows the cumulative frequency of in-stent late loss immediately after the index procedure at 6 months and 1 year in each

treatment group. The late luminal loss at both the proximal and the distal edges of the stent was less in the everolimus-stent group than in the control arm (p < 0.001 for proximal and p = 0.04 for distal). The in-segment late loss was significantly less in the everolimus arm than in the bare stent arm (p < 0.001).

## One-year intravascular ultrasound evaluation (Table 3)

In this 1-year report, data in patients who underwent IVUS at 6 months as well as 1 year were presented to identify the volumetric change in serial IVUS examination. Forty-one patients (18 in the everolimus arm; 23 in the control arm) out of 47 patients with 1-year angiography underwent a 1-year IVUS examination. In the remaining

Table 3. Serial IVUS measurements at 1 year follow-up

| | | Everolimus-Stent | Uncoated-Stent | P-value |
| --- | --- | --- | --- | --- |
| Vessel volume (mm³) | 6 months | 296±90 | 291±74 | 0.89 |
| | 1 year | 286±80 | 290±72 | 0.82 |
| Stent volume (mm³) | 6 months | 137±31 | 138±31 | 0.94 |
| | 1 year | 133±27 | 137±32 | 0.79 |
| In-stent neo-intima volume (mm³) | 6 months | 9±12 | 39±20 | < 0.001 |
| | 1 year | 13±9 | 37±17 | < 0.001 |
| Luminal volume (mm³) | 6 months | 128±34 | 98±29 | 0.03 |
| | 1 year | 120±30 | 100±28 | 0.15 |
| In-stent volume obstruction (%)# | 6 months | 7±9 | 29±14 | < 0.001 |
| | 1 year | 10±7 | 28±12 | < 0.001 |

* Patients who underwent IVUS at 6 months as well as 1 year.
# In-stent volume obstruction=100*(In-stent neo-intima volume/Stent volume)



Figure 2. Cumulative frequency of late loss (in-stent) immediately after stenting.



6 patients, IVUS was not available: 2 were not properly scheduled for IVUS, 2 inability to advance IVUS catheter distal to stent in the everolimus arm; 1 malfunction of IVUS, 1 inability to advance the IVUS catheter distal to the stent in the control arm. Of the 41 patients, 37 patients (16 in the everolimus arm; 21 in the control arm) had serial IVUS data. Everolimus-eluting stent was associated with a significantly reduced degree of in-stent neointimal hyperplasia as well as in-stent% volume obstruction compared to the bare metal stent (13±9 mm³ vs. 37±17 mm³, p < 0.001; 10±7% vs. 28±12%, p < 0.001), reaching a 64% reduction of the in-stent volume obstruction (Table 3). There was no late acquired or persisting stent malapposition observed either at 6 months or at 1 year.

## Major adverse events and clinical outcomes

Table 4 provides results of MACE and target vessel failure for the time points of 1 year. Since the six months follow-up the 1-year results for the everolimus arm included 1 non-Q wave MI due to a spasm during the follow-up IVUS procedure and 2 additional TLRs by PCI. One of these patients had a delayed ballout (TLR) using a non-study drug eluting stent 21 days after the baseline procedure due to a dissection. In the control arm, 1 additional TLR by PCI was observed, this being the patient's 3rd TLR since the index procedure. The hierarchical MACE rate at 1 year was 15.4% for the everolimus arm and 21.4% for the bare stent arm (p=0.59). The MACE rate for the everolimus group increased from 7.7% (2/26) at 6 months to 15.4% (4/26) at 1 year. Three of the 4 overall MACE events in the everolimus group were non-study-device related events. One Q-wave MI was in a non-target vessel, one TLR was due to dissection during the procedure, and one non-Q-wave MI occurred during follow-up IVUS procedure. Total non-hierarchical clinically-driven TLR rates at 1 year were 7.7% in the everolimus arm and 21.4% in the control arm. No adverse effects related to everolimus or the durable polymer were noted. Kaplan-Meier survival estimates were performed for overall MACE (Figure 3). There was no stent thrombosis observed in both arms out to the 1-year time period.

Table 4. Hierarchical Major Adverse Cardiac Events at 1 year in Per-Treatment Population

| Event | Everolimus Stent | | Uncoated Stent | |
|---|---|---|---|---|
| | n | 26 (%) | n | 28 (%) |
| Cardiac death | 0 | 0 | 0 | 0 |
| Myocardial infarction | 2 | 7.6 | 0 | 0 |
| Q-wave | 1 | 3.8 | 0 | 0 |
| Non-Q-wave | 1 | 3.8 | 0 | 0 |
| Reintervention | | | | |
| Clinically driven TLR-CABG | 0 | 0 | 1 | 3.6 |
| Clinically driven TLR-PCI | 2 | 7.7 | 5 | 17.9 |
| Clinically driven TVR-CABG | 0 | 0 | 0 | 0 |
| Clinically driven TVR-PCI | 0 | 0 | 0 | 0 |
| Target vessel failure | 4 | 15.4 | 6 | 21.4 |
| Major adverse cardiac events | 4 | 15.4 | 6 | 21.4 |



*Figure 3. Kaplan-Meier survival curve: MACE. Since the 6-month time point, 1 non-Q wave MI due to a dissection during the follow-up IVUS procedure and 1 clinically-driven additional target lesion revascularization by PCI were observed in everolimus arm. In the control arm, 1 clinically-driven additional target lesion revascularization by PCI was performed.*

## Discussion

One-year clinical and angiographic follow-up from this trial demonstrates that the polymer-controlled release of everolimus from a coronary stent is safe and effective, with no late adverse effects. The superiority in efficacy, as measured by in-stent late loss, of everolimus-eluting stent as compared to bare stent was sustained at 1 year (71% reduction in late loss). The everolimus arm also maintained its superiority to the bare metal arm in the major secondary IVUS endpoint,% volume obstruction, at 1 year (64% reduction). In addition, the everolimus arm also continued to show significantly lower neointimal volume than the bare stent arm at 1 year (65% reduction).

The current strategy of local drug delivery using sirolimus and paclitaxel is the most promising approach to prevent restenosis, but, at the same time, the strategy has the potential liability for impairing endothelial recovery. Developing new compounds may improve on the potential side effects of the current drug-eluting stents, such as delayed healing with re-endothelialization[16] and fibrin[17], early[18] and late stent thrombosis[19]. In this trial, neither stent thrombosis nor other adverse effects related to the drug/durable polymer was observed out to the 1-year time point. On the other hand, an in vitro study has shown that sirolimus enhances tissue factor in human endothelial cell[20]. Effect of everolimus on endothelial cell and its similarity or difference compared to sirolimus will have to be investigated. The significant differences between sirolimus- and paclitaxel-eluting stents have recently been reported to likely exist with regard to angiographic as well as clinical outcomes[21,22]. "New comers" following these 2 pioneers could be competitors if they can, at least, demonstrate performance as effective as these 2 drug-eluting stents. Studies have suggested that angiographic assessment of late loss is associated with an increased restenosis rate[23,24] as well as a higher risk of TLR[25]. However, it still remains to be determined how to interpret the significance of the slight increase in late loss from 6 months (0.12 mm) to 1 year (0.24 mm) observed in this study stent. Moreover, delayed neointimal growth beyond the first 6 to 9 months has been reported in serial IVUS analyses in some trials

EURO PCRONLINE.COM

as documented in everolimus-eluting stent (in-stent volume obstruction, 7% at 6 months to 10% at 1 year), which may raise a concern about potential late catch-up phenomenon of DES[26]. Recent head-to-head comparative studies between sirolimus- and paclitaxel-eluting stent are still limited to short-term results[21,22,25,27-30]. Beneficial short-term outcomes do not necessarily translate in long-term efficacy. For example, late catch-up phenomenon has been experienced in vascular brachytherapy[31]. In this respect, the follow-up period of 1 year still seems relatively short to assess the durable safety and efficacy of one drug-eluting stent. However, neither sirolimus- nor paclitaxel-eluting stent have been associated with gradually increasing MACE over the years[32,33]. Therefore, we could expect a similar lasting treatment effect of this new eluting stent.

## Study limitation

This study with a small patient population provided only safety and efficacy data. Two larger single-blind, randomized controlled studies (The SPIRIT II and SPIRIT III) further evaluating this study stent compared to the paclitaxel-eluting stent for the treatment of coronary artery disease are under way.

## Conclusions

At 1 year, this trial demonstrated that the treatment effect observed at 6 months was sustained at 1 year for everolimus-eluting stent. The in-stent and in-segment late loss in the everolimus arm was reduced by 71% and 78% compared to those in the bare metal arm, respectively. These observations were consistent with IVUS measurements. The 1-year results showed a reduction of neointimal volume by 65% as compared to bare metal stent. A small increase in % volume obstruction in event-free patients was observed from 6 to 12 months, but is considered clinically insignificant. Both the angiographic and IVUS measurements showed that the patency of the target vessel treated with everolimus-eluting stent was maintained at 1 year.

## Acknowledgement

The authors would like to express the invaluable assistance of Stan Fink and Danny Detiège (Guidant, Santa Clara and Guidant Europe) for their valued assistance in reporting this study.

## References

1. Morice MC, Serruys PW, Sousa JE, Fajadet J, Ban Hayashi E, Perin M, Colombo A, Schuler G, Barragan P, Guagliumi G, Molnar F, Falotico R. A randomized comparison of a sirolimus-eluting stent with a standard stent for coronary revascularization. *N Engl J Med.* 2002;346:1773-80.

2. Moses JW, Leon MB, Popma JJ, Fitzgerald PJ, Holmes DR, O'Shaughnessy C, Caputo RP, Kereiakes DJ, Williams DO, Teirstein PS, Jaeger JL, Kuntz RE. Sirolimus-eluting stents versus standard stents in patients with stenosis in a native coronary artery. *N Engl J Med.* 2003;349:1315-23.

3. Colombo A, Drzewiecki J, Banning A, Grube E, Hauptmann K, Silber S, Dudek D, Fort S, Schiele F, Zmudka K, Guagliumi G, Russell ME. Randomized study to assess the effectiveness of slow- and moderate-release polymer-based paclitaxel-eluting stents for coronary artery lesions. *Circulation.* 2003;108:788-94.

4. Serruys PW, Ormiston JA, Sianos G, Sousa JE, Grube E, den Heijer P, de Feyter P, Buszman P, Schomig A, Marco J, Polonski L, Thuesen L, Zeiher AM, Bett JH, Suttorp MJ, Glogar HD, Pitney M, Wilkins GT, Whitbourn R, Veldhof S, Miquel K, Johnson R, Coleman L, Virmani R. Actinomycin-eluting stent for coronary revascularization: a randomized feasibility and safety study: the ACTION trial. *J Am Coll Cardiol.* 2004;44:1363-7.

5. Serruys PW, Ong ATL, Piek JJ, Neumann FJ, van der Giessen WJ, Wiemer M, Zeiher A, Grube E, Haase J, Thuesen L, Hamm C, Otto-Terlouw PC. A randomized comparison of a durable polymer everolimus-eluting stent with a bare metal coronary stent: The SPIRIT first trial. *EuroIntervention.* 2005;1:58-65.

6. Meredith IT, Ormiston J, Whitebourn R, Kay IP, Muller D, Bonan R, Popma JJ, Cutlip DE, Fitzgerald PJ, Prpic R, Kuntz RE. First-in-human study of the Endeavor ABT-578-eluting phosphorylcholine-encapsulated stent system in *de novo* native coronary artery lesions: Endeavor I Trial. *EuroIntervention.* 2005;1:157-164.

7. Costa RA, Lansky AJ, Mintz GS, Mehran R, Tsuchiya Y, Negoita M, Gilutz Y, Nikolsky E, Fahy M, Pop R, Cristea E, Carlier S, Dangas G, Stone GW, Leon MB, Muller R, Techen G, Grube E. Angiographic results of the first human experience with everolimus-eluting stents for the treatment of coronary lesions (the FUTURE I trial). *Am J Cardiol.* 2005;95:113-6.

8. Storger H, Grube E, Hofmann M, Schwarz F, Haase J. Clinical experiences using everolimus-eluting stents in patients with coronary artery disease. *J Interv Cardiol.* 2004;17:387-90.

9. Grube E, Sonoda S, Ikeno F, Honda Y, Kar S, Chan C, Gerckens U, Lansky AJ, Fitzgerald PJ. Six- and twelve-month results from first human experience using everolimus-eluting stents with bioabsorbable polymer. *Circulation.* 2004;109:2168-71.

10. Schuler W, Sedrani R, Cottens S, Haberlin B, Schulz M, Schuurman HJ, Zenke G, Zenwes HG, Schreier MH. SDZ RAD, a new rapamycin derivative: pharmacological properties *in vitro* and *in vivo.* *Transplantation.* 1997;64:36-42.

11. Schuurman HJ, Cottens S, Fuchs S, Joergensen J, Meerloo T, Sedrani R, Tanner M, Zenke G, Schuler W. SDZ RAD, a new rapamycin derivative: synergism with cyclosporine. *Transplantation.* 1997;64:32-5.

12. Farb A, John M, Acampado E, Kolodgie FD, Prescott MF, Virmani R. Oral everolimus inhibits in-stent neointimal growth. *Circulation.* 2002;106:2379-84.

13. Hamers R, Bruining N, Knook M, Sabate M, Roelandt JRTC. A novel approach to quantitative analysis of intravascular ultrasound images. *Computers in Cardiology.* 2001;28:589-592.

14. Kereiakes DJ, Cox DA, Hermiller JB, Midei MG, Bachinsky WB, Nukta ED, Leon MB, Fink S, Marin L, Lansky AJ. Usefulness of a cobalt chromium coronary stent alloy. *Am J Cardiol.* 2003;92:463-6.

15. Stone GW, Ellis SG, Cox DA, Hermiller J, O'Shaughnessy C, Mann JT, Turco M, Caputo R, Bergin P, Greenberg J, Popma JJ, Russell ME. A polymer-based, paclitaxel-eluting stent in patients with coronary artery disease. *N Engl J Med.* 2004;350:221-31.

16. Finn AV, Kolodgie FD, Harnek J, Guerrero LJ, Acampado E, Tefera K, Skorija K, Weber DK, Gold HK, Virmani R. Differential response of delayed healing and persistent inflammation at sites of overlapping sirolimus- or paclitaxel-eluting stents. *Circulation.* 2005;112:270-8.

17. Virmani R, Guagliumi G, Farb A, Musumeci G, Grieco N, Motta T, Mihalcsik L, Tespili M, Valsecchi O, Kolodgie FD. Localized hypersensitivity and late coronary thrombosis secondary to a sirolimus-eluting stent: should we be cautious? *Circulation.* 2004;109:701-5.



18. Ong AT, Hoye A, Aoki J, Van Mieghem CA, Rodriguez Granillo GA, Sonnenschien K, Regar E, Mc Fadden EP, Sianos G, van der Giessen WJ, de Jaegere PT, de Feyter PJ, van Domburg RT, Serruys PW. Thirty-Day Incidence and Six-Month Clinical Outcome of Thrombotic Stent Occlusion Following Bare Metal, Sirolimus or Paclitaxel Stent Implantation. J Am Coll Cardiol. 2005;45:947-953.

19. McFadden EP, Stabile E, Regar E, Cheneau E, Ong AT, Kinnaird T, Suddath WO, Weissman NJ, Torguson R, Kent KM, Pichard AD, Satler LF, Waksman R, Serruys PW. Late thrombosis in drug-eluting coronary stents after discontinuation of antiplatelet therapy. Lancet. 2004;364:1519-21.

20. Steffel J, Latini RA, Akhmedov A, Zimmermann D, Zimmerling P, Luscher TF, Tanner FC. Rapamycin, but not FK-506, increases endothelial tissue factor expression: implications for drug-eluting stent design. Circulation. 2005;112:2002-11.

21. Kastrati A, Mehilli J, von Beckerath N, Dibra A, Hausleiter J, Pache J, Schuhlen H, Schmitt C, Dirschinger J, Schomig A. Sirolimus-eluting stent or paclitaxel-eluting stent vs balloon angioplasty for prevention of recurrences in patients with coronary in-stent restenosis: a randomized controlled trial. Jama. 2005;293:165-71.

22. Windecker S, Remondino A, Eberli FR, Juni P, Raber L, Wenaweser P, Togni M, Billinger M, Tuller D, Seiler C, Roffi M, Corti R, Sutsch G, Maier W, Luscher T, Hess OM, Egger M, Meier B. Sirolimus-eluting and paclitaxel-eluting stents for coronary revascularization. N Engl J Med. 2005;353:653-62.

23. Mauri L, Orav EJ, O'Malley AJ, Moses JW, Leon MB, Holmes DR,Jr., Teirstein PS, Schofer J, Breithardt G, Cutlip DE, Kereiakes DJ, Shi C, Firth BG, Donohoe DJ, Kuntz RE. Relationship of late loss in lumen diameter to coronary restenosis in sirolimus-eluting stents. Circulation. 2005;111:321-7.

24. Mauri L, Orav EJ, Kuntz RE. Late loss in lumen diameter and binary restenosis for drug-eluting stent comparison. Circulation. 2005;111:3435-42.

25. Moliterno DJ. Healing Achilles–sirolimus versus paclitaxel. N Engl J Med. 2005;353:724-7.

26. Aoki J, Abizaid AC, Ong AT, Tsuchida K, Serruys PW. Serial assessment of tissue growth inside and outside the stent after implantation of drug-eluting stent in clinical trials. Does delayed neointimal growth exist? Eurointervention. 2005;1. In press.

27. Dibra A, Kastrati A, Mehilli J, Pache J, Schuhlen H, von Beckerath N, Ulm K, Wessely R, Dirschinger J, Schomig A. Paclitaxel-eluting or sirolimus-eluting stents to prevent restenosis in diabetic patients. N Engl J Med. 2005;353:663-70.

28. Goy JJ, Stauffer JC, Siegenthaler M, Benoit A, Seydoux C. A prospective randomized comparison between paclitaxel and sirolimus stents in the real world of interventional cardiology: the TAXi trial. J Am Coll Cardiol. 2005;45:308-11.

29. Kaiser C, Brunner-La Rocca HP, Buser PT, Bonetti PO, Osswald S, Linka A, Bernheim A, Zutter A, Zellweger M, Grize L, Pfisterer ME. Incremental cost-effectiveness of drug-eluting stents compared with a third-generation bare-metal stent in a real-world setting: randomised Basel Stent Kosten Effektivitats Trial (BASKET). Lancet. 2005;366:921-9.

30. Kastrati A, Dibra A, Eberle S, Mehilli J, Suarez de Lezo J, Goy JJ, Ulm K, Schomig A. Sirolimus-eluting stents vs paclitaxel-eluting stents in patients with coronary artery disease: meta-analysis of randomized trials. Jama. 2005;294:819-25.

31. Grise MA, Massullo V, Jani S, Popma JJ, Russo RJ, Schatz RA, Guarneri EM, Steuterman S, Cloutier DA, Leon MB, Tripuraneni P, Teirstein PS. Five-year clinical follow-up after intracoronary radiation: results of a randomized clinical trial. Circulation. 2002;105:2737-40.

32. Fajadet J, Morice MC, Bode C, Barragan P, Serruys PW, Wijns W, Constantini CR, Guermonprez JL, Eltchaninoff H, Blanchard D, Bartorelli A, Laarman GJ, Perin M, Sousa JE, Schuler G, Molnar F, Guagliumi G, Colombo A, Ban Hayashi E, Wulfert E. Maintenance of long-term clinical benefit with sirolimus-eluting coronary stents: three-year results of the RAVEL trial. Circulation. 2005;111:1040-4.

33. Grube E, Silber S, Hauptmann KE, Buellesfeld L, Mueller R, Lim V, Gerckens U, Russell ME. Two-year-plus follow-up of a paclitaxel-eluting stent in de novo coronary narrowings (TAXUS I). Am J Cardiol. 2005;96:79-82.



# EXHIBIT 3

UNITED STATES POSTAL SERVICE

First-Class Mail
Postage & Fees Paid
USPS
Permit No. G-10

• Sender: Please print your name, address, and ZIP+4 in this box •

June M. Sutton
Young Conaway Stargatt & Taylor, LLP
P.O. Box 391
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19899

---

**SENDER: COMPLETE THIS SECTION**

- Complete items 1, 2, and 3. Also complete item 4 if Restricted Delivery is desired.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Johnson & Johnson, Inc.
One Johnson & Johnson Plaza
New Brunswick, NJ 08933

**COMPLETE THIS SECTION ON DELIVERY**

A. Signature
X  E. Gresh
☐ Agent
☐ Addressee

B. Received by ( Printed Name )
E. Gresh
C. Date of Delivery
12/2/07

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

NEW ... DEC 3 2007 ...3901

3. Service Type
☐ Certified Mail   ☐ Express Mail
☐ Registered       ☐ Return Receipt for Merchandise
☐ Insured Mail     ☐ C.O.D.

4. Restricted Delivery? (Extra Fee)   ☐ Yes

2. Article Number
(Transfer from service label)
RE 088 591 635 US

PS Form 3811, February 2004        Domestic Return Receipt        102595-02-M-1540